## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RAYONIER PERFORMANCE FIBERS,
LLC.,

     Plaintiff,                 Case No.:

v.

CITY OF FERNANDINA BEACH,
FLORIDA,

     Defendant.

_____/

## COMPLAINT

COMES NOW, Plaintiff RAYONIER PERFORMANCE FIBERS, LLC ("RYAM"), files this Complaint against the CITY OF FERNANDINA BEACH (the "City"), by and through its Board of City Commissioners, and states as follows:

### I.    PARTIES

1.    RYAM, is a foreign limited liability company incorporated in the state of Delaware, whose principal place of business is Jacksonville, Florida, with operations at 10 Gum Street, Fernandina Beach, Florida.

2.    The City is a municipal corporation located within the geographic boundaries of Nassau County, Florida. The City has comprehensive planning and

land use authority within its geographic boundaries, pursuant to Chapters 163 and 166, Florida Statutes.

## II.    JURISDICTION

3.    Jurisdiction to hear Plaintiff's claims under the Civil Rights Act of 1871, 42 U.S.C. § 1983, "its jurisdictional counterpart," 28 U.S.C. § 1343(a)(3) and 28 U.S.C. §§ 2201 *et seq.*, exists. This is an action for a declaratory judgment and damages to redress the past deprivation and prevent the further deprivation by the defendants, acting under color of state law and ordinance, of Plaintiff's rights secured by the Constitution of the United States, namely the Equal Protection Clause of the U.S. Const. Amend. XIV.

## III.    VENUE

4.    Venue in the Middle District of Florida is proper under 28 U.S.C. § 1391(b)(1) & (2) given that the Defendant is the City of Fernandina Beach, Florida, RYAM's subject real property is situated in the City of Fernandina Beach, Florida and a substantial portion of the acts underlying this action occurred in this district.

## IV.    GENERAL ALLEGATIONS

### A.    The RYAM Facility

5.    RYAM owns and operates an acid sulfite-based pulp mill in Fernandina Beach, Florida that produces dissolving pulp (the "RYAM Facility").

2

6.     The RYAM Facility was created in the 1930s because of economic demand and scientific breakthroughs in the cellulose market.

7.     The impact of the Great Depression prompted local City officials to turn to heavy industry, particularly the forest industry, to bolster the local economy.

8.     An agreement between local leaders and RYAM's former parent company Rayonier was reached to construct a pulp mill, which built in 1937, and became operational in 1939 when the first pulp sheet came off the machine.

9.     By 1940, the RYAM Facility employed 500 people, who accounted for 20% of the City's total population in 1940.

10.    During World War II, the RYAM Facility produced nitrating pulp used in munitions and its machine shop-built propellers for the Navy to support the United States' war effort.

11.    Following the war, the City's population grew by approximately 60% with 33% of the population being employed by the RYAM Facility and the other mill currently owned by Smurfit WestRock.

12.    As of 2025, the RYAM Facility continues to be one of the top employers in the City and Nassau County, employing approximately 314 people.

13.     In addition to the economic benefits RYAM has brought to the City in its more than eight (8) decades of operation, it has also invested significantly in sustainable manufacturing practices.

14.     In 1976, RYAM constructed an $80 million waste treatment system.

15.     In the early 2000's, RYAM added a $30 million power generation system that implemented a new boiler designed to burn biomass instead of fossil fuels, reducing air emissions.

16.     In 2010, RYAM took action to reduce the facility's sulfur dioxide emissions, improving its vent gas scrubber system.

17.     This investment in air quality technology allowed Nassau County to be the first county in the United States to be re-designated as having attained ambient air quality standards after having initially been designated under the category of "non-attainment" for sulfur dioxide.

18.     The project that forms the basis of the present dispute between the City and one of its oldest corporate partners is the next chapter in RYAM's investment in technological solutions to increase economic opportunity and reduce environmental impacts within the City.

**B.    The Project**

19.    One of the byproducts of RYAM's pulping process is spent sulfite liquor ("SSL"). SSL contains unused biomass components from the wood chips RYAM uses to make its specialty cellulose products.

20.    Currently, RYAM either burns the SSL in its Sulfite Recovery Boiler for energy or sells it to LignoTech Florida, LLC ("LignoTech").

21.    Consistent with its long history of sustainable operations, RYAM proposes to construct a project within the existing footprint of the RYAM Facility to convert the existing SSL by-product through the biological process of fermentation into second-generation bioethanol, a renewable energy source (the "Project").

**C.    The City's Site Plan Amendment Process**

22.    The City's Land Development Code ("LDC") requires RYAM to submit a site plan amendment application to receive approval for the Project.

23.    Sections 11.01.03 and 11.01.04, LDC set forth the application requirements for site plan amendment approval.

24.    Table 11.01.01 identifies the City Manager as the person responsible for final review and decision making on a site plan amendment.

25.     The City Commission has no authority to review, conduct hearings on, or approve or deny site plan amendment applications under the LDC.

26.     Section 11.03.00, LDC identifies review and decision-making procedures for various applications, including site plan amendment applications. The applicable review criteria and procedures depend on the type of approval sought.

27.     Section 11.03.31(A) provides that **all** applications are subject to a determination of completeness. In the context of a site plan, this review includes a determination by the City that all applicable information required in Sections 11.01.03 and 11.01.04, LDC have been submitted.

28.     Once a site plan application is deemed complete, it is required to be submitted to the Technical Review Committee ("TRC") within three days pursuant to Section 11.03.02(A), LDC. Section 11.03.02 states that all applications for site plans **shall** be reviewed by the TRC (*emphasis added*). Section 11.03.02(A-M) provides for the specific review procedures of the TRC.

29.     Under Sections 9.0503(A) and 11.0302, LDC, the TRC must prepare a preliminary compliance report and hold a public meeting to consider the preliminary compliance report and any proposed revisions to the application. If

the application fails to comply with the standards and criteria set forth in the LDC, the compliance report must specifically identify the manner in which the application is deficient, including a citation of applicable sections of the LDC.

30.     The TRC consists of representatives from various City Departments, including Planning and Zoning, Utility, Building, Facilities Maintenance, and Fire pursuant to Section 9.05.02, LDC.

31.     The City has deliberately and maliciously failed to follow the process set forth above in its review of RYAM's site plan amendment application.

**D.     The City's Comprehensive Plan and Land Development Code**

32.     The City has adopted a Comprehensive Plan, pursuant to Chapter 163, Florida Statutes.

33.     The City's LDC was adopted to implement the Comprehensive Plan.

34.     State law requires that development orders like the site plan amendment for which RYAM applied be consistent with the City's Comprehensive Plan and LDC. However, the City has never adopted an ordinance pursuant to Section 163.3215, Florida Statutes, to create a statutorily permitted consistency review process.

35.     The RYAM Facility has an Industrial (IN) Future Land Use Map ("FLUM") designation under the Comprehensive Plan.

7

36.     The Comprehensive Plan Policy 1.07.12. describes permissible uses in

the "IN" future land use category as follows:

**Policy 1.07.12. Industrial (IN)**
a.     The industrial land use category is intended to recognize existing industrial development, appropriate open air recreation activities and animal shelter, and to ensure the availability of land for industrial and airport purposes.
b.     The intensity of industrial development shall not exceed a FAR of 0.75.
c.     Industrial sites should have transportation access by air, rail, or highway.
d.     ***Industrial    uses    include***:    airport    dependent    uses, ***manufacturing, assembling and distribution activities***; warehousing and ***storage activities***; ***green technologies***, general commercial activities; integral airport related support services such as rental car facilities, parking facilities; ***and other similar land uses.***
***

*g.     Heavy metal fabrication, batch plants, salvage yards, **chemical** or petroleum **manufacturing or refining**, rubber or plastics manufacturing, or other uses generating potentially harmful environmental or nuisance impacts shall be prohibited.*
***

City of Fernandina Beach, Fla., 2030 Comprehensive Plan, Goal 1, Objective 1.06.,

Pol'y 1.07.12. (emphasis added).

37.     The Project is a permissible use under Policy 1.07.12.

38.     The application also meets the LDC provisions that implement the IN

future land use designation. The RYAM facility is presently zoned, Heavy

Industrial I-2 under the LDC.

8

39.     The LDC defines "Manufacturing and/or Assembly-Heavy"

(hereafter the "Heavy Manufacturing" definition) as follows:

> *[U]ses involving **intensive manufacturing and industrial operations**,* including the ***manufacturing***, assembly, fabrication, ***compounding, processing and/or treatment of extracted or raw materials or other industrial products***; packaging and freight loading/unloading activities; ***utilization, handling and bulk* storage *of materials including raw materials, chemicals and hazardous materials* associated *with manufacturing processes; and all other associated or ancillary activities*.

City of Fernandina Beach, Fla., Land Dev. Code § 1.07.00 (2023) (emphasis added).

40.     The Project fits squarely within the description of the types of uses and activities included in this definition. The Project proposes the processing and treatment of SSL, an extracted material, and the utilization, handling and bulk storage of materials, including chemicals and hazardous materials associated with the pulp manufacturing process.

41.     The Heavy Manufacturing definition further specifies that "all other associated or ancillary activities" are also included in the definition and authorized in the Heavy Industrial I-2 zoning district. Here, the Project is an "associated or ancillary activity" to the existing and permitted pulp manufacturing use.

42.     Using the SSL, as proposed by the Project, is closely connected and subordinate to the pulp manufacturing process because without the pulping operations, the sugars in the biomass would not be available for fermentation.

43.     Similar to the description of the IN-Industrial land use category in the Plan, the Heavy Manufacturing definition also includes the following sentence:

> Such use does not include heavy metal fabrication, batch plants, salvage yards, chemical or petroleum manufacturing or refining, rubber or plastics manufacturing, or other uses generating potentially harmful environmental or nuisance impacts.

City of Fernandina Beach, Fla., Land Dev. Code § 1.07.00 (2023).

44.     Even though the Project clearly fits within the Comprehensive Plan and LDC definitions that describe what is permissible in the Heavy Manufacturing zoning district and IN future land use designation, opponents of the Project, including former and current members of the City Commission and the Board of Adjustment, have taken the irrational position that the Project represents either chemical manufacturing or chemical refining, which are not permitted.

45.     The City Staff's machinations to bow to political pressure from the community, candidates for political offices, and members of the City Commission to adopt this erroneous interpretation are at the heart of this dispute.

### E.    Fermentation is Not Chemical Manufacturing

46.    The Project's proposed method of creating bioethanol relies on the same fermentation process used in making beer, yogurt, and certain baked goods.

47.    This process is distinct from chemical manufacturing, which is generally understood by the industry to refer to the industrial production of chemicals through chemical reactions involving non-living substantives.

48.    The distinction between creating bioethanol through fermentation and chemical manufacturing is recognized by state and federal regulatory agencies that govern the industry. This is significant because the City itself has never adopted a definition for "chemical," "chemical manufacturing," or "chemical refining."

### F.    Physical Separation is Not Chemical Refining

49.    Once bioethanol is made through fermentation, it can be isolated depending on the end use.

50.    In the case of the proposed Project, the fermented bioethanol mixture will be distilled and then dried using molecular sieves to physically remove water contained in the alcohol so that the bioethanol can be used as a clean energy fuel source.

51.     Distillation and drying are physical processes, relying on temperature differences and mechanical separation to segregate the bioethanol. By contrast, chemical refining is a process that involves the use of chemical reactions, often through the addition of chemical agents that react with impurities.

52.     The distillation proposed by the Project is identical to the process used to make distilled spirits.

53.     Just as chemical manufacturing does not encompass the production of bioethanol through fermentation, "chemical refining" does not encompass the processes of "drying and distillation."

54.     In fact, the City has recognized the distinctions between chemical manufacturing and chemical refining and the production methods proposed by the Project by approving the making of beer, yogurt, and even wastewater treatment through the use of living organisms, and the distillation of ethanol intended for drinking within the City limits.

## G.     The Air Permit

55.     On November 14, 2023, RYAM submitted an application for a Title V air construction permit to the Florida Department of Environmental Protection ("FDEP").

56.    FDEP issued a Notice of Intent to Issue the air permit on March 13, 2024, which RYAM published on March 27, 2024.

57.    However, before FDEP's Notice of Intent was even published, the spouse of a City Commissioner obtained a copy of the draft permit and Public Notice of Intent to Issue through a Public Records Request to FDEP.

58.    On March 26, 2024, several citizens asked FDEP for an extension of time to file a petition for formal administrative hearing. One of the citizens that requested the extension of time to challenge the permit was Taina Christner, current member of the City's Board of Adjustment.

59.    Ultimately, a single petitioner, Tom Budd, filed a petition challenging the air construction permit sought by RYAM before voluntarily withdrawing his petition for administrative hearing.

60.    FDEP issued RYAM the air construction permit on October 31, 2024 (the "Air Permit").

61.    The Air Permit issuance and its supporting application documents were based on environmental standards that are distinct from the LDC's criteria for the issuance of a site plan amendment. Significantly, the air permit application process did not evaluate whether the Project qualified as either chemical

13

manufacturing or chemical refining. Consequently, the Air Permit application and FDEP's evaluation of it have no relevance to the City's review of RYAM's site plan amendment application. Nevertheless, as discussed below, the City improperly considered and misinterpreted the Air Permit application materials in its efforts to fabricate plausible grounds upon which RYAM's site plan amendment application could be denied before the application was even made.

## H. The Illegal Actions Taken By the City and the Commission Members Preceding RYAM's Application Submission

### 1. Prejudgment by the City and Commission Members Based on the Air Permit Application

62. Well before RYAM submitted any application to the City, there was public opposition to the Project.

63. At a City Commission meeting on February 20, 2024, resident Jack Imber raised concerns regarding ethanol production during public comments, referring to a sugar dust explosion at an unrelated facility and made the generic statement that ethanol can explode.

64. During the same meeting, then-City Commissioner Chip Ross asked the City Attorney, Tammi Bach the following: "There has been talk about a bioethanol plant and one of the questions that I have been asked for …is whether that is an allowable use in the City. And umm. Will you get an opinion on that?"

65.    Ms. Bach responded that it was her plan to get an outside written legal opinion because members of the community expressed beliefs that a bioethanol plant is a chemical manufacturing processing plant, which is not permitted under the City's Comprehensive Plan and Land Development Code.

66.    At the time of the February 20, 2024, meeting, RYAM had not submitted an application to the City for review or approval.

67.    Public commentary about permitted land uses is not a mechanism for a site plan application evaluation to be initiated under the LDC.

68.    Nevertheless, based solely on the premature request of a single City Commissioner and generalized community concerns, the City Attorney engaged the law firm of Weiss, Serota, Helman, Cole and Bierman ("Weiss Serota") to provide the opinion she promised Commissioner Ross.

69.    Commissioner Ross's apparent animus towards RYAM extended not only to a premature denial of the proposed Project, but also drove him to seek a way for the RYAM Facility to be deemed a "non-conforming use" – a designation with the potential to limit RYAM's reasonable beneficial use of its property.

70.    On March 20, 2024, the City Attorney provided Weiss Serota with copies of her memorandum requesting a legal opinion, which recited

Commissioner Ross's legal question and personal comments regarding what he believed to be the facts surrounding the Project, as well as the Air Permit backup documentation obtained from FDEP. These materials served as the basis for Weiss Serota to evaluate consistency of the Project with the City's Comprehensive Plan and LDC.

71.    Additionally, Planning Director Kelly Gibson provided documents related to an entirely different, unrelated project co-located at the RYAM Facility as background for how the City viewed things in 2016, which she likened to a "basket of kittens. 😊". In Director Gibson's March 27, 2024, email to Weiss Serota she referred to information that might help thwart RYAM's future project as "pearls" and the effort to stop RYAM before it even applied a "critical issue," stating:

> Good Afternoon,
>
> I am providing several documents that discuss the history surrounding Lignotech. I will also investigate their air permit application and send that over separately. There is one document "NEFRC_102016" which captures my written statements provided at the regional council meeting from when we went to defend the Comp Plan changes. This may provide some insight on how we were viewing things at that time.
>
> During this trip down memory lane, I was reminded that amid this difficult topic we were simultaneously processing LDC definitional

changes for heavy industry, modifying the City's floodplain management ordinance, and establishing Zoning Map change to create the I-2 zoning district. I bundled in some of those meeting minutes too. The year 2016 was akin to accepting a basket of kittens. 😊 If you find any pearls in here and want me to look for more details, just let me know!

Thank you again for your expertise on this critical issue.

72.    What Weiss Serota was not provided with was any technical information from anyone with both the requisite expertise and knowledge of RYAM's proposal and the specific production process being proposed, or any information regarding how the industry or other regulatory authorities view that production process.

73.    When RYAM became aware of the City Attorney's decision to procure an opinion from a private law firm before an application was even submitted, RYAM advised the City Attorney that it had a right to submit an application to the City and have it reviewed pursuant to the City's requirements, separate and apart from the Air Permit application to FDEP. RYAM emphasized that this procedural right would be violated by the City's procurement of an opinion from outside counsel.

74.    Additionally, to supplement the woefully inadequate materials provided to Weiss Serota by the City's Planning Director, RYAM provided the City

Attorney with information describing the Project in more detail, explaining how it would be sited within the footprint of the current pulping operations, and defining the fermentation, distillation, and drying process.

75.    The City Attorney actually requested that RYAM provide this supplemental material so it could be provided to the City's outside counsel, but upon information and belief, the City never intended to and, in fact, did not, provide RYAM's information to Weiss Serota.

76.    Further, behavior by the City Commissioners makes clear that the Weiss Serota memorandum was requested in bad faith and merely as a pretext to deny RYAM's Project before it was ever requested.

77.    On May 9, 2024, Vice-Mayor Ayscue told the Fernandina Observer in an article titled "Bioethanol Activists Get Little Support from Four Commissioners" that his position was simple: "if outside attorneys advise that the bioethanol plant violates city laws, *__the commission__* – not the City Manager – will not allow the proposal to move forward". The Vice-Mayor made this statement, even though the City Commission has no legitimate role in the evaluation or approval of site plan amendments under the City's adopted zoning code.

78.     When this statement was made, the Vice Mayor and the Commissioners sufficient interfered and intervened in the process of obtaining an outside counsel's opinion to ensure that the Weiss Serota opinion would conclude "that the bioethanol plan violates city laws."

79.     Likewise, in an April 15, 2024, email to Suzanne Dixon, then-Commissioner Ross assured her that, when the Weiss Serota opinion is given, "[a]t that point, I will ask the Interim City Manager [Charlie George] - who has the authority to make the final decision - to determine if the use is allowed."

80.     Understanding the request for the Weiss Serota memorandum in this context, it is evident that proper technical information was never provided to the Weiss Serota lawyers lest they arrive at anything other than the Commissioners' foregone conclusion and that this was deliberately hidden from RYAM and the public.

### 2.     The RYAM Open House

81.     Despite facts to the contrary, deflecting attention away from their own actions, certain members of the City Commission and community members accused RYAM of being secretive and not forthcoming about the Project.

82.     At the urging of and under pressure from the City and City Commissioners, RYAM hosted an Open House at the RYAM Facility on March 6,

2024, having been led to believe that it would be able to rebut the unfounded accusations lodged against the Project.

83.    The purpose of the Open House was for RYAM to provide the public access to all available information about the Project *at that time*. RYAM also provided attendees access to its engineers, technical support personnel, local Fernandina Beach site management, its environmental and safety professionals, and lawyers.

84.    More than 100 people, including television news media and newspaper reporters, attended the Open House, which was conducted in a science fair format with informational tables and RYAM employees available to answer questions.

85.    RYAM also responded to news media requests for interviews at the Open House.

86.    Critically, at the time of the Open House, RYAM did not have all of the information necessary to make a complete site plan application to the City, which it repeatedly explained to the City and City Commissioners.

87.     It was not until December 2024, that RYAM had the requisite design, engineering, safety, and other information required to submit a complete site plan application.

88.     More importantly, the City's LDC does not require or even provide a process for presenting a site plan amendment application to the City Commission, to the public at an open house or other public meeting, or to outside lawyers for a plan interpretation , particularly before the application has even been submitted.

89.     Moreover, no other site plan amendment applicant has ever been required to submit to the type of public scrutiny and City Commission review as the City demanded of RYAM.

*3.      The May 23, 2024, Weiss Serota Memo*

90.     On May 23, 2024, Weiss Serota delivered its memorandum titled "Request for Legal Opinion – Adding Bioethanol Plant to Existing Industrial Use" (the "Weiss Serota Memo").

91.     The Weiss Serota Memo was based entirely on the misapprehension, apparently derived from a misreading of the Air Permit application materials, that a separate plant – similar to Lignotech - would be constructed for the bioethanol production.

92.     This misapprehension was the intentional and deliberate result of the City giving Weiss Serota incomplete and misleading information while also intentionally withholding from Weiss Serota the information that had been solicited from RYAM.

93.     Tellingly, the Weiss Serota Memo acknowledges that its opinion was solicited "...*prior to receiving an application from the property owner*." The Weiss Serota Memo also states that, "[t]he City is aware of this plan because RYAM has filed an air construction permit application with the Florida Department of Environmental Protection ("FDEP") requesting authority to add the Bioethanol Plant to be co-located with the RPF Plant."

94.     Nothing in the Weiss Serota Memo suggests that its authors consulted with, or relied upon input from, or were themselves persons familiar with the bioethanol production industry.

95.     Further, because Weiss Serota did not have the application ultimately submitted by RYAM, it made many errors in its assumptions about the RYAM project.

96.     Concerning these errors to its assumptions, first, while Weiss Serota acknowledges the existence of different processes for converting sugar into

bioethanol, it fails to distinguish between the one that is a natural fermentation process and the one that is a chemical process. After describing both, without recognizing the difference between the two processes described, Weiss Serota concludes "[c]ellulosic production is *the process* that would *typically* be followed for a plant like the proposed at issue."

97.     The Weiss Serota Memo then takes a sharp turn in declaring that the key issue is whether ethanol is a chemical. The Weiss Serota Memo concludes that bioethanol is a chemical substance and therefore bioethanol production must be a form of "chemical manufacturing."

98.     Without any reservation or caveat that an application by RYAM to the City should be reviewed and analyzed, the memorandum predictably concludes, "[i]n sum, it is our opinion that the proposed Bioethanol Plant is not an allowable use consistent with the City's Comprehensive Plan and LDC" – just as intended by the City Commission, City Attorney, and City Planning Director.

99.     The memorandum further concludes without reservation that "[i]f the City wanted to consider allowing the proposed Bioethanol Plant, it would need to amend both the Comprehensive Plan and the LDC to allow for it…."

100.    Following issuance of the Weiss Serota Memo, on June 6, 2024, RYAM's attorneys met with the City Attorney to address the inaccuracies and the prejudice to RYAM created by the memorandum.

101.    While the City Attorney invited RYAM to provide a different interpretation of the Comprehensive Plan and Land Development Code, the Weiss Serota Memo was never rescinded or updated in light of RYAM's application, which included extensive technical analysis of the relationship between RYAM's proposed bioethanol production process and the technical meaning of the phrases "chemical manufacturing" and "chemical refining."

102.    This invitation to RYAM was not made in good faith by the City Attorney as the City and the Commissioners had already decided that they would prevent the Project regardless of the actual directions and obligations of the LDC.

>    *4.    The City's Attack on RYAM's Credibility, the Project, and Predetermination of Consistency*

103.    Having received the Weiss Serota Memo he asked for, then-City Commissioner Chip Ross continued his predetermined campaign, prior to a formal application being made by RYAM, to ensure that the Project would not and could not be approved despite the legal obligations to the contrary.

104.    At a public meeting hosted by the Florida nonprofit corporation, Fernandina Wins LLC d/b/a NoEthanolFernandina on May 30, 2024, then-Commissioner Ross told the crowd that he wrote an email to the interim city manager asking him to make an interpretation of whether a bioethanol plant was an allowable use in the city, even though no application was pending before the City.

105.    Again, then-Commissioner Ross's statements were made in order to mislead RYAM and the public as he already knew and intended that the interim city manager's interpretation would be against finding an allowable use.

106.    Knowing that the Project was, in fact, permissible and his machinations might fail, then-Commissioner Ross worked behind the scenes for a proposed comprehensive plan policy change to expressly prohibit bioethanol. This is a clear acknowledgement that the existing policy did not, in fact, prohibit the production of ethanol through fermentation.

107.    Then-Commissioner Ross was warned against such a plan by the City Attorney who advised in an email that such a change to "expressly prohibit 'bioethanol' at this time is a big legal liability for the City under the Bert Harris Act and potentially federal takings law."

108.    Instead, the City Attorney advised then-Commissioner Ross that the best way to accomplish the former Commissioner's biased objectives was to "to stick with [the] current position from what we know about RYAM's proposed bioethanol project, it is 'chemical manufacturing' that has been prohibited by the City's Comprehensive Plan for many, many years."

109.    When giving this advice, both the City Attorney and then-Commissioner Ross knew and worked to conceal the falsity of this position.

110.    On August 20, 2024, the City Attorney forwarded her July 17, 2024, correspondence with Mr. Ross to the entire City Commission and copied City Staff members.

111.    In this message, the City Attorney supported her position by telling the Commissioners that the Weiss Serota opinion was ***binding***. The City Attorney knew that this statement was untrue.

112.    She stated, "[b]ased upon the written legal opinion the City has received from outside counsel, City staff could not today approve a building permit application for construction of a bioethanol plant anywhere in the City." She continued, "[t]here is no danger of the City issuing a building permit for a bioethanol plant, at this time."

113. Thus, according to the City Attorney, the City procured, at the direction of a single City Commissioner, the legal opinion of a private law firm without first allowing the landowner the right to submit an application, technical expert information, or even legal argument for consideration by either the City or the private law firm whose opinion was then considered binding on the landowner.

114. This position was communicated to the press and repeated in several different fora, thus foreclosing any chance at a fair hearing on RYAM's application when it was eventually filed.

115. By communicating this position to the public over and over again, the City, City Commissioners, and City Attorney mislead the public, fomenting irrational animus against RYAM.

5. *The September 3, 2024, City Commission Meeting*

116. In response to continuing public comments that RYAM was secretly attempting to construct the Project, RYAM representative Mark Homans had no choice but to appear and speak at the September 3, 2024, City Commission meeting.

117. He provided information regarding RYAM's public statements about the proposed Project, the air permit application process with FDEP, the Open

House hosted by RYAM and attended by 175 people, one-on-one meetings with members of the community, and RYAM's attendance at several other small community group events where the Project was discussed.

118.    Mr. Homans confirmed that RYAM would follow the City's process for applying to the TRC, including answering questions from City Staff and the public during the TRC public meeting.

119.    Additionally, he clearly stated that RYAM expected the City to fairly evaluate RYAM's application without any preconceptions.

120.    Then-Commissioner Ross asked Mr. Homans, "just one question is manufacturing of bioethanol a chemical manufacturing process?" Mr. Homans responded, "[i]t is not, and we will be prepared to explain that in the application."

121.    Then-Commissioner Ross asked this question despite knowing that he and the other commissioners, along with the City Attorney, had already determined to improperly adopt the position that the manufacturing of bioethanol was a chemical manufacturing process.

122.    Despite RYAM not having an application pending before the City and there being no provision authorizing review of site plan amendment applications by the City Commission, at this same meeting, Interim City Manager Jeremiah

Glisson announced that the City Staff was working on dates for another Town Hall to hear feedback from the community for the Bioethanol plant process by RYAM. He stated, "…so we are looking at dates later on in the next few months to accomplish that."

123.    Both Mr. Glisson and current-Mayor James Antun had communicated with Mark Homans of RYAM before the City Commission meeting asking him to commit to an unspecified date in the future for RYAM to give a presentation regarding the Project at a City Commission meeting.

124.    In fact, Mayor Antun commented at the September 3 City Commission meeting that he would "[l]ike to edify Mr. Jeremiah's request or statement I should say about having a future workshop for bioethanol and informally request that RYAM is willing to do so …to make sure we can get actually get some answers for the Commission."

125.    Commissioner Ayscue then said he wanted to see four Open Houses that would be open for everyone over a 6-8 week period that would be open up for the people to come in – open for everyone – because this issue is "that large" and "we have gotten to that point."

126.    These statements were not made in good faith, Mayor Antun and the Commission had already decided on their improper "answers" in this matter.

127.    Of course, as noted above, by the time Commissioner Ayscue made this extraordinary demand of RYAM, he had already publicly taken the position that, based on the Weiss Serota Memo, the City Commission would not allow the Project to go forward.

*6.    The October 24, 2024, Town Hall Meeting*

128.    The City published the notice of a Town Hall Meeting for October 24, 2024, at 6 p.m. at the City Commission Chambers (the "Town Hall"). The Agenda described the one substantive item on the agenda as "**BIOETHANOL** – *In response to civic concern regarding Rayonier Advanced Materials (RYAM) proposed bioethanol manufacturing, the City of Fernandina Beach is holding this Town Hall to facilitate discussion.*"

129.    The Interim City Manager Jeremiah Glisson opened the meeting, stating that the Town Hall was being held due to community concern related to the proposed bioethanol plant.

130.    The City retained a facilitator for the Town Hall, Cindy Jacoby, a Fernandina Beach local with whom the City had worked with previously on its annual visioning sessions.

131. Ms. Jacoby announced the meeting agenda, which included a 30-minute presentation by RYAM and a 30-minute presentation by Tom Budd, the petitioner who challenged the Air Permit, and his non-profit group NoEthanolFernandina. The remaining time was reserved for public comments of three minutes each. Ms. Jacoby allowed questions to be asked but indicated no one could be compelled to answer a question.

132. The City and City Commissioners knew that this meeting was a sham; they had already determined that, contrary to the appropriate legal obligations, the bioethanol plant would not be built. This overture of providing a forum for RYAM to hear the public's concerns was only made to provide cover for their actions with the public and to mislead RYAM into believing that the proper, legal process would ultimately be followed.

133. Mark Homans and David Rogers presented for RYAM, sharing general information about the current pulping operations, RYAM's outreach efforts to educate about the Project, and new information about the Project that had been developed since the Open House.

134. RYAM agreed under pressure from the City and City Commissioners to make this presentation, even though it did not yet have sufficient information

to submit a site plan application to the City and there was on-going litigation involving the other presenting party regarding the Air Permit.

135.   Comments from the community at the Town Hall Meeting demonstrated that the primary concerns of the community related to safety, which the site plan application process already addresses. Public comments also expressed significant opposition to the *existing* pulping operations, rather than the proposed Project. The existing pulping operations are vested and cannot be modified as part of the City's evaluation of a site plan amendment application.

136.   While not required by the City's TRC process, RYAM took into consideration public comments made at the Open House and the Town Hall in finalizing its site plan amendment application.

### 7.   *Technical Review Committee First Step Meeting*

137.   The City provides a "First Step Meeting" with City staff as a "free service" to applicants "for input and guidance" and for "exchanging information on the potential development of a site."

138.   The City's webpage instructs applicants to "USE THIS FORM TO Submit a project for input and guidance from the Technical Review Committee ('TRC')" which it identifies as "the City group responsible for reviewing site plans and commercial projects."

139.    The City's webpage also instructs that during this exchange of information the City may provide information to the applicant on permissible uses of the site.

140.    RYAM timely submitted its First Step application for and attended a First Step Meeting on December 12, 2024.

141.    Multiple City Staff members were in attendance. Director Gibson, the person ultimately tasked with determining the completeness of a site plan application, directed the meeting.

142.    The meeting was not recorded and, upon information and belief, no minutes were taken.

143.    Mark Homans, on behalf of RYAM, presented a PowerPoint reviewing key components of the Project and RYAM's application. He also responded to questions and comments from Staff.

144.    At no time during the First Step Meeting did Director Gibson, or any other member of Staff, provide information to RYAM about the permissible uses of the site or advise that the proposed use was inconsistent with the Comprehensive Plan or the LDC.

145.    On December 17, 2024, the City's Planning Department provided RYAM with a Next Steps form containing comments along with a contact sheet for City Staff.

146.    The notes contained on the Next Steps form do not state that the use proposed by the Project is inconsistent with the Comprehensive Plan or Land Development Code or request additional information regarding future land use or zoning district designation or use consistency. Rather, the notes identified the need for additional information regarding utilities, permitting, potable water supply, and new structures associated with the Project.

## I.    RYAM's Application Submissions and the City's, City Commissioners', and the Board of Adjustment's Illegal Actions

### 1.    *The Application*

147.    Prior to the submission of the Application in December 2024, RYAM retained a professional engineer who spoke to Interim City Manager Glisson regarding the proposed Project. Interim Manager Glisson informed the engineer that the new City Manager would probably have to deny the application because it had become "political."

148.    Nevertheless, RYAM held out hope that after all of the information it had provided the City and its residents and all the time and money it had invested in engaging with the City at the City's prompting, it would be fairly treated.

149.    Hence, on December 19, 2024, RYAM submitted a carefully prepared site plan amendment application to the City that responded to the notes contained on the Next Steps form issued after the First Step meeting (the "Application").

150.    The Application properly identified the property's Future Land Use designation and Zoning District and contained technical information from experts supporting RYAM's position that the production of bioethanol through fermentation and distillation was permissible under the applicable Comprehensive Plan and LDC policies.

151.    RYAM also paid the maximum application fee of $4,400, which according to the City's ordinance, is calculated based on the estimated costs of preparing the site for construction.

### 2.    *First Completeness Determination*

152.    On December 30, 2024, the City provided RYAM with a request for additional information in the City's First Completeness Determination.

153.    The City claimed the Application was incomplete and identified information and items that needed to be submitted before the Application could

be deemed complete and transmitted to the TRC for the development of a Compliance Report/Sufficiency Determination.

154. As with the Next Steps notes, none of the items identified in the First Completeness Determination requested additional information regarding whether the proposed use was consistent with the City's Comprehensive Plan or LDC.

155. Pretending that RYAM's application was still being legitimately considered, Director Gibson's letter requested that RYAM, "[p]lease submit response documents to address each comment in the narrative form and with an amended site plan."

156. On January 22, 2025, RYAM invited Director Gibson, Margaret Ohlendorf, and new City Manager Sarah Campbell to visit the proposed Project site that is the subject of RYAM's Application to assist them with their evaluation of the Application.

157. During the January 22 site visit, Director Gibson informed RYAM-retained engineer Asa Gillette that the new City Manager would deny the application, even though a response to the First Completeness Determination had yet to be submitted.

158.    Despite this frank admission of prejudgment and bias without any support in the Comprehensive Plan or LDC, RYAM continued to proceed in good faith, submitting a letter to Director Gibson requesting clarification of certain items contained in the First Completeness Determination.

159.    Taking into account feedback received from the City, RYAM timely submitted its responses and updated the Application to the City on January 28, 2025 (the "updated Application").

160.    At no time prior to RYAM's submittal of the updated Application did Director Gibson or her staff indicate that RYAM's application was incomplete because of a lack of information regarding consistency with the Comprehensive Plan or zoning district.

    *3.    Final Completeness Determination and Written Interpretation*

161.    On February 4, 2025, RYAM received two letters from the City in response to its updated Application.

162.    The first was from Director Gibson on behalf of the Technical Review Committee ("TRC") titled "Completeness Review" and dated February 4, 2025 (the "Final Completeness Determination").

163.    RYAM has never been given the opportunity to meet with the full TRC, having only spoken with the individuals present at the First Step Meeting.

Upon information and belief, the TRC itself, contrary to its legal obligation to do so, has never reviewed the Application or updated materials.

164.    The Final Completeness Determination signed by Director Gibson as the TRC Coordinator states that, "[a] Completeness Determination of the application has found the application to be incomplete."

165.    The sole basis for finding the updated Application incomplete is stated as:

> The application fails to provide, identify or reference a future land use category (established by the Comprehensive Plan) or zoning district (established by the LDC) which permits the proposed use (2G Bioethanol Plant) as required by LDC Section 11.03.01(A)(2), and is therefore deficient.

166.    This finding is no more than a thin veneer over the irrational animus that the City and City Commission have towards RYAM. This "finding" was never communicated to RYAM during the First Step Meeting, in the correspondence following the First Step Meeting, in the First Completeness Determination dated December 30, 2024, or at the January 22, 2025, on-site meeting to review the site plan with Director Gibson and Manager  Campbell.

167.    This sole finding is also facially absurd. By the plain terms of the LDC, a completeness determination requires only the determination of whether certain

specified forms have been submitted and does **not** consider the substantive merit of an application. RYAM's Application and its supporting documentation expressly state the Project's future land use category and zoning district and explain in detail how the Project comports with the policies for both the future land use category and the zoning district. Therefore, there is no rational basis for concluding that the Application is incomplete on the grounds of consistency.

168.    Instead, while Director Gibson's letter is titled a Completeness Determination, its substance reveals that it is simply an improperly labeled "Written Interpretation."

169.    The LDC provisions governing the two types of determinations reveal the difference. Under Section 11.03.01(A), LDC, "Determination of Completeness," the LDC provides in part as follows:

> "2.    A determination of completeness is a determination that all required documents and plans has been submitted in sufficient number, and whether all fees have been paid. A determination of completeness is *not* a determination of compliance with substantive standards and criteria."

(Emphasis added). The same section directs the City Manager to identify "the missing documents and/or plans" when an application is not complete.

170.    Section 11.01.04(20), lists the document submittal requirements for all site plans. Contrary to Director Gibson's letter, the completeness requirements for site plan applications do not require the provision of a future land use and zoning district that permit the use but instead requires only a "summary block" containing the property's future land use designation and zoning district – information that was, in fact, contained within RYAM's Application.

171.    While a completeness review does not consider the substantive merit of an Application, a separate type of document provided for under the LDC does. "Written Interpretation" is the title the LDC uses for substantive determinations of consistency between an application and the City's Comprehensive Plan or LDC provisions except in the context of a site plan that must be reviewed pursuant to the TRC process.

172.    In this case, Director Gibson's Final Completeness Determination relied on the City Manager's "Written Interpretation of Proposed Use" also dated February 4, 2025 (the "Written Interpretation") as the sole support for the determination that the dispute regarding permissible uses under the Comprehensive Plan and LDC render the application incomplete.

173.    The Written Interpretation was allegedly provided as the City's interpretation of the LDC and City's Comprehensive Plan, pursuant to Section 1.05.02(A), LDC. RYAM never requested a written interpretation. Instead, City Manager Sarah Campbell issued the written interpretation on her own initiative.

174.    Receipt of Manager Campbell's February 4 Written Interpretation was the first time RYAM became aware that the City intended to issue an independent written interpretation concerning the proposed use. Manager Campbell never gave RYAM the opportunity to submit additional information regarding the Written Interpretation prior to issuing it.

175.    The Written Interpretation concluded that the Project is not allowable by either the IN future land use designation established by the Comprehensive Plan or the Heavy Industrial zoning district assigned by the LDC. While the Written Interpretation summarily states that it is based upon the whole of the City's file, including, but not limited to, the site plan application (TRC 2024-0009) and supplemental documents submitted by RYAM, it expressly relies on the Weiss Serota Memo.

176.    As explained above, the Weiss Serota Memo was not based on the Application, as updated, did not consider any of the materials provided to the City

41

to explain why the proposed Project *is* consistent with the Comprehensive Plan and LDC, and was not prepared by persons knowledgeable about the technical aspects of the proposed Project.

177.    Furthermore, the City obtained no updated opinion from Weiss Serota after the Application was submitted.

178.    Like the Final Completeness Determination, the Written Interpretation concluded, without identifying any bases or facts to refute the information provided by RYAM in its Application, that the proposed Project constituted either chemical manufacturing or chemical refining, which are prohibited uses in the Industrial (IN) future land use category.

179.    Furthermore, like the Final Completeness Determination, the Written Interpretation was issued in a manner that is inconsistent with the requirements of the LDC.

180.    Under Section 1.05.02(A), LDC, the power to issue written interpretations is vested in the City Manager with one important exception: the City Manager cannot use the Written Interpretation process to override the responsibilities of any other commission, board, or official.

181.    Section 11.03.02, LDC, expressly provides that the TRC is vested with the responsibility for reviewing site plan amendments and developing a compliance report. Section 11.03.02, LDC, states, "[a]ll applications for site plans, preliminary subdivision plats, final subdivision plats, minor subdivisions, and amendments to previously issued local development orders, change of use, and nonresidential building expansions **shall be reviewed** by the Technical Review Committee (TRC)." (emphasis added).

182.    Therefore, a Written Interpretation that precludes the TRC's consideration of a site plan amendment application and development of a compliance report violates the express provisions of Sections 1.05.02(A) and 11.03.02, LDC.

183.    This distinction is not trivial. Consideration by the TRC allows an applicant to develop a full administrative record upon which further determinations may be judged, first by administrative decision-makers and ultimately by a reviewing court. Access to the TRC process is a fundamental part of RYAM's right to a meaningful opportunity to be heard.

184.    Furthermore, the City's issuance of both a Written Interpretation and a Written Interpretation mislabeled as a Completeness Determination changes the process for administrative review.

185.    Written Interpretations that fall outside of a compliance report are reviewable by the City's Board of Adjustment, a quasi-judicial body appointed by the City Commission, pursuant to Section 11.07.01(B)(10), LDC. Completeness Determinations are also reviewable as an administrative decision by the Board of Adjustment, pursuant to Section 11.03.01(A)(5), LDC. By contrast, if the TRC were allowed to complete its work and issue a compliance report, that compliance report would **not be subject** to appeal to the Board of Adjustment.

186.    Even more disturbing, this is precisely what was intended by the City and the Commissioners NoEthanolFernandina was deeply involved in creating and developing the strategy to abuse the Comprehensive Plan and LDC to keep RYAM's Project from proceeding while simultaneously seeking to prevent RYAM from developing an administrative record that would allow it to challenge the Completeness Determination.

187.    John Hart, a NoEthanolFernandina board member, provided several lengthy and detailed 'Talking Papers' for City Manager Campbell and the

Commissioners to this end. Notably, these papers include the following

statements:

> Completeness determinations are pivotal in Florida.
>
> …
>
> if RYAM satisfies the December 30 request before January 29, 2025, the City will have just five days to declare the application complete and forward the application, such as it is, to the TRC for technical review.
>
> …
>
> Assuming an individual TRC member was interested in raising and evaluating concerns not previously identified, the press of time may preclude that leaving the only issue of significance being whether the project involves chemical manufacturing.
>
> …
>
> [I]n the event [the application] is found to not be compliant [by the TRC], then any judicial review of the applicant's project would only review the issue or issues that are the city's basis for any denial. Only these issues would be clearly established in the administrative record and a Court's review will be based solely on the administrative record.
>
> …
>
> A concern that you must be cognizant of, and one that we frankly debate internally within [NoEthanolFernandina], is the wisdom of taking an action on RYAM's application or a view of our LDC not previously taken by the [City of Fernandina Beach]. Some within [NoEthanolFernandina] argue that it risks a claim by RYAM that impinges on their due process.

188.    The City and Commissioners worked hand in glove with the

unelected, biased NoEthanolFernandina to obstruct the Project and deny RYAM

its due consideration under the law.

189.    As explained below, the current membership of the City's Board of Adjustment is incapable of providing RYAM a fair and impartial hearing on the consistency matters raised by both letters, regardless of their titles.  Furthermore, relief at the Board of Adjustment requires five (5) votes in the applicant's favor, pursuant to Section 11.07.04(G), LDC. There *are* only five members on the Board of Adjustment, pursuant to Section 9.04.02, LDC, with two alternates.

190.    Therefore, even if the Board of Adjustment was not constituted by anti-RYAM activists who have engaged in *ex parte* communication and prejudged RYAM's application before it was even filed, which is the case as explained more fully below, an appeal to the Board of Adjustment is intentionally set up by the City to be a virtually impossible task.

191.    Further, the City knew and intended for this absurd and unjust result. On February 12, 2025, Vice Mayor Ayscue, acknowledging that Commissioner Kreger and "at least one other board member and an alternate have spoken out against RYAM and possibly contributed to No Ethanol Fernandina, the non-profit organization" asked City Manager Campbell "Would all members be required to disclose this information in a quasi-judicial hearing?" Both Vice Mayor Ayscue and City Manager Campbell seemed to acknowledge the biased behavior of the

board members and alternates and yet still actively put forth their argument that such conflicts were not sufficient to allow Board members to recuse themselves.

192.    It is, therefore, no wonder that the City's Planning Director and City Manager have worked so hard to fit their *ultra vires* acts within the Board of Adjustment's purview.

> 4.    *Board of Adjustment Prejudgment, Ex Parte Communication and Bias*

193.    The Board of Adjustment has five members, with two alternates. Director Gibson is identified as the Staff liaison to the Board, even though it is her decision regarding completeness that is under review.

194.    Board of Adjustment member, Len Kreger was appointed to the Board by the City Commission on December 3, 2024, a few weeks before RYAM's Application and several months after RYAM was pressured to make the many public presentations set forth above. Board member Kreger is a former Commissioner and Vice-Mayor who has been outspoken against the Project, including publishing editorial articles in local newspapers opposing the Project.

195.    It is telling that over a year before he was appointed to the Board, well before RYAM submitted its site plan amendment application, and several months before the Weiss Serota Memo was solicited by the Commission, on December 24,

2023, Mr. Kreger wrote to the Commissioners that the Air Permit process does not address "that the Comp Plan Policy prohibits Chemical or petroleum Manufacturing or refining" and made it clear that part of his 2024 agenda was to prevent the Project from ever coming to fruition regardless of the City's legal actual obligations under the Comprehensive Plan or LDC.

196.    The website of an entity called "NoEthanolFernandina" identifies Board member Kreger as a Director. As stated above, "NoEthanolFernandina," is a d/b/a for a Florida non-profit corporation called "Fernandina Wins, Inc." Len Kreger is also identified as a Director for Fernandina Wins, Inc., on the Florida Division of Corporations' "Sunbiz" website.

197.    The website for "NoEthanolFernandina" further declares "we are united in our determination to prevent the manufacturing of the chemical ethanol in Fernandina Beach at RYAM's Gum Street plant adjacent to residences, businesses, schools, churches, and our historic downtown."

198.    In addition to his advocacy against RYAM with "NoEthanolFernandina", Board member Kreger also served as a guest columnist for the News-Leader writing a column on December 5, 2024, in which he implicitly

cast aspersions on the veracity of RYAM's public presentations stating, "[t]ruth is the first casualty."

199.   Board member Kreger wrote that RYAM's Air Permit application was discovered through the "watchful monitoring of a private citizen," perpetuating the false narrative that RYAM had behaved secretively with respect to the Project.

200.   Board member Kreger then wrote that the Weiss Serota Memo "definitively concluded that 'state law requires the city to reject such a proposal and enforce its Comprehensive Plan and LDC." Board member Kreger lamented that RYAM's position that the creation of bioethanol through fermentation is not chemical manufacturing or refining" makes it "legally challenging to oppose the project on those grounds."

201.   Board member Kreger observed that "RYAM's next step will be to bring their project pre-application to the city Technical Review Committee. According to the Land Development Code (LDC), this project should be rejected because it is not a permissible use on the site. **The new city manager, in consultation with staff, will make this decision.** RYAM can and likely will challenge this decision through one of the legal options available to them." This incredible statement was made almost two weeks before RYAM had even

submitted an application to the City for the Project. This suggests that Board member Kreger was engaged in behind-the-scenes communications with City staff regarding their prejudgment of RYAM's application and shows an intense prejudice against both RYAM and the Project.

202.    Interestingly, while Board member Kreger claims a concern about truth being a casualty, Board member Kreger did not share as part of his "guest column" his activist role in the NoEthanolFernandina organization, choosing instead to list only his former military service and his prior roles on the Fernandina Beach Planning Advisory Board, Sustainable Fernandina Committee, and County Code Enforcement Board.

203.    To say that Board member Kreger is incapable of serving as a fair and impartial decision-maker on any appeal related to the RYAM application would be an understatement of the first water.

204.    Board member Kreger does not even try to hide his prejudice and animus towards RYAM and the Project. In an opinion piece published in the February 12, 2025, Fernandina Beach News Leader, bearing his byline, picture, and ironically titled "How Fernandina Beach government works", he wrote, "A recent positive reflection of effective management was the recent rejection of the RYAM

bioethanol project, which was prohibited by the Comprehensive Plan." Board member Kreger's "effective management" is to ignore the actual, legal obligations of the Comprehensive Plan and LDC in order to provide a soupçon of legitimacy to illegal actions.

205.    Similarly, Board of Adjustment member Taina Christner has a history of inflammatory and factually inaccurate social media posts regarding the Project that are obviously designed to create fear and stimulate opposition in the local community against RYAM and its anticipated application.

206.    Ms. Christner is a member and either a current or former director of Fernandina Wins, Inc. The Articles of Incorporation for Fernandina Wins, Inc. identify Ms. Christner as a Director and as Secretary. Apparently in an effort to cure her obvious conflict of interest after her appointment to the Board of Adjustment in December 2024, Fernandina Wins, Inc. filed Articles of Amendment to Articles of Incorporation with the Florida Secretary of State removing Ms. Christner as both a Director and Secretary. (Interestingly, solidifying Mr. Kreger's conflict and actual bias against RYAM's Applications, Fernandina Wins, Inc. filed an Amended Annual Report on February 19,2025, adding him as a Director. In its

on-line "Toolkit", No Ethanol Fernandina continues to identify Mr. Kreger as Director, City Relations Advisor).

207.    Aside from her involvement in NoEthanolFernandina and association with Tom Budd, its President, Board member Christner has repeatedly made false and/or inflammatory statements against RYAM and the Project. For example, in March 2024, Board member Christner issued a social media post alerting viewers that "No Ethanol Plant" yard signs were available for sale for $10 at a local art gallery. On March 19, 2024, Board member Christner issued a social media post sharing a NoEthanolFernandina post stating the following: "Ethanol is highly flammable," "**Prohibited by local Comp Plan**," "Dangerous for Residents," "No evacuation plan for residential areas," "Waste water concerns for river quality," "Contaminants pose a threat to aquatic ecosystems," "Noise, odor, and light pollution issues." The post exhorts viewers to "Join Us to Make Our Voice Heard!"

208.    On March 22, 2024, Board member Christner issued a social media post sharing a YouTube video about an explosion at an unrelated laboratory in 2007, pondering "What would an explosion similar to this do to downtown Fernandina Beach? Just imagine. And I believe this plant was smaller than what is proposed here."

209.   Two days later on March 24, 2024, Board member Christner shared on her social media a story with the caption, "Residents concerned over possible health impact of planned bioethanol plant in Fernandina Beach."

210.   In April 2024, Board member Christner posted that the US Airforce limited the use of foam fire retardant after realizing the substance "polluted the drinking water for 6 million Americans." Board member Christner queried, "Will the same happen to Fernandina if this is used right next to our local waterways for the proposed Ethanol Plant?"

211.   Also, in April 2024, both Board members Christner and Kreger were part of a group email chain from other anti-RYAM activists reporting on the position of the interim City Manager on RYAM's Project. When advised that the City Manager was apparently concerned about whether the City Commission would interfere if he attempted to thwart the Project (a position the interim City Manager later denied), Board member Christner stated, "Politicians are still under the belief that they can blow us off and we'll go away. They don't know us very well."

212.   In May 2024, Board member Christner posted an event invitation for a "No Ethanol Fernandina Town Hall." On June 5, 2024, Board member Christner

posted a plea for donations to the aforementioned "NoEthanolFernandina" to "help with the legal fees associated with saving Fernandina from an ethanol plant being built in the middle of our neighborhood." On June 13, 2024, Board member Christner shared a radio program regarding what she referred to as "the proposed ethanol refinery in downtown Fernandina Beach."

213.    On August 7, 2024, Board member Christner sent an email to the City Commissioners about the public statements of RYAM's CEO, strongly implying that she distrusted statements made by RYAM's representatives in "informal discussions.". Even Commissioner Ayscue, no friend to the Project as explained above, responded that he would not comment on the Project for fear of litigation.

214.    Not to be dissuaded, Board member Christner sent another email in August 2024, complaining that the City Commissioner had removed from the City Commission's agenda a bioethanol presentation designed to stimulate a comprehensive plan amendment prohibiting its production, after the City Attorney advised that such an action would likely lead to litigation. Board member Christner's email attacked the City Attorney as "unelected" and decried the lack of opportunity for public participation on the topic.

215.    Board member Christner was also one of the citizens who initially requested an extension of time to challenge RYAM's Air Permit, calling herself "an affected party" as a result of the proposed Project. Under Chapter 120, Florida Statutes "an affected party" is someone whose substantial interests are impacted by an agency decision, giving them standing to challenge that decision. *See generally, Agrico Chemical Co. v. Department of Environmental Regulation*, 406 So. 2d 478 (Fla. 2d DCA 1981).

216.    In addition, when the Florida Department of Environmental Protection referred Tom Budd's petition for an administrative hearing on the Air Permit to the Division of Administrative Hearings, Board member Christner celebrated with a post to the NoEthanolFernandina Facebook page on June 6, 2024, stating "Great news everyone!"

217.    In response to Alternate Board member Wolford's invitation to attend "a town hall meeting about the proposed ethanol plant this coming Tuesday night, Oct. 8, 6:00 Peck Auditorium." a discussion ensued regarding a hurricane hitting the Project.  Board member Christner responded "yes, can you imagine the poison that will be in our floodwaters if we flood?"

218.    In one of the most pointed expressions of her own bias and the City's

concerted efforts to prejudge RYAM's application, Board Member Christner

posted the following on social media February 8, 2025:

CELEBRATION THIS SATURDAY!

...

Last night, the City Manager **denied RYAM's request** to build the
ethanol plant, citing the city's comprehensive plan! This is a big win
for Fernandina, and while we know the fight isn't over, every battle
won deserves a celebration.

So let's take a moment to enjoy this one! **No speeches, no agenda,
totally grass roots and informal – just good company (maybe some
cake), and a well-earned toast to all the hard work from everyone,
while supporting local business.**

Thank you to everyone who wrote letters, showed up, spoke out and
stood strong. This was your win. See you Saturday 5:00. CELEBRATE!

(Emphasis in original)

219.    Similarly, the NoEthanolFernandina website also posted a

congratulatory update on the City Manager's written interpretation. Incredibly, in

spite having two current or former Directors sitting on the Board of Adjustment,

the NoEthanolFernandina update acknowledges that the matter was likely to be

appealed to the Board of Adjustment and pledged support for the City Manager's

summary denial of the application.

220.    Thus, bias and prejudgment are hardly adequate to describe Board

member Christner's anti-RYAM animus.

221.    Alternate Board member Kim Wolford was also appointed to the Board in December 2024 by a City Commission comprised of political connections whom she supported because of their opposition to RYAM and the Project.  The Commission's vote to appoint her as an alternate was made on a motion by Commissioner Tuten, was seconded by Commissioner Poynter, and passed 3-2 with Commissioners Tuten and Poynter voting yes along with Mayor Antun. Ms. Wolford publicly supported Mayor Antun's and Commissioner Tuten's campaigns with comments on Amelia Island Fernandina Beach Network Facebook page.  In a Facebook discussion that characterizes Mayor Bean as pro-bioethanol and pro-RYAM, Commissioner Tuten was described as "ardently opposed to the toxic ethanol plant". Immediately following this comment, Ms. Wolford wrote "You geaux girl!". Elsewhere in the comments, Ms. Wolford posted a comment stating that Mayor Bean's support of RYAM and bioethanol are not surprising and encouraging the public to vote for Tuten.

222.    Commissioner Tuten is far from objective or unbiased in her opposition to the Project, and, has served on the Board of Conserve Nassau, an advocacy organization opposing the Project, listing her name on various letters

57

from Conserve Nassau opposing the Project. Her obvious conflict of interest is glaring.

223.    Alternate Board member Wolford has a history of lodging public complaints about RYAM. As recently as January 2025, Alternate Board member Wolford complained to the City regarding the "chemical smells" emanating from the RYAM facility.

224.    City staff concluded that the smells were probably from a neighboring plant, not RYAM. In addition, Alternate Board member Wolford has issued social media posts about the Project that suggest bias and prejudgment.

225.    On another social media post, mocking RYAM's post discussing the highly regulated, closely monitored, and safety first promises of its proposed 2G-Bioethanol Project , Alternate Board member Wolford warned as follows:

> Please be aware: RYAM is going to ask the benefactors of their community outreach (recipients of $$$$) to partner with them on this project. They also make the cellulose piece in cigarette filters.

226.    Alternate Board member Wolford then further promoted her bias against RYAM's and the proposed 2G-Bioethanol Project by stating:

> As an FYI< [sic] they make cigarette filters at the plant here. If they cant [sic] kills us with the biofuel they will kill us by making an essential part of a cigarette.

They are trying to fool people like you and me.

227.    From this discourse it is evident that Alternate Board member Wolford is incapable of giving RYAM a fair and impartial hearing. Her clear animus against and mistrust of RYAM resonates throughout her public comments.

228.    It is no accident that Board members Kreger, Christner, and Alternate Board member Wolford have such deep-seated bias against RYAM. Rather, these members were appointed to the BOA in December 2024 by City Commissioners who share their bias and prejudgment with the expectation that the BOA would act consistently with the publicly expressed bias and prejudgment. As Tom Budd, President of Fernandina Wins, Inc. d/b/a NoEthanolFernandina, noted in the Florida Phoenix, "Every race was won by candidates who favor No Ethanol Fernandina."  Craig Pittman, Florida beach town faces explosive fight over ethanol plant[1].

229.    Since the City has chosen to require a unanimous vote by the Board of Adjustment to overturn staff decisions, the obvious bias and prejudgment of

---

[1] FLORIDA PHOENIX. (Nov. 7, 2024),
https://floridaphoenix.com/2024/11/07/florida-beach-town-faces-explosive-fight-over-ethanol-plant/)

either Board Members Kreger or Christner would be fatal to RYAM's ability to receive equal protection and treatment under the law.

230.   That two Board Members and one alternate are biased against the project to this extent render the entire Board of Adjustment appellate process an obvious sham; yet the LDC provides no express mechanism to request recusal.

231.   Furthermore, the LDC requires the specific number of five votes to gain relief on appeal to the Board of Adjustment. Since two Board Members and one alternate are unfit, there are not five members who could even meaningfully hear an appeal brought on RYAM's behalf.

### 5.   The City's Celebration of its Ultra Vires Act

232.   At the regular City Commission Meeting on February 4, 2025, Ms. Campbell announced that Staff sent a letter to Mark Homans at RYAM and read an excerpt from her letter to RYAM stating that the City must reject the application for the proposed Project and that no further action would be taken.

233.   The City Commissioners celebrated. Commissioner Genece Minshew thanked her for "taking a stand on the bioethanol" and thanked her for "stepping up and doing it." Later, Commissioner Minshew issued a social media post celebrating the City Manager's behavior, stating, "OK, this is not anywhere close to being over. Yes, a good victory for the moment, but the war is not over."

234.   Commissioner Joyce Tuten also thanked Ms. Campbell for sending the letter.

235.   Worse, during the Mayor/Commissioner Comments period, Commissioner Tuten asked that an item be placed on the City Commission's agenda to discuss the criteria to award the City Manager her 6-month $10,000 bonus, even though she had only served for 60 days as of this meeting.

236.   This celebration by the City of the City Manager and Planning Director's abuse of the administrative letter processes in order to deprive RYAM of the chance to have its site plan amendment application considered by the TRC makes clear that the City already decided to deny RYAM's application, as far back as May 23, *2024*, almost six months before RYAM submitted its Step One application. This was *before* the City and the Commissioners knowingly and intentionally coerced RYAM into spending more than one (1) year, hundreds of hours, and hundreds of thousands of dollars preparing and supplementing its Application.

### 6.   Direction to Appeal

237.   Even after the two administrative letters were issued, the City continued to create procedural roadblocks for RYAM. Contradictory to the instructions given to RYAM for filing an administrative appeal with the Board of

Adjustment, the Board of Adjustment webpage instructs that, "… you must meet with a planner before you submit an application for a variance or an administrative appeal."

238.   RYAM was required to obtain a clarification from the interim City Attorney regarding the process described by the two letters versus the process described by the webpage.

239.   Even more confusing to RYAM, RYAM received an automated message from the City of Fernandina Beach dated February 6, 2025, at 7:05:03 PM stating, "Your plan will expire in the next 15 days. Please reach out to our Planning and Conservation Department as soon as possible to discuss your plans at (904) 310-3480."

240.   Once again, RYAM had to contact the interim City Attorney, this time to obtain clarification on the 15-day message. The first response from the City Planning Department only stating that "no action is required" was vague and ambiguous in light of the two February 4th letters. After questioning the meaning of that message, RYAM was told that the automated message should not have been sent and should be disregarded in favor of the deadlines for filing an administrative appeal set forth in the letters.

241. Thus, for more than a year the City has engaged in an orchestrated, bad-faith, effort to deny RYAM a reasonable application process for consideration of its bioethanol Project, which merely augments a facility that has operated safely and to the mutual benefit of RYAM and the City for almost a century. The City's behavior has harmed RYAM.

## J. RYAM's Damages

242. As of May 2024, RYAM had invested $1,563,000 towards developing the engineering and site planning for the proposed Project necessary to support its application to the City, but had not had the opportunity to submit an application for consideration before the City obtained the Weiss Serota Memo and determined it would rely on it to respond to RYAM's application.

243. Between May 2024, and February 2025, when the City's Final Completeness Determination and Written Interpretation were issued, RYAM spent another $1,899,000 on design, engineering, and safety and environmental planning.

244. Additionally, to develop the expert materials interpreting the City's Comprehensive Plan and Land Development Code in support of RYAM's Application, RYAM incurred fees and costs of $448,426.19.

245.    Further, it paid – and the City accepted as if the application would be properly evaluated - the maximum application fee of $4,400 to access the TRC process.

246.    Worse, RYAM has been substantially burdened in its ability to use and enjoy its property, even though its proposed use is consistent with both the Comprehensive Plan and the LDC.  The Project is important to RYAM's corporate goals to engage in sustainable production practices that benefit the environment through the production of renewable energy, diversify its income stream, and enable RYAM to fully utilize its property.

247.    Accordingly, RYAM has suffered significant financial harm through the City's illegal and *ultra vires* acts.

### K.    The City's Treatment of RYAM's Application Unjustly Treated RYAM Differently from Others Similarly Situated

248.    The City's treatment of RYAM's application unjustly, and illegally, treated RYAM's site plan amendment differently from other, similarly situated applicants.

249.    The RYAM facility is presently zoned Heavy Industrial I-2 under the LDC and its site plan amendment application met the LDC provisions that implement the IN future land use designation.

250.    Yet, RYAM's site plan amendment application was treated differently from other applicants seeking site plan amendment.

251.    Many times in response to other applications, Planning Director Gibson has expressly disclaimed substantive review as part of a completeness determination.

252.    For example, on December 18, 2024, the Board of Adjustment heard an appeal challenging the City's determination that an application was complete. Many of the concerns raised by the appellant related to whether the application met various LDC requirements, standards or criteria. Time and time again, both the Planning Director and others explained to the appellant that matters of compliance were **not** proper for consideration at the completeness stage of review, but rather are properly taken up at the full TRC substantive review stage. Yet, in this case, Planning Director Gibson has reversed course and misused the completeness review process to make a premature consistency finding to preclude full review of RYAM's application.

253.    Likewise, the City has never procured what purports to be a "binding" legal opinion before an application for site plan amendment was even filed in an effort to thwart an applicant's right to administrative review. Similarly, the City Manager has never issued a Written Interpretation in response to any other applicant's site plan amendment application based on a private legal memorandum without an applicant request for such interpretation and before the TRC has issued a compliance report. Moreover, the City has never demanded that a land owner considering a future site plan amendment application submit itself to expensive and time consuming open houses and public inquiries by the Board and activist non-profit organizations. Thus, while others have applied to the City for site plan amendments, the City's treatment of RYAM's application in comparison to those other, similarly situated, site plan amendment applicants was unprecedented. The City's ad hoc demands of RYAM and contortionist applications of its own standards to deny RYAM even the pretense of an administrative process reflect the City's irrational animus against RYAM and its Project motivated by NIMBY sentiment and a fundamental lack of understanding of the science underpinning the project.

254.   In other site plan amendment applications, other applicants were not

subjected to the same Kafkaesque procedural hurdles.

255.   For example, in application TRC-2023-0039, the application

requirements given state:

> All applications are subject to a determination of completeness as
> required by Land Development Code section 11.03.01. , [*sic*] A
> determination of completeness is a determination that all required
> documents and plans have been submitted, and whether all fees have
> been paid.

The checklist required for this application was, in pertinent part: "… A summary

block containing:, o Land use category from the Future Land Use Map in the

comprehensive plan;, o Zoning district;…"

256.   This checklist reflects the requirements and standard procedures of

the Comprehensive Plan and LDC that should have been applied to RYAM for the

Project. Among many things notably absent is the "consistency review" that the

City applied to RYAM's application. The process that the City forced RYAM to

undergo was only applied to them and caused them to expend millions of dollars

and untold man-hours in a rigged process.

257.    Another example, application TRC 2024-0010 was received by the City on December 20, 2024 and TRC review for a complete application was determined on December 22, 2024, two days later.

258.    The TRC provided comments and directed the applicant to "submit response documents to address each comment in a narrative form and with an amended site plan within 30 days."

259.    Again, this is markedly, substantively, and significantly different from the procedural detours and hurdles that were imposed against RYAM in their application.

260.    The City had no rational reason for subjecting RYAM to such a different process other than its demonstrated animus to RYAM and the Project.

261.    Another example of an applicant being treated differently than RYAM, showing RYAM's disadvantage by subjecting them to onerous procedures and processes not supported by the Comprehensive Plan and LDC, is the standard process and procedure the City applied to TRC 2024-0005.

262.    Application TRC 2024-0005 was received by the City on July 12, 2024, and TRC review for a complete application was determined on July 16, 2024, four days later.

263.    The TRC provided comments and directed the applicant to "submit response documents to address each comment in a narrative form and with an amended site plan within 30 days."

264.    Again, this is markedly, substantively, and significantly different from the procedural detours and hurdles that were imposed against RYAM in their application and in how completeness was determined.

265.    While some aspects of the applications cited above may vary from RYAM, they are similarly situated comparators in all material respects regarding the process applicable to their applications. And they were each treated differently from RYAM to RYAM's detriment and without a rational basis for the difference.

## V.    Cause of Action

### Count I – Violation of RYAM's Rights Under 42 U.S.C. 1983

266.    RYAM reasserts and realleges paragraphs 1 through 265 as if fully set forth herein.

267.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and seeks damages against the City for violating the Plaintiff's right to equal protection of law guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution, under a "class of one" theory of intentional, discriminatory treatment.

268.    In denying RYAM's site plan amendment application, the City, acting under color of state law, deprived RYAM of its rights and privileges secured by the Fifth and Fourteenth Amendments to the United States Constitution.

269.    42 U.S.C. § 1983 provides RYAM the right to seek redress against the City for the acts and omissions it took under color of law that deprived RYAM of their federal, constitutional right to equal protection under the law.

270.    In denying RYAM's site plan amendment application, the City acted under the color of the City's Comprehensive Plan and LDC.

271.    The specific provisions of the City's Comprehensive Plan and LDC are set forth above in the following paragraphs: 36, 39, 43, 169, 181 and 185.

272.    RYAM's site plan amendment application met all of the requirements of the City's Comprehensive Plan and LDC; yet the City still denied RYAM's application.

273. RYAM has been intentionally treated differently and disadvantageously from other, similarly situated, applicants for site plan amendments with no rational basis for the intentional mistreatment.

274.    RYAM has provided numerous examples in paragraphs 248 through 265 above demonstrating that the City treated RYAM's site plan amendment

70

application differently and in a discriminatorily different manner than other, similarly situated applications.

275. In no other site plan amendment applications did the City, as stated above, violate its own land development code by impermissibly procuring a legal opinion from a private law firm that the City called "binding," with the obvious direction to craft legal justification for the City's predetermined decision to deny a site plan amendment before application had even been made.

276. Similarly, the City demanded that RYAM provided multiple presentations and open-houses before RYAM even had sufficient information to apply for the site plan amendment and while RYAM was in the midst of administrative challenge to its Air Permit. The City did not make such demands on any other party seeking a site plan amendment.

277. Worse, the City invited the challenger to RYAM's Air Permit to provide a 30-minute presentation challenging RYAM's future, anticipated application. Again, the City did not treat any other party seeking a site plan amendment in this manner.

278. While RYAM was being forced to incur costs by engaging with the City Commission and the public in these unprecedented public inquisitions, the

City never intended to give RYAM a fair hearing having already obtained the legal opinion from Weiss Serota that it publicly said in multiple instances barred the Project from being built.  This behavior was not only discriminatory, imposing requirements on RYAM that no other site plan amendment applicant was required to meet, but also reflects the City's malice and bad faith towards RYAM.

279.   The City also singled RYAM out for adverse treatment when it intentionally misused its completeness determination process to deny RYAM's application on the basis of land use consistency. Land use consistency is a substantive determination. The City's land development code specifically provides that completeness determinations are not intended to include substantive criteria.

280.   Similarly, the City intentionally discriminated against RYAM by publishing a written interpretation on the question of comprehensive plan and zoning consistency, even though a written interpretation was not requested by RYAM or otherwise contemplated in a site plan amendment application prior to consideration of the application by the TRC. Upon information and belief, the City has never issued such an interpretation at a similar stage in the site plan amendment application process.

281.   Thus, in denying RYAM's site plan amendment application, the City treated RYAM from other, similarly situated applicants. The unequal application of the Comprehensive Plan and LDC constituted an intentional and discriminatory exercise of power applied in a malicious, irrational, and wholly arbitrary manner, without any reasonable or rational basis for such disparate treatment.

282.   The City, in discriminating against RYAM through the denial of their site plan amendment application did so without any conceivable basis to support its actions, or any rational relationship between its denial and a legitimate governmental interest.

283.   Furthermore, the City's actions were clearly taken as the result of a discriminatory animus towards RYAM.

284.   RYAM has set forth examples of the City's animus in paragraphs 62 through 266 above.

285.   The City thus violated RYAM's Constitutional guarantee of equal protection under the law as set forth in the Fourteenth Amendment to the United States Constitution.

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

a. Render a Judgment finding that the City's policies, interpretations, practices, and actions violate the rights of Plaintiff secured by the Equal Protection Clause of the Fourteenth Amendment as protected by 42 U.S.C. §§ 1983 and 1988;

b. Award the Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988; and

c. Grant such other and further relief as this Court determines to be equitable, just, proper, or necessary under the circumstances.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury on all issues so triable.

[SIGNATURE PAGE FOLLOWS]

Dated March 28, 2025

Respectfully submitted,

/s/ Aaron R. Modiano
Aaron R. Modiano
Fla. Bar No. 90563
LEWIS LONGMAN & WALKER, PA
360 South Rosemary Avenue, Suite 1100
West Palm Beach, FL 33401
Tel: 561-640-0820
Fax: 561-640-8202
amodiano@llw-law.com
bpennington@llw-law.com

Brenna Durden
Fla. Bar No. 518786
LEWIS LONGMAN & WALKER, PA
245 Riverside Ave Ste 510
Jacksonville, FL 32202-4924
Tel: 904-353-6410
Fax: 904-353-7619
bdurden@llw-law.com
sreichard@llw-law.com

Nicole Poot
Fla. Bar No. 118858
LEWIS LONGMAN & WALKER, PA
100 2nd Ave S Ste 501S
St Petersburg, FL 33701-4307
Tel: 727-245-0820
Fax: 727-290-4057
npoot@llw-law.com
jgabriel@llw-law.com

*Counsel for Plaintiff, Rayonier Performance Fibers, LLC*