UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 3:25-cv-343-WWB-PDB

RAYONIER PERFORMANCE FIBERS, LLC,

     Plaintiff,

vs.

CITY OF FERNANDINA BEACH, FLORIDA,

     Defendant.

_____/

## DEFENDANT, CITY OF FERNANDINA BEACH'S MOTION TO DISMISS

Defendant, City of Fernandina Beach, Florida ("City") moves to dismiss this action with prejudice, pursuant to Rule 12(b)(6), Fed. R. Civ. P., and states:

### OVERVIEW

This matter is an improper refiling of a state court action in which Plaintiff, Rayonier Performance Fibers, LLC ("Plaintiff") sued the City asserting several counts for declaratory and injunctive relief and seeking monetary damages as supplemental relief, arising from the same events at issue herein. *See* Case No. 2025-CA-60 (Fla. 4th Cir. Ct. 2025) ("State Court Action").[1] The events at issue are the same in both the operative Complaint before this Court and the State

---

[1] "On a motion to dismiss, the court may take judicial notice of a fact outside of the pleading 'provided that it is central to the plaintiff's claims and is undisputed in terms of authenticity.'" *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111 (S.D. Fla. 2022) (citing *Kuber v. Berkshire Life Ins. Co. of Am.*, 423 F. Supp. 3d 1326, 1331 (S.D. Fla. 2019); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n. 3 (11th Cir. 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)). Accordingly, on motion to dismiss for claim-splitting, "[a] Court may take judicial notice of the documents in the first case 'which were public records that were 'not subject to reasonable dispute' because they were 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned.'" *Smith v. Florida Gulf Coast University Board of Turstees*, 2024 WL 474128, *1 (M.D. Fla. Feb. 7, 2024) (quoting *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010)).

Court Action: the City's review of and response to Plaintiff's site plan amendment application. *See* ECF No. 1; State Court Action, Complaint, dated February 28, 2025 (Exhibit "A" hereto), State Court Action, Amended Complaint, dated May 15, 2025 (Exhibit "B" hereto).  As set forth herein, this federal action violates the well-established rule against claims-splitting in two different forums and should be dismissed, with prejudice.

## PROCEDURAL BACKGROUND

Plaintiff commenced the State Court Action in February 2025, against the City asserting five counts of declaratory relief, relating to the City's review of and response to Plaintiff's site plan amendment application. A month later, on March 28, 2025, Plaintiff filed its complaint in the instant action.  ECF No. 1.  Most recently, on May 15, 2025, Plaintiff filed its Amended Complaint in the State Court Action, asserting the same five counts, but updating its factual allegations to largely mirror the allegations within the Complaint in the instant action.  *See* Ex. B; ECF No. 1. In addition to the declaratory and injunctive relief sought in the State Court Action, Plaintiff seeks monetary damages as supplemental relief. The State Court Action against the City remains on-going.

## ARGUMENT

## I.    THIS ACTION MUST BE DISMISSED UNDER THE RULE AGAINST CLAIMS-SPLITTING.

"The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit. By spreading claims around in multiple lawsuits in other courts or before other judges, parties waste scarce judicial resources and undermine the efficient and comprehensive disposition of cases." *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017) (quoting *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011)); *see also Bowman v. Coddington*, 517 F. App'x 683, 685 (11th Cir. 2013) ("The rule against splitting causes

2

of actions is designed to prevent a multiplicity of suits.") (quoting *Brody Constr., Inc. v. Fabri–Built Structures, Inc.,* 322 So. 2d 61, 63 (Fla. 4th DCA 1975)). "Indeed, [i]t is well settled that a plaintiff may not file duplicative complaints in order to expand their legal rights." *Vanover*, 857 F.3d at 841 (quotation omitted). "The claim-splitting doctrine thereby ensures that a plaintiff may not split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which relief is sought, and leave the rest to be presented in a second suit, if the first fails." *Id.* (quotation omitted). Accordingly, to decide whether a case should be dismissed pursuant to the doctrine against claim-splitting, courts in the Eleventh Circuit determine "(1) whether the case involves the same parties and their privies, and (2) whether separate cases arise from the same transaction or series of transactions." *Id.* at 841–42 (quotation omitted). "Successive causes of action arise from the same transaction or series of transactions when the two actions are based on the same nucleus of operative facts." *Id.* at 842.

Plaintiff's Complaint before this Court is clearly barred by the claims-splitting doctrine. This action and the State Court Action are indisputably based on the same underlying events: the City's review of and response to Plaintiff's site plan amendment application. ECF No. 1; Exh. A; Exh. B. In the State Court Action, Plaintiff seeks several claims of declaratory and injunctive relief, each targeted at determining the lawfulness of the City's process in reviewing Plaintiff's site plan amendment application. Plaintiff also seeks supplemental relief in the form of monetary damages in the State Court Action. Here, Plaintiff, likewise, challenges the lawfulness of the City's review process, in the form of a Section 1983 discrimination claim and seeks the award of the same monetary damages sought in the State Court Action. ECF No. 1. Nothing precluded Plaintiff from asserting this federal claim in the State Court Action.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Instead, Plaintiff wrongly filed this action in federal court, improperly multiplying the proceedings arising from the same occurrence and involving the same parties and seeking the same monetary damages in different venues in direct violation of the rule against claim splitting. Accordingly, Plaintiff's Complaint should be dismissed with prejudice. *See Kent-Stevens v. CHS Employee Group LLC*, No. 8:24-cv-2394-CEH-TGW, 2025 WL 50318, at *2 (M.D. Fla. Jan. 8, 2025) ("The typical remedy for claim-splitting is a dismissal of the second action with prejudice."); *see also Mohamad v. HSBC Bank N.A.,* No. 616CV2239ORL41DCI, 2018 WL 8576597, at *5 (M.D. Fla. Mar. 27, 2018) (dismissing federal FDCPA claim, pursuant to Fed. R. Civ. P. 12(b)(6), in light of pending Florida Consumer Collection Practices Act claim in state court because the plaintiff "improperly split his causes of action by seeking declaratory relief in federal court while maintaining suit in Florida state court against the same defendants based on the same underlying facts and issues."). The City, therefore, respectfully seeks dismissal with prejudice.

WHEREFORE, Defendant, City of Fernandina Beach respectfully seeks dismissal of this action with prejudice and any further relief the Court deems just and proper.

Dated: June 18, 2025

Respectfully submitted,

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Counsel for Defendant*
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, FL  33301
Telephone:  954-763-4242
Facsimile:  954-764-7770

By:  */s/ Samuel I. Zeskind*
MATTHEW H. MANDEL
Florida Bar No. 147303
Primary: mmandel@wsh-law.com
Secondary: lbrewley@wsh-law.com
SAMUEL I. ZESKIND
Florida Bar No. 43033
szeskind@wsh-law.com (primary)
tjames@wsh-law.com (secondary)

4

CASE NO. 3:25-cv-343-WWB-PDB

JESSICA B. GOODMAN
Florida Bar No. 1060202
jgoodman@wsh-law.com (primary)
msarraff@wsh-law.com (secondary)

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Case 3:25-cv-00343-WWB-PDB    Document 22    Filed 06/18/25    Page 6 of 111 PageID 126

Exhibit "A"

**IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT**
**IN AND FOR NASSAU COUNTY, FLORIDA**

RAYONIER PERFORMANCE FIBERS,
LLC.                                          )
                                              )
      Plaintiff,                         )
                                              )        CASE NO.
v.                                            )
                                              )
CITY OF FERNANDINA BEACH,                     )
FLORIDA                                       )
                                              )
      Defendant.                         )
_____      )

## COMPLAINT

COMES NOW, Plaintiff RAYONIER PERFORMANCE FIBERS, LLC ("RYAM"), files this Complaint seeking declaratory judgment against the CITY OF FERNANDINA BEACH (the "City"), by and through its Board of City Commissioners, and states as follows:

## PARTIES

1.      RYAM, is a Delaware limited liability company, whose principal place of business is Jacksonville, Florida, with operations at 10 Gum Street, Fernandina Beach, Florida.

2.      The City, is a municipal corporation located within the geographic boundaries of Nassau County, Florida. The City has comprehensive planning and land use authority within its geographic boundaries, pursuant to Chapters 163 and 166, Florida Statutes.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this case pursuant to Section 26.012, Florida Statutes, and Section 86.011, Florida Statutes.

4.      Venue in Nassau County is appropriate because the City is located in Nassau County, RYAM operates its business in Nassau County, and the actions that form the basis of this dispute occurred in Nassau County.

## GENERAL ALLEGATIONS

### The RYAM Facility

5.      RYAM owns and operates an acid sulfite-based pulp mill in Fernandina Beach, Florida that produces dissolving pulp (the "RYAM Facility").

6.      The RYAM Facility was created in the 1930s because of economic demand and scientific breakthroughs in the cellulose market.

7.      The impact of the Great Depression prompted local City officials to turn to heavy industry, particularly the forest industry, to bolster the local economy.

8.      An agreement between local leaders and RYAM's former parent company Rayonier was reached to construct a pulp mill, which was built in 1937, and became operational in 1939 when the first pulp sheet came off the machine.

9.      By 1940, the RYAM Facility employed 500 people, who accounted for 20% of the City's total population in 1940.

10.     During World War II, the RYAM Facility produced nitrating pulp used in munitions and its machine shop, built propellers for the Navy to support the United States' war effort.

11.     Following the war, the City's population grew by approximately 60% with 33% of the population being employed by the RYAM Facility and the other mill currently owned by Smurfit WestRock.

2

12.    As of 2024, the RYAM Facility continues to be one of the top employers in Nassau County, employing approximately 314 people.

13.    In addition to the economic benefits the RYAM Facility has brought to the City in more than eight decades of operation, it has also invested in sustainable manufacturing practices.

14.    In 1976, RYAM constructed an $80 million waste treatment system.  In the early 2000's, it added a $30 million power generation system that implemented a new boiler designed to burn biomass instead of fossil fuels thereby reducing air emissions.  In 2010, RYAM took action to reduce sulfur dioxide emissions, improving its vent gas scrubber system.  This investment in air quality technology allowed Nassau County to be the first county in the United States to be re-designated as having attained ambient air quality standards after having initially been designated under the category of "non-attainment" for sulfur dioxide.

15.    The project that forms the basis of the instant dispute between the City and one of its oldest corporate partners is the next chapter in RYAM's investment in technological solutions to increase economic opportunity and reduce environmental impacts within the City.

## The Project

16.    One of the byproducts of RYAM's pulping process is spent sulfite liquor ("SSL").  SSL contains unused biomass components from the wood chips RYAM uses to make its specialty cellulose products.

17.    Currently, RYAM either burns the SSL in its Sulfite Recovery Boiler for energy or sells it to LignoTech Florida, LLC ("LignoTech").

18.    Consistent with its long history of sustainable operations, RYAM proposes to construct a project within the existing footprint of the RYAM Facility to convert the existing SSL by-product through the biological process of fermentation into second-generation bioethanol, a

3

renewable energy source (the "Project").

**The City's Site Plan Amendment Process**

19.    The City's Land Development Code ("LDC") requires RYAM to submit a site plan amendment application in order to receive approval for the Project.

20.     Sections 11.01.03 and 11.01.04, LDC set forth the application requirements for site plan amendment approval.

21.    Table 11.01.01 identifies the City Manager as the person responsible for final review and decision making on a site plan amendment.  The City Commission has no authority to review, conduct hearings on, or approve or deny site plan amendment applications under the LDC.

22.    Section 11.03.00, LDC identifies review and decision-making procedures for various applications, including site plan amendment applications. The applicable review criteria and procedures depend on the type of approval sought.

23.    Section 11.03.31(A) provides that **all** applications are subject to a determination of completeness. In the context of a site plan, this review includes a determination by the City that all applicable information required in Sections 11.01.03 and 11.01.04, LDC have been submitted.

24.    Once a site plan application is deemed complete, it is required to be submitted to the Technical Review Committee ("TRC") within three days pursuant to Section 11.03.02(A), LDC. Section 11.03.02 states that all applications for site plans **shall** be reviewed by the TRC. (*emphasis added*). Section 11.03.02(A-M) provides for the specific review procedures of the TRC.

25.     Under Sections 9.0503(A) and 11.0302, the TRC must prepare a preliminary compliance report and hold a public meeting to consider the preliminary compliance report and any proposed revisions to the application.  If the application fails to comply with the standards and criteria set forth in the LDC, the compliance report must specifically identify the manner in which

4

the application is deficient, including a citation of applicable sections of the LDC.

26.     The TRC consists of representatives from various City Departments, including Planning and Zoning, Utility, Building, Facilities Maintenance, and Fire pursuant to Section 9.05.02, LDC.

27.     As explained below, the City has failed to follow the process set forth above in its review of RYAM's site plan amendment application.

**The City's Comprehensive Plan and Land Development Code**

28.     The City has adopted a Comprehensive Plan, pursuant to Chapter 163, Florida Statutes. The City's LDC was adopted to implement the Comprehensive Plan.

29.     State law requires that development orders like the site plan amendment for which RYAM applied must be consistent with the City's Comprehensive Plan and LDC. However, the City has never adopted an ordinance pursuant to Section 163.3215, Florida Statutes, to create a statutorily permitted consistency review process.

30.     The RYAM Facility has an Industrial (IN) Future Land Use Map ("FLUM") designation under the Comprehensive Plan.

31.     The Comprehensive Plan Policy 1.07.12. describes permissible uses in the "IN" future land use category as follows:

**Policy 1.07.12. Industrial (IN)**

a.     The industrial land use category is intended to recognize existing industrial development, appropriate open air recreation activities and animal shelter, and to ensure the availability of land for industrial and airport purposes.

b.     The intensity of industrial development shall not exceed a FAR of 0.75.

c.     Industrial sites should have transportation access by air, rail, or highway.

d.    *Industrial uses include*: airport dependent uses, *manufacturing, assembling and distribution activities*; warehousing and *storage activities*; *green technologies*, general commercial activities; integral airport related support services such as rental car facilities, parking facilities; *and other similar land uses.*

\*\*\*

g.    *Heavy metal fabrication, batch plants, salvage yards, chemical or petroleum manufacturing or refining, rubber or plastics manufacturing, or other uses generating potentially harmful environmental or nuisance impacts shall be prohibited.*

\*\*\*

CITY OF FERNANDINA BEACH, FLA., 2030 COMPREHENSIVE PLAN, Goal 1, Objective 1.06., Pol'y 1.07.12. (emphasis added).

32.    The Project is a permissible use under Policy 1.07.12.

33.    The application also meets the LDC provisions that implement the IN future land use designation. The RYAM facility is presently zoned, Heavy Industrial I-2 under the LDC.

34.    The LDC defines "Manufacturing and/or Assembly-Heavy" (hereafter the "Heavy Manufacturing" definition) as follows:

*[U]ses involving intensive manufacturing and industrial operations, including the manufacturing, assembly, fabrication, compounding, processing and/or treatment of extracted or raw materials or other industrial products; packaging and freight loading/unloading activities; utilization, handling and bulk storage of materials including raw materials, chemicals and hazardous materials associated with manufacturing processes; and all other associated or ancillary activities.*

CITY OF FERNANDINA BEACH, FLA., LAND DEV. CODE § 1.07.00 (2023) (emphasis added).

35.    The Project fits squarely within the description of the types of uses and activities included in this definition. The Project proposes the processing and treatment of SSL, an extracted material, and the utilization, handling and bulk storage of materials, including chemicals and hazardous materials associated with the pulp manufacturing process.

6

36.     The Heavy Manufacturing definition further specifies that "all other associated or ancillary activities" are also included in the definition and authorized in the Heavy Industrial I-2 zoning district. Here, the Project is an "associated or ancillary activity" to the existing and permitted pulp manufacturing use.

37.     Using the SSL, as proposed by the Project, is closely connected and subordinate to the pulp manufacturing process because without the pulping operations, the sugars in the biomass would not be available for fermentation.

38.     Similar to the description of the IN-Industrial land use category in the Plan, the Heavy Manufacturing definition also includes the following sentence:

> Such use does not include heavy metal fabrication, batch plants, salvage yards, chemical or petroleum manufacturing or refining, rubber or plastics manufacturing, or other uses generating potentially harmful environmental or nuisance impacts.

CITY OF FERNANDINA BEACH, FLA., LAND DEV. CODE § 1.07.00 (2023).

39.     Even though the Project clearly fits within the Comprehensive Plan and LDC definitions that describe what is permissible in the Heavy Manufacturing zoning district and IN future land use designation, opponents of the Project, including former and current members of the City Commission and the Board of Adjustment, have taken the erroneous position that the Project represents either chemical manufacturing or chemical refining, which are not permitted. The City Staff's machinations to bow to political pressure from the community, candidates for political offices, and members of the City Commission to adopt this erroneous interpretation is at the heart of this dispute.

**Fermentation is Not Chemical Manufacturing**

40.     The Project's proposed method of creating bioethanol relies on the same fermentation process used in making beer, yogurt, and certain baked goods.

7

41.     This process is distinct from chemical manufacturing, which is generally understood by the chemical industry to refer to the industrial production of chemicals through chemical reactions involving non-living substantives.

42.     The distinction between creating bioethanol through fermentation and chemical manufacturing is recognized by state and federal regulatory agencies that govern the industry.

**Physical Separation is Not Chemical Refining**

43.     Once bioethanol is made through fermentation, it can be isolated depending on the end use.

44.     In the case of the proposed Project, the fermented bioethanol mixture will be distilled and then dried using molecular sieves to physically remove water contained in the alcohol so that the bioethanol can be used as a clean energy fuel source.

45.     Distillation and drying are physical processes, relying on temperature differences and mechanical separation to segregate the bioethanol. By contrast, chemical refining is a process that involves the use of chemical reactions, often through the addition of chemical agents that react with impurities.

46.     The distillation proposed by the Project is identical to the process used to make distilled spirits.

47.     Just as chemical manufacturing does not encompass the production of bioethanol through fermentation, "chemical refining" does not encompass the processes of "drying and distillation."

48.     Nothing in Chapter 163, Florida Statutes, the state law governing adoption and implementation of comprehensive plans and zoning codes, nor in the City's Comprehensive Plan and LDC calls for a different interpretation of the phrases "chemical manufacturing" or "chemical

8

refining" in the context of making bioethanol through fermentation more than the interpretation applied by both the industry itself and the environmental regulatory agencies that govern it. In fact, the City's Comprehensive Plan and LDC are silent as to the meaning of these phrases. Importantly, the City employs no one with the expertise to draw meaningful technical distinctions between the various processes and has never sought someone with the requisite expertise to review RYAMs site plan application.

49.      In fact, the City has recognized the distinctions between chemical manufacturing and chemical refining and the production methods proposed by the Project by approving the making of beer, yogurt, and even wastewater treatment through the use of living organisms, and the distillation of ethanol intended for drinking within the City limits.

**The Air Permit**

50.      On November 14, 2023, RYAM submitted an application for a Title V air construction permit to the Florida Department of Environmental Protection ("FDEP").

51.      FDEP issued a Notice of Intent to Issue the air permit on March 13, 2024, which RYAM published on March 27, 2024.

52.      However, before FDEP's Notice of Intent was even published, the spouse of a City Commissioner obtained a copy of the draft permit and Public Notice of Intent to Issue through a Public Records Request to FDEP.

53.      On March 26, 2024, several citizens asked FDEP for an extension of time to file a petition for formal administrative hearing.

54.      Ultimately, a single petitioner filed a petition challenging the air construction permit sought by RYAM before voluntarily withdrawing his petition for administrative hearing.

55.      FDEP issued RYAM the air construction permit on October 31, 2024 (the "Air

4911-5025-5650, v. 1

Permit").

56.    The Air Permit issuance and its supporting application documents were based on environmental standards that are distinct from the LDC's criteria for the issuance of a site plan amendment. Significantly, the air permit application process did not evaluate whether the Project qualified as either chemical manufacturing or chemical refining. Consequently, the Air Permit application and FDEP's evaluation of it have no relevance to RYAM's site plan amendment application. Nevertheless, as discussed below, the City improperly considered and misinterpreted the Air Permit application materials in its efforts to fabricate plausible grounds upon which RYAM's site plan amendment application could be denied.

**Prejudgment by the City based on the Air Permit Application**

57.    Well before RYAM submitted any application to the City, there was public opposition to the Project.

58.    At a City Commission meeting on February 20, 2024, resident Jack Imber raised concerns regarding ethanol production during public comments, referring to a sugar dust explosion at an unrelated facility and made the generic statement that ethanol can explode.

59.    During the same meeting, then-City Commissioner Chip Ross asked the City Attorney, Tammi Bach the following: "There has been talk about a bioethanol plant and one of the questions that I have been asked for …is whether that is an allowable use in the City. And umm. Will you get an opinion on that?"

60.    Ms. Bach responded that it was her plan to get an outside written legal opinion because members of the community expressed beliefs that a bioethanol plant is a chemical manufacturing processing plant, which is not permitted under the City's Comprehensive Plan and Land Development Code ("LDC").

61.     As of the February 20, 2024, meeting, RYAM had not submitted an application to the City for review or approval. Public commentary about permitted land uses is not a mechanism for a site plan application evaluation to be initiated under the LDC.

62.     Nevertheless, based solely on the premature request of a single City Commissioner and generalized community concerns, the City Attorney engaged the law firm of Weiss, Serota, Helman, Cole and Bierman ("Weiss Serota") to provide the opinion she promised Commissioner Ross.

63.     Commissioner Ross's apparent animus towards RYAM extended not only to a premature denial of the proposed Project, but also to having the RYAM Facility deemed a "non-conforming use" – a designation with the potential to limit RYAM's reasonable beneficial use of its property.

64.     On March 20, 2024, the City Attorney provided Weiss Serota with copies of her memorandum requesting a legal opinion, which recited Commissioner Ross's legal question and personal comments regarding what he believed to be the facts surrounding the Project, as well as the Air Permit backup documentation obtained from FDEP. These materials served as the basis for Weiss Serota to evaluate consistency of the Project with the City's Comprehensive Plan and LDC.

65.     Additionally, the City's Planning Director, Kelly Gibson provided documents related to an entirely different unrelated project collocated at the RYAM Facility as background for how the City viewed things in 2016, which she likened to a "basket of kittens. ☺".  In the Planning Director's March 27, 2024, email to Weiss Serota she stated:

> Good Afternoon,
> I am providing several documents that discuss the history surrounding Lignotech. I will also investigate their air permit application and send that over separately. There is one document "NEFRC_102016" which captures

11

my written statements provided at the regional council meeting from when we went to defend the Comp Plan changes. This may provide some insight on how we were viewing things at that time.

During this trip down memory lane, I was reminded that amid this difficult topic we were simultaneously processing LDC definitional changes for heavy industry, modifying the City's floodplain management ordinance, and establishing Zoning Map change to create the I-2 zoning district. I bundled in some of those meeting minutes too. The year 2016 was akin to accepting a basket of kittens. 😊 If you find any pearls in here and want me to look for more details, just let me know!

Thank you again for your expertise on this critical issue.

Sincerely,

66.     Weiss Serota was not provided with technical information from anyone with both the requisite expertise and knowledge of RYAM's proposal and the specific production process being proposed, or how the industry or other regulatory authorities view that production process.

67.     When RYAM became aware of the City Attorney's scheme to procure an opinion from a private law firm before an application was even submitted, RYAM advised the City Attorney that it had a right to submit an application to the City and have it reviewed pursuant to the City's requirements, separate and apart from the Air Permit application that was reviewed and approved by FDEP.  RYAM emphasized that this right was being violated by the City prematurely requesting an opinion from outside counsel.

68.     Additionally, in an effort to supplement the woefully inadequate materials provided to Weiss Serota by the City, David Rogers of RYAM provided the City Attorney with information describing the Project in more detail, explaining how it would be sited within the footprint of the current pulping operations, and defining the fermentation, distillation and drying process.  The City Attorney actually requested that RYAM provide this supplemental material so it could be provided to the City's outside counsel, but upon information and belief, that information was never provided to Weiss Serota.

69.     Commissioner behavior makes clear that the Weiss Serota memorandum was requested merely as a tool to deny RYAM's Project before it was ever requested. On May 9, 2024, Commissioner Ayscue told the Fernandina Observer in an article titled "Bioethanol Activists Get Little Support from Four Commissioners" that his position was simple: "if outside attorneys advise that the bioethanol plant violates city laws, *__the commission__* – not the City Manager – will not allow the proposal to move forward".

70.     Likewise, in an April 15, 2024, email to Suzanne Dixon, Commissioner Ross assured her that, when the Weiss Serota opinion is given, "[a]t that point, I will ask the Interim City Manager [Charlie George] - who has the authority to make the final decision - to determine if the use is allowed." When one understands the request for the Weiss Serota memorandum in this context, it is no wonder that proper technical information was never provided to the Weiss Serota lawyers.

### The RYAM Open House

71.     Despite facts to the contrary, certain members of the City Commission and community members accused RYAM of being secretive and not forthcoming about the Project. Faced with these unfounded accusations and under pressure from the City, RYAM hosted an Open House at the RYAM Facility on March 6, 2024.

72.     The purpose of the Open House was for RYAM to provide the public access to all available information about the Project *__at that time__*. RYAM also provided attendees access to its engineers, technical support personnel, local Fernandina Beach site management, its environmental and safety professionals, and lawyers.

73.     More than 100 people, including television news media and newspaper reporters, attended the Open House, which was conducted in a science fair format with informational tables

13

and RYAM employees available to answer questions.

74.    RYAM also responded to news media requests for interviews at the Open House.

75.    Despite RYAM's best efforts to inform and educate, the public remained dissatisfied, and they continued to demand that the City Commission require RYAM to present the Project to the City Commission.

76.    Critically, at the time of the Open House, RYAM did not have all of the information necessary to make a complete site plan application to the City, which it explained to the City and City Commissioners numerous times.  It was not until December 2024, that RYAM had the requisite design, engineering, safety and other information required to submit a complete site plan application.

77.    More importantly, the City's LDC does not require or even provide a process for presenting a site plan amendment application to the City Commission, to the public at an open house or other public meeting, or to outside lawyers for a hatchet job, particularly before the application has even been submitted. Moreover, upon information and belief, no other site plan amendment applicant has ever been required to submit to the type of public scrutiny and City Commission review as they demanded of RYAM.

**The May 23, 2024, Weiss Serota Memo**

78.    On May 23, 2024, Weiss Serota delivered its Memorandum titled "Request for Legal Opinion – Adding Bioethanol Plant to Existing Industrial Use" (the "Weiss Serota Memo").

79.     The Weiss Serota Memo was based entirely on the misapprehension, apparently derived from a misreading of the air permit application materials, that a separate plant – similar to Lignotech - would be constructed for the bioethanol production.

80.     Amazingly, the Weiss Serota Memo acknowledges that its opinion was solicited
"...*prior to receiving an application from the property owner*."  The Weiss Serota Memo also states
that, "[t]he City is aware of this plan because RYAM has filed an air construction permit
application with the Florida Department of Environmental Protection ("FDEP") requesting
authority to add the Bioethanol Plant to be co-located with the RPF Plant."

81.     Nothing in the Weiss Serota Memo suggests that its authors were, consulted with,
or relied upon input from those familiar with the bioethanol production industry.

82.     Further, because Weiss Serota did not have the application ultimately submitted by
RYAM, it made many errors in its assumptions about the RYAM project.

83.     First, while Weiss Serota acknowledges the existence of different processes for
converting sugar into bioethanol, it fails to distinguish between the one that is a natural
fermentation process and the one that is a chemical process.  After describing both, without
recognizing the difference between the two processes described, Weiss Serota concludes
"[c]ellulosic production is *the process* that would *typically* be followed for a plant like the proposed
at issue."

84.     The Weiss Serota Memo then takes a sharp turn and decides that the key issue is
whether ethanol is a chemical.  The Weiss Serota Memo concludes that bioethanol is a chemical
substance and therefore bioethanol production must be a form of "chemical manufacturing."

85.     Without any reservation or caveat that an application by RYAM to the City should
be reviewed and analyzed, the Weiss Serota Memo concludes, "[i]n sum, it is our opinion that the
proposed Bioethanol Plant is not an allowable use consistent with the City's Comprehensive Plan
and LDC."

15

86.     The Weiss Serota Memo further concludes without reservation that "[i]f the City wanted to consider allowing the proposed Bioethanol Plant, it would need to amend both the Comprehensive Plan and the LDC to allow for it…."

87.     Following issuance of the Weiss Serota Memo, on June 6, 2024, RYAM's attorneys met with the City Attorney to address the prejudice to RYAM created by the Weiss Serota Memo.

88.     While the City Attorney invited RYAM to provide a different interpretation of the Comprehensive Plan and Land Development Code, the Weiss Serota Memo was never rescinded or updated in light of RYAM's application, which included extensive technical analysis of the relationship between RYAM's proposed bioethanol production process and the technical meaning of the phrases "chemical manufacturing" and "chemical refining."

**The City's Attack on RYAM's Credibility, the Project, and Predetermination of Consistency**

89.     Having received the Weiss Serota Memo he asked for, then-City Commissioner Chip Ross continued his campaign to predetermine, prior to a formal application being made by RYAM, that the Project could not be approved.

90.     At a public meeting hosted by NoEthanolFernandina on May 30, 2024, then-Commissioner Ross told the crowd that he wrote an email to the interim city manager asking him to make an interpretation of whether a bioethanol plant was an allowable use in the city, even though no application was pending before the City.

91.     In addition, then-Commissioner Ross apparently worked behind the scenes for a proposed comprehensive plan policy change to expressly prohibit bioethanol, in acknowledgement that the existing policy did not, in fact, prohibit the production of ethanol through fermentation. Then-Commissioner Ross was warned against such a plan by the City Attorney who advised in an email that such a change to "expressly prohibit 'bioethanol' at this time is a big legal liability for the City under the Bert Harris Act and potentially federal takings law."

16

92.     Instead, the City Attorney advised then-Commissioner Ross that the best way to accomplish the former Commissioner's biased objectives was to "to stick with [the] current position from what we know about RYAM's proposed bioethanol project, it is 'chemical manufacturing' that has been prohibited by the City's Comprehensive Plan for many, many years."

93.     On August 20, 2024, the City Attorney forwarded her July 17, 2024, correspondence with Mr. Ross to the entire City Commission and copied City Staff members.

94.     In this message, the City Attorney supported her position by telling the Commissioners that the Weiss Serota opinion was ***binding***.

95.     She stated, "Based upon the written legal opinion the City has received from outside counsel, City staff could not today approve a building permit application for construction of a bioethanol plant anywhere in the City." She continued, "There is no danger of the City issuing a building permit for a bioethanol plant, at this time."

96.     Thus, according to the City Attorney, the City procured, at the direction of a single City Commissioner, the legal opinion of a private law firm without first allowing the landowner the right to submit an application, technical expert information, or even legal argument for consideration by either the City or the private law firm whose opinion was then considered binding on the landowner. This position was communicated to the press and repeated in several different fora, thus foreclosing any chance at a fair hearing on RYAM's application when it was eventually filed.

### September 3, 2024, City Commission Meeting

97.     In response to continuing public comments that RYAM was secretly attempting to construct the Project, RYAM representative Mark Homans had no choice but to appear and speak at the September 3, 2024, City Commission meeting.

17

98.     He provided information regarding RYAM's public statements about the proposed
Project, the air permit application process with FDEP, the Open House hosted by RYAM and
attended by 175 people, one-on-one meetings with members of the community, and RYAM's
attendance at several other small community group events where the Project was discussed.

99.     Mr. Homans confirmed that RYAM would follow the City's process for applying
to the TRC, including answering questions from City Staff and the public during the TRC public
meeting.

100.    Additionally, he clearly stated that RYAM expected the City to fairly evaluate
RYAM's application without any preconceptions.

101.    Then-Commissioner Chip Ross asked Mr. Homans, "just one question is
manufacturing of bioethanol a chemical manufacturing process?"  Mr. Homans responded, "It is
not, and we will be prepared to explain that in the application."

102.    Despite RYAM not having an application pending before the City and there being
no provision authorizing review of site plan amendment applications by the City Commission, at
this same meeting, Interim City Manager Jeremiah Glisson announced that the City Staff was
working on dates for another Town Hall to hear feedback from the community for the Bioethanol
plant process by RYAM.  He stated, "…so we are looking at dates later on in the next few months
to accomplish that."

103.    Both Mr. Glisson and current-Mayor James Antun had communicated with Mark
Homans of RYAM before the City Commission meeting asking him to commit to an unspecified
date in the future for RYAM to give a presentation regarding the Project at a City Commission
meeting.

104.    In fact, Mayor Antun commented at the September 3 City Commission meeting that he would "Like to edify Mr. Jeremiah's request or statement I should say about having a future workshop for bioethanol and informally request that RYAM is willing to do so …to make sure we can get actually get some answers for the Commission."

105.    Commissioner Ayscue then said he wanted to see four Open Houses that would be open for everyone over a 6-8 week period that would be open up for the people to come in – open for everyone – because this issue is "that large" and "we have gotten to that point." Of course, as noted above, by the time Commissioner Ayscue made this extraordinary demand of RYAM, he had already publicly taken the position that, based on the Weiss Serota Memo, the City Commission would not allow the Project to go forward.

### The October 24, 2024, Town Hall Meeting

106.    The City published the notice of a Town Hall Meeting for October 24, 2024, at 6 p.m. at the City Commission Chambers (the "Town Hall").  The Agenda described the one substantive item on the agenda as "**BIOETHANOL** – *In response to civic concern regarding Rayonier Advanced Materials (RYAM) proposed bioethanol __manufacturing__, the City of Fernandina Beach is holding this Town Hall to facilitate discussion.*"

107.    The Interim City Manager Jeremiah Glisson opened the meeting stating that the Town Hall was being held due to community concern related to the proposed bioethanol plant.

108.    The City retained a facilitator for the Town Hall, Cindy Jacoby, a Fernandina Beach local with whom the City had work with previously on its annual visioning sessions.

109.    Ms. Jacoby announced the meeting agenda, which included a 30-minute presentation by RYAM and a 30-minute presentation by Tom Budd, the petitioner who challenged the Air Permit, and his non-profit group NoEthanolFernandina.  The remaining time was reserved

for public comments of three minutes each. Ms. Jacoby allowed questions to be asked but indicated no one could be compelled to answer a question.

110.    Mark Homans and David Rogers presented for RYAM, sharing general information about the current pulping operations, RYAM's outreach efforts to educate about the Project, and new information about the Project that had been developed since the Open House. RYAM agreed under pressure to make this presentation, even though it did not yet have sufficient information to submit a site plan application to the City and there was on-going litigation involving the other presenting party regarding the Air Permit.

111.    Comments from the community at the Town Hall Meeting demonstrated that the primary concerns of the community related to safety, which the site plan application process already addresses.  Public comments also expressed significant opposition to the *existing* pulping operations, rather than the proposed Project.  The existing pulping operations are vested and cannot be modified as part of the City's evaluation of a site plan amendment application.

112.    While not required by the City's TRC process, RYAM took into consideration public comments made at the Open House and the Town Hall in finalizing its site plan amendment application.

**Technical Review Committee First Step Meeting**

113.    The City provides a "First Step Meeting" with City staff as a "free service" to applicants "for input and guidance" and for "exchanging information on the potential development of a site."

114.    The City's webpage instructs applicants to "USE THIS FORM TO Submit a project for input and guidance from the Technical Review Committee ('TRC')" which it identifies as "the City group responsible for reviewing site plans and commercial projects."

20

115.     The City's webpage also instructs that during this exchange of information the City may provide information to the applicant on permissible uses of the site.

116.     RYAM timely submitted its First Step application for and attended a formal TRC Site Plan Review for the December 12, 2024, meeting.

117.     Multiple City Staff members were in attendance. Kelly Gibson the City's Planning Director, and the person ultimately tasked with determining the completeness of a site plan application, directed the meeting.

118.     The meeting was not recorded and, upon information and belief, no minutes were taken.

119.     Mark Homans, on behalf of RYAM, presented a PowerPoint reviewing key components of the Project and RYAM's application.  He also responded to questions and comments from Staff.

120.     At no time during the First Step Meeting did Ms. Gibson, or any other member of Staff, provide information to RYAM about the permissible uses of the site or advise that the proposed use was inconsistent with the Comprehensive Plan or the LDC.

121.     On December 17, 2024, the City's Planning Department provided RYAM with a Next Steps form containing comments along with a contact sheet for City Staff.

122.     The notes contained on the Next Steps form do not state that the use proposed by the Project is inconsistent with the Comprehensive Plan or Land Development Code or request additional information regarding use consistency.  Rather, the notes identified the need for additional information regarding utilities, permitting, potable water supply and new structures associated with the Project.

21

## The Application

123.    Prior to the submission of the Application in December, 2024, RYAM retained a professional engineer who spoke to Interim City Manager Jeremiah Glisson regarding the proposed Project. Mr. Glisson informed the engineer that the City had no choice but to deny the application. Mr. Glisson advised that the new City Manager would probably have to deny the application because it had become "political."

124.    Nevertheless, RYAM held out hope that after all of the information it had provided the City and its residents and all the time and money it had invested in engaging with the City at the City's prompting, it would be fairly treated. Hence, on December 19, 2024, RYAM submitted a carefully prepared site plan amendment application to the City that responded to the notes contained on the Next Steps form issued after the First Step meeting (the "Application"). The Application properly identified the property's Future Land Use designation and Zoning District and contained technical information from experts supporting RYAM's position that the production of bioethanol through fermentation and distillation was permissible under the applicable Comprehensive Plan and LDC policies.

125.    RYAM also paid the maximum application fee of $4,400, which according to the City's ordinance, is calculated based on the estimated costs of preparing the site for construction.

## First Completeness Determination

126.    On December 30, 2024, the City provided RYAM with a request for additional information in the City's First Completeness Determination.

127.    The City claimed the Application was incomplete and identified information and items that needed to be submitted before the Application could be deemed complete and transmitted to the TRC for the development of a Compliance Report/Sufficiency Determination.

22

128.    As with the Next Steps notes, none of the items identified in the First Completeness Determination requested additional information regarding whether the proposed use was consistent with the City's Comprehensive Plan or LDC.

129.    Pretending that RYAM's application was still being considered, Ms. Gibson's letter requested that RYAM, "[p]lease submit response documents to address each comment in the narrative form and with an amended site plan."

130.    On January 22, 2025, RYAM invited Ms. Gibson, Margaret Ohlendorf, and new City Manager Sarah Campbell to visit the proposed Project site that is the subject of RYAM's Application to assist them with their evaluation of the Application. During the January 22 site visit, Ms. Gibson informed RYAM retained engineer Asa Gillette that the new City Manager would deny the application, even though a response to the First Completeness Determination had yet to be submitted.

131.    Despite this worrisome indication of prejudgment and bias, RYAM continued to proceed in good faith, submitting a letter to Ms. Gibson requesting clarification of certain items contained in the First Completeness Determination.

132.    Taking into account feedback received from the City, RYAM timely submitted its responses and updated the Application to the City on January 28, 2025 (the "updated Application").  At no time prior to RYAM's submittal of the updated Application did Ms. Gibson or her staff indicate that RYAM's application was incomplete because of a lack of information regarding consistency with the Comprehensive Plan or zoning district.

**Final Completeness Determination and Written Interpretation**

133.    On February 4, 2025, RYAM received two letters from the City in response to its updated Application.

134.    The first was from Kelly Gibson on behalf of the Technical Review Committee ("TRC") titled "Completeness Review." A copy of the Completeness Review dated February 4, 2025, is attached hereto as Exhibit "A" (hereinafter the "Final Completeness Determination").

135.    RYAM has never been given the opportunity to meet with the full TRC, having only spoken with the individuals present at the First Step Meeting. Upon information and belief, the TRC itself has never reviewed the Application or updated materials.

136.    The Final Completeness Determination signed by Kelly Gibson as the TRC Coordinator states that, "[a] Completeness Determination of the application has found the application to be incomplete."

137.    The sole basis for finding the updated Application incomplete is stated as:

> The application fails to provide, identify or reference a future land use category (established by the Comprehensive Plan) or zoning district (established by the LDC) which permits the proposed use (2G Bioethanol Plant) as required by LDC Section 11.03.01(A)(2), and is therefore deficient.

138.    This finding was never communicated to RYAM during the First Step Meeting, in the correspondence following the First Step Meeting, in the First Completeness Determination dated December 30, 2024, or at the January 22, 2025, on-site meeting to review the site plan with Ms. Gibson and Ms. Campbell.

139.    Further, this sole finding is facially absurd. The Application and its supporting documentation expressly state the Project's future land use category and zoning district and explain in detail how the Project comports with the policies for both the future land use category and the zoning district.

140.    Accordingly, while Kelly Gibson's letter is titled a Completeness Determination, its substance reveals that it is simply an improperly labeled "Written Interpretation." The LDC

24

provisions governing the two types of determinations reveal the difference. Under Section 11.03.01(A), LDC, "Determination of Completeness," the LDC provides in part as follows:

"2.    A determination of completeness is a determination that all required documents and plans has been submitted in sufficient number, and whether all fees have been paid. A determination of completeness is ***not*** a determination of compliance with substantive standards and criteria."

(Emphasis added). The same section directs the City Manager to identify "the missing documents and/or plans" when an application is not complete.

141.    Section 11.01.04(20), lists the document submittal requirements for all site plans. Contrary to Ms. Gibson's letter, the completeness requirements for site plan applications do not require the provision of a future land use and zoning district that permit the use but instead requires only a "summary block" containing the property's future land use designation and zoning district.

142.    Thus, it is clear that a completeness review is limited to a checklist of documents and plans that must be included in an application and expressly ***does not allow*** a substantive review of criteria like whether the documents provided demonstrate Comprehensive Plan or LDC consistency.

143.    By contrast, "Written Interpretation" is the title the LDC uses for substantive determinations of consistency between an application and the City's Comprehensive Plan or LDC provisions except in the context of a site plan that must be reviewed pursuant to the TRC process. In this case, Ms. Gibson's Final Completeness Determination relied on the City Manager's "Written Interpretation of Proposed Use" also dated February 4, 2025 (the "Written Interpretation") as the sole support for the determination that the dispute regarding permissible uses under the Comprehensive Plan and LDC render the application incomplete. A copy of the Written Interpretation is attached hereto as Exhibit "B".

25

144.    The Written Interpretation was allegedly provided as the City's interpretation of the LDC and City's Comprehensive Plan, pursuant to Section 1.05.02(A), LDC. RYAM never requested a written interpretation. Instead, the City Manager issued the written interpretation on her own initiative.

145.    Receipt of the City Manager's February 4 Written Interpretation was the first time RYAM became aware that the City intended to issue an independent written interpretation concerning the proposed use. The City Manager never gave RYAM the opportunity to submit additional information regarding the Written Interpretation before it was written.

146.    The Written Interpretation concluded that the Project is not allowable by either the IN future land use designation established by the Comprehensive Plan or the zoning district assigned by the LDC. While the Written Interpretation summarily states that it is based upon the whole of the City's file, including, but not limited to, the site plan application (TRC 2024-0009) and supplemental documents submitted by RYAM, it expressly relies on the Weiss Serota Memo.

147.    As explained above, the Weiss Serota Memo was not based on the Application, as updated, did not consider any of the materials provided to the City to explain why the proposed Project is consistent with the Comprehensive Plan and Land Development Code, and was not prepared by persons knowledgeable about the technical aspects of the proposed Project.

148.    Furthermore, the City obtained no updated opinion from Weiss Serota after the Application was submitted.

149.    Like the Final Completeness Determination, the Written Interpretation concluded, without identifying any bases or facts to refute the information provided by RYAM in its Application, that the proposed Project constituted either chemical manufacturing or refining, which are prohibited uses in the Industrial (IN) future land use category.  And, like the Final

26

Completeness Determination, the Written Interpretation was issued in a manner that is inconsistent with the requirements of the LDC.

150.    Under Section 1.05.02(A), the power to issue written interpretations is vested in the City Manager with one important exception: the City Manager cannot use the Written Interpretation process to override the responsibilities of any other commission, board, or official.

151.    Section 11.03.02, LDC expressly provides that the TRC is vested with the responsibility for reviewing site plan amendments and developing a compliance report. Section 11.03.02, LDC, states, "All applications for site plans, preliminary subdivision plats, final subdivision plats, minor subdivisions, and amendments to previously issued local development orders, change of use, and nonresidential building expansions **shall be reviewed** by the Technical Review Committee (TRC)."

152.    Therefore, a Written Interpretation that precludes the TRC's consideration of a site plan amendment application and development of a compliance report violates the express provisions of Sections 1.05.02(A) and 11.03.02, LDC.

153.    This distinction is not trivial.  Consideration by the TRC allows an applicant to develop a full administrative record upon which further determinations may be judged, first by administrative decision-makers and ultimately by a reviewing court. Therefore, access to the TRC process is a fundamental part of RYAM's right to a meaningful opportunity to be heard.

154.    Furthermore, the City's scheme to issue both a Written Determination and a Written Determination mislabeled as a Completeness Determination changes the process for administrative review.  Written Determinations that fall outside of a compliance report are reviewable by the Board of Adjustment, pursuant to Section 11.07.01(B)(10), LDC. Completeness determinations are also reviewable as an administrative decision by the Board of Adjustment, pursuant to Section

27

11.03.01(A)(5), LDC. By contrast, compliance reports are **not subject** to appeal to the Board of Adjustment.

155.    As explained below, the current membership of the City's Board of Adjustment is incapable of providing RYAM a fair and impartial hearing on the consistency matters raised by both letters, regardless of their titles.  Furthermore, relief at the Board of Adjustment requires five votes in the applicant's favor, pursuant to Section 11.07.04(G), LDC. There *are* only five members on the Board of Adjustment, pursuant to Section 9.04.02, LDC, with two alternates.

156.    Therefore, even if the Board of Adjustment was not constituted by anti-RYAM activists who have engaged in *ex parte* communication and prejudged RYAM's application before it was even filed, which is the case as explained more fully below, an appeal to the Board of Adjustment is intentionally set up by the City to be a virtually impossible task.  It is, therefore, no wonder that the City's Planning Director and City Manager have worked so hard to fit their *ultra vires* acts within the Board of Adjustment's purview.

**Board of Adjustment Prejudgment, Ex Parte Communication and Bias**

157.    The Board of Adjustment has five members, with two alternates. Kelly Gibson, is identified as the Staff liaison to the Board, even though it is her decision regarding completeness that is under review.

158.    Board of Adjustment member, Len Kreger was appointed to the Board by the City Commission on December 3, 2024, a few weeks before RYAM's Application and several months after RYAM was pressured to make the many public presentations set forth above. Board member Kreger is a former Commissioner and Vice-Mayor who has been outspoken against the Project, including publishing editorial articles in local newspapers opposing the Project.

4911-5025-5650, v. 1

159.    Len Kreger is identified as a Director of "NoEthanolFernandina," a DBA for a Florida non-profit corporation called "Fernandina Wins, Inc." Len Kreger is also identified as a Director for Fernandina Wins, Inc., on the Florida Division of Corporations website.

160.    The website for "NoEthanolFernandina" declares "we are united in our determination to prevent the manufacturing of the chemical ethanol in Fernandina Beach at RYAM's Gum Street plant adjacent to residences, businesses, schools, churches, and our historic downtown."

161.    Len Kreger also served as a guest columnist for the News-Leader writing a column on December 5, 2024, in which he implicitly cast aspersions on the veracity of RYAM's public presentations stating "Truth is the first casualty." Board member Kreger wrote that RYAM's Air Permit application was discovered through the "watchful monitoring of a private citizen," perpetuating the false narrative that RYAM had behaved secretively with respect to the Project. Mr. Kreger then wrote that the Weiss Serota Memo "definitively concluded that 'state law requires the city to reject such a proposal and enforce its Comprehensive Plan and LDC." Mr. Kreger lamented that RYAM's position that the creation of bioethanol through fermentation is not chemical manufacturing or refining" makes it "legally challenging to oppose the project on those grounds."

162.    Mr. Kreger observed that "RYAM's next step will be to bring their project pre-application to the city Technical Review Committee. According to the Land Development Code (LDC), this project should be rejected because it is not a permissible use on the site. **The new city manager, in consultation with staff, will make this decision.** RYAM can and likely will challenge this decision through one of the legal options available to them." This incredible statement was made almost two weeks before RYAM had even submitted an application to the

29

City for the Project. This suggests that Mr. Kreger was engaged in behind-the-scenes communications with City staff regarding their intent and shows an intense prejudice against the Project.

163.    Interestingly, while Mr. Kreger claims a concern about truth being a casualty, Mr. Kreger did not share as part of his "guest column" his activist role in the NoEthanolFernandina organization, choosing instead to list only his former military service and his prior roles on the Fernandina Beach Planning Advisory Board, Sustainable Fernandina Committee, and County Code Enforcement Board.   To say that Mr. Kreger is incapable of serving as a fair and impartial decision-maker on any appeal related to the RYAM application would be an understatement of the first water.

164.    Taina Christner is another Board of Adjustment member appointed in December, 2024, by the City Commission, who is a member and either current or former director of Fernandina Wins, Inc.

165.    Taina Christner has a history of inflammatory and factually inaccurate social media posts regarding the Project that are obviously designed to create fear and stimulate opposition in the local community against RYAM and its anticipated application. For example, in March, 2024, Taina Christner issued a social media post alerting viewers that "No Ethanol Plant" yard signs were available for sale for $10 at a local art gallery. On March 19, 2024, Taina Christner issued a social media post sharing a NoEthanolFernandina post stating the following, "Ethanol is highly flammable," "**Prohibited by local Comp Plan**," "Dangerous for Residents," "No evacuation plan for residential areas," "Waste water concerns for river quality," "Contaminants pose a threat to aquatic ecosystems," "Noise, odor, and light pollution issues." The post exhorts viewers to "Join Us to Make Our Voice Heard!"

30

166.    On March 22, 2024, Taina Christner issued a social media post sharing a Youtube video about an explosion at an unrelated laboratory in 2007, pondering "What would an explosion similar to this do to downtown Fernandina Beach? Just imagine. And I believe this plant was smaller than what is proposed here."

167.    Two days later on March, 24, 2024, Taina Christner shared on her social media a story with the caption, "Residents concerned over possible health impact of planned bioethanol plant in Fernandina Beach."

168.    In April, 2024, Taina Christner posted that the US Airforce limited the use of foam fire retardant after realizing the substance "polluted the drinking water for 6 million Americans." Ms. Christner queried, "Will the same happen to Fernandina if this is used right next to our local waterways for the proposed Ethanol Plant?"

169.    Also, in April, 2024, both Taina Christner and Len Kreger were part of a group email chain from other anti-RYAM activists reporting on the position of the interim City Manager on RYAM's Project. When advised that the City Manager was apparently concerned about whether the City Commission would interfere if he attempted to thwart the Project (a position the interim City Manager later denied), Ms. Christner stated, "Politicians are still under the belief that they can blow us off and we'll go away. They don't know us very well."

170.    In May, 2024, Taina Christner posted an event invitation for a "No Ethanol Fernandina Town Hall." On June 5, 2024, Taina Christner posted a plea for donations to the aforementioned "NoEthanolFernandina" to "help with the legal fees associated with saving Fernandina from an ethanol plant being built in the middle of our neighborhood." On June 13, 2024, Taina Christner shared a radio program regarding what she referred to as "the proposed ethanol refinery in downtown Fernandina Beach."

31

171.    In August, 2024, Taina Christner sent an email to the City Commissioners about the public statements of RYAM's CEO.  Even Commissioner Ayscue, no friend to the Project as explained above, responded that he would not comment on the Project for fear of litigation.  Not to be dissuaded, Taina Christner sent another email in August, 2024, complaining that the City Commissioner had removed from the City Commission's agenda a bioethanol presentation designed to stimulate a comprehensive plan amendment prohibiting its production, after the City Attorney advised that such an action would likely lead to litigation.  Ms. Christner's email attacked the City Attorney as "unelected" and decried the lack of opportunity for public participation on the topic.

172.    Taina Christner was also one of the citizens who initially requested an extension of time to challenge RYAM's Air Permit, calling herself "an affected party" as a result of the proposed Project.  Thus, bias and prejudgment are hardly adequate to describe Ms. Christner's anti-RYAM animus.

173.    Alternate Board of Adjustment member Kim Wolford was also appointed to the Board in December, 2024 and has openly spoke out against RYAM. Ms. Wolford has a history of lodging public complaints about RYAM. As recently as January, 2025, Ms. Wolford complained to the City regarding the "chemical smells" emanating from the RYAM facility. City staff concluded that the smells were probably from a neighboring plant, not RYAM. In addition, Ms. Wolford has issued social media posts about the Project that suggest bias and prejudgment.

174.    Since the City has chosen to require a unanimous vote by the Board of Adjustment to overturn staff decisions, the obvious bias and prejudgment of either Board Members Kreger or Christner would be fatal to RYAM's ability to receive due process. That two Board Members and one alternate are biased against the project to this extent render the entire Board of Adjustment

32

appellate process an obvious sham. Yet, the LDC provides no mechanism to request recusal. Furthermore, the LDC requires the specific number of 5 votes to gain relief on appeal to the Board of Adjustment. Since two Board Members and one alternate are unfit, there are not five members who could even meaningfully hear an appeal brought on RYAM's behalf.

**The City's Celebration of its Ultra Vires Act**

175.    At the regular City Commission Meeting on February 4, 2025, Ms. Campbell announced that Staff sent a letter to Mark Homans at RYAM and read an excerpt from her letter to RYAM stating that the City must reject the application for the proposed Project and that no further action would be taken.

176.    The City Commissioners celebrated. Commissioner Genece Minshew thanked her for "taking a stand on the bioethanol" and thanked her for "stepping up and doing it."  Later, Commissioner Minshew issued a social media post celebrating the City Manager's behavior, stating, "OK, this is not anywhere close to being over.  Yes, a good victory for the moment, but the war is not over."

177.    Commissioner Joyce Tuten also thanked Ms. Campbell for sending the letter.

178.    Worse, during the Mayor/Commissioner Comments period, Commissioner Tuten asked that an item be placed on the City Commission's agenda to discuss the criteria to award the City Manager her 6 month $10,000 bonus, even though she had only served for 60 days as of this meeting.

179.    This celebration by the City of the City Manager and Planning Director's misuse of the administrative letter processes in order to deprive RYAM of the chance to have its site plan amendment application considered by the TRC makes clear that the City already decided to deny RYAM's application, as far back as May 23, *2024*, almost six months before RYAM submitted its

Step One application and before the City coerced RYAM into spending more than one (1) year, hundreds of hours, and hundreds of thousands of dollars preparing and supplementing its Application.

### Direction to Appeal

180.    Even after the two administrative letters were issued, the City has continued to create procedural roadblocks for RYAM. Contradictory to the instructions given to RYAM for filing an administrative appeal with the Board of Adjustment, the Board of Adjustment webpage instructs that, "… you must meet with a planner before your submit an application for a variance or an administrative appeal."

181.    RYAM was required to obtain a clarification from the interim City Attorney regarding the process described by the two letters versus the process described by the webpage.

182.    Even more confusing to RYAM and further demonstrating the lack of control and consistency the City has over its TRC process, RYAM received an automated message from the City of Fernandina Beach dated February 6, 2025, at 7:05:03 PM stating, "Your plan will expire in the next 15 days. Please reach out to our Planning and Conservation Department as soon as possible to discuss your plans at (904)310-3480."

183.    Once again, RYAM had to contact the interim City Attorney to obtain clarification on the 15-day message. The first response from the City Planning Department only stating that "no action is required" was vague and ambiguous in light of the two February 4th letters. After questioning the meaning of that message, RYAM was told that the automated message should not have been sent and should be disregarded in favor of the deadlines for filing an administrative appeal set forth in the letters.

34

184.    Thus, for more than a year the City has engaged in an orchestrated, bad-faith, effort to deny RYAM a reasonable application process for consideration of its bioethanol Project, which merely augments a facility that has operated safely and to the mutual benefit of RYAM and the City for almost a century.  The City's behavior has harmed RYAM and caused it to doubt its rights and responsibilities under the City's Comprehensive Plan and LDC.

## RYAM's Damages

185.    As of May 2024, RYAM had invested $1,563,000 towards developing the engineering and site planning for the proposed Project necessary to support its application to the City, but had not had the opportunity to submit an application for consideration before the City obtained the Weiss Serota Memo and determined it would rely on it to respond to RYAM's application.

186.    Between May 2024, and February 2025, when the City's Completeness Determination and consistency evaluation were issued, RYAM spent another $1,899,000 on design, engineering, and safety and environmental planning.

187.    Additionally, to develop the expert materials interpreting the City's Comprehensive Plan and Land Development Code in support of RYAM's Application, RYAM incurred fees and costs of $448,426.19.

188.    Finally, it paid – and the City accepted as if the application would be properly evaluated - the maximum application fee of $4,400 to access the TRC process.

189.    Worse, RYAM has been substantially burdened in its ability to use and enjoy its property, even though its proposed use is consistent with both the Comprehensive Plan and the LDC.  The Project is important to RYAM's corporate goals to engage in sustainable production

practices that benefit the environment through the production of renewable energy and enable

RYAM to fully utilize its property.

190.     Accordingly, RYAM has suffered significant financial harm through the City's

*ultra vires* acts.

### COUNT I – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (COMPLETENESS DETERMINATION)

191.     RYAM re-alleges paragraphs 1 through 190, as if fully set forth herein.

192.     This is an action for declaratory judgment, injunctive relief, and supplementary

relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, for the City's

*ultra vires* attempt to reject RYAM's site plan amendment application as incomplete based on its

substantive review of consistency with the comprehensive plan, and to subject RYAM to the sham

of a Board of Adjustment hearing reviewing the Planning Director's determination where its own

Code does not call for such review.

193.     All conditions precedent have been satisfied or waived.

194.     The City has issued what it calls a "completeness determination" refusing to further

process or consider RYAM's Application, based on its assertion that RYAM failed to identify a

comprehensive plan future land use designation and zoning district applicable to the property that

would permit the intended use of a secondary bioethanol production process.

195.     However, as explained above the determination is actually an improper Written

Interpretation not contemplated by the City's procedures, as set forth in the LDC.

196.     The City is now directing RYAM to the City's Board of Adjustment.  The Board

of Adjustment's jurisdiction is set forth in Section 11.07.01, LDC, which provides the Board of

Adjustment the power to hear and resolve appeals of specific administrative actions.

36

197.    Section 11.07.01, LDC, does not authorize an appeal from a written interpretation of the City Planning Director acting as the TRC Coordinator addressing comprehensive plan consistency under the title of a completeness determination.

198.    In fact, the City's Code provides no administrative process to consider the Planning Director's letter, which stands entirely outside of the City's LDC and the Planning Director's own admissions regarding how the completeness determination process actually works.

199.    As a quasi-judicial entity, the Board of Adjustment can only exercise the power that is expressly given under the Code.

200.    Moreover, the Planning Director's letter effectively denies RYAM's site plan amendment application, which RYAM is entitled to have considered and processed by the full TRC under the plain terms of the LDC.

201.    Based on the City's actions, RYAM is in doubt regarding its rights under the City's LDC as a site plan amendment applicant and a landowner within the City.  The dispute between the parties is real, actual, present, and adverse.

202.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

203.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application.

204.    While money damages are warranted in this case as supplemental relief, money damages alone will not make RYAM whole for the City's refusal to process RYAM's application.

4911-5025-5650, v. 1

205.    The public interest is served by an order declaring the ultra vires nature of the Planning Director's letter and requiring the City to acknowledge the completeness of RYAM's application and refer the application for substantive review by the TRC.

206.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the City's denial of RYAM's site plan application as incomplete based on its conclusion that the Comprehensive Plan and Zoning Districts do not permit the use is contrary to the City's Land Development Code process for completeness determinations; that the Board of Adjustment process is inapplicable to such decisions; that the Court order the City to refer RYAM's application to the TRC for review and the development of a compliance report; and that the City award RYAM monetary damages and other such supplemental relief as the Court deems appropriate.

## COUNT II – CONSISTENCY CHALLENGE (SECTION 163.3215, FLORIDA STATUTES)

207.    RYAM re-alleges paragraphs 1 through 190, as if fully set forth herein.

208.    This is an action for declaratory judgment and injunctive relief, pursuant to Section 163.3215 and Chapter 86, Florida Statutes.

209.    All actions taken by local governments on applications for development orders must be made consistent with the provisions of the local government's comprehensive plan.

210.    Where a local government has denied the application for a development order on the grounds that the application would be inconsistent with the comprehensive plan, that decision is subject to challenge pursuant to Section 163.3215, Florida Statutes. In fact, Section 163.3215, Florida Statutes, is the sole method for challenging such consistency, since the City has not adopted

38

an ordinance providing for an alternative method of review, in accordance with Section 163.3215(4), Florida Statutes.

211.    Any applicable conditions precedent have been satisfied or waived.

212.    As the landowner and applicant for a site plan amendment approval, which is a development order under Chapter 163, Florida Statutes, RYAM has been adversely affected by the City's denial of its site plan application, and thus has standing to enforce the requirement that decisions on development orders be consistent with the City's comprehensive plan, pursuant to Section 163.3215, Florida Statutes.

213.    As explained herein, the City's rejection of RYAM's site plan application as inconsistent with the City's comprehensive plan is, itself, inconsistent with the City's comprehensive plan. RYAM's Application and subsequent update comports with all the requirements of the City's Comprehensive Plan, as well as the City's LDC, and was denied based solely on the City's inconsistent interpretation of its Comprehensive Plan policies regarding the IN future land use designation.

214.    The City's decision affects the intensity of use on RYAM's property and therefore is actionable under Section 163.3215, Florida Statutes.

215.    The City's decision is accorded no deference in a consistency challenge brought pursuant to Section 163.3215, Florida Statutes, and the burden to demonstrate consistency belongs to the City.

216.    RYAM has retained the undersigned law firm to represent it in the instant matter and has agreed to pay a reasonable attorney's fee for the firm's prosecution of the case.

217.    Pursuant to Section 163.3215(8), Florida Statutes, prevailing parties in a consistency challenge are entitled to the recovery of attorney's fees.

4911-5025-5650, v. 1

WHEREFORE, RYAM respectfully requests that the Court issue an order finding the City's denial of its site plan application inconsistent with the City's Comprehensive Plan, enjoining the City from denying its site plan application on the basis of comprehensive plan consistency, and awarding RYAM reasonable attorney's fees, and other such supplemental relief as the Court deems appropriate.

## COUNT III – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (SUFFICIENCY DETERMINATION)

218.    RYAM re-alleges paragraphs 1 through 190, as if fully set forth herein.

219.    This is an action for declaratory judgment, injunctive relief, and supplementary relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, for the City's *ultra vires* attempt to reject RYAM's site plan amendment application based on a written interpretation that usurped the power of the TRC and was therefore not within the City Manager's power to issue, and to subject RYAM to the sham of a Board of Adjustment hearing reviewing the written interpretation.

220.    All conditions precedent have been satisfied or waived.

221.    The City Manager issued a "written interpretation" concluding that RYAM's site plan application was inconsistent with the City's Comprehensive Plan and Land Development Code.  Substantively, this is incorrect, as addressed above.

222.    However, the City Manager's interpretation is also procedurally inappropriate. Section 11.03.01(B), LDC, calls for written determinations of sufficiency for "citizen-led Comprehensive Plan Amendments and Amendments to the land development code. . . ", categories that do not apply to RYAM's application. Separately, an applicant can request written interpretations.

40

223.    Section 1.05.02 identifies the City Manager as responsible for interpretations of the zoning code, but specifies that this power does not allow the City Manager to override the responsibilities of any commission, board, or official. Therefore, while the City Manager can make interpretations, she is not allowed to use that power to divest another body of its authority. That is exactly what the City Manager has attempted to do here by prematurely issuing a written interpretation letter that prevents the TRC from substantively evaluating RYAM's application.

224.    The Board of Adjustment has the power to hear appeals regarding sufficiency determinations made pursuant to Section 11.03.01(B), LDC. But, the City Manager's letter does not fall under this provision.

225.    Separately, the Board of Adjustment has the power to review written determinations regarding use and zoning district boundaries, pursuant to Section 11.07.01(B)(10). This category of written determination refers to written determinations regarding uses that can be requested by land owners, pursuant to Section 2.03.01(D), which provides, "[a] property owner may request an interpretation to determine if a use that is not identified is permissible, based on substantial similarity of the requested use to permissible uses within the zoning district in which the property is located." Again, RYAM never requested such a letter, therefore, Section 11.07.01(B)(10), does not grant the Board of Adjustment authority to hear an appeal over the City Manager's letter.

226.    There is no catch-all authority on the part of the Board of Adjustment to hear consistency determinations not authorized by the LDC, which is what the City Manager's letter represents. Therefore, the City Manager's letter demanding that RYAM submit its appeal to the Board of Adjustment is *ultra vires*. In fact, the City's Code provides no administrative process to

4911-5025-5650, v. 1

consider the City Manager's sufficiency determination outside of the provisions of 11.01.03(B) and Section 2.03.01(D).

227.    Based on the foregoing, RYAM is in doubt regarding its rights under the City's LDC as a site plan amendment applicant and a landowner within the City.  The dispute between the parties is real, actual, present, and adverse.

228.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

229.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application. Money damages alone will not make RYAM whole for the City's unwarranted refusal to process its application.

230.    The public interest is served by an order requiring the City to refer the application for substantive review by the TRC so that a record can be developed upon which full code compliance can be adequately evaluated.

231.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the City Manager's denial of RYAM's site plan application as inconsistent with the City's Comprehensive Plan and Land Development Code is outside of the City Manager's authority to issue *sue sponte*; that the Board of Adjustment process is inapplicable to such decisions; that the Court order the City to refer RYAM's application to the TRC for review and a compliance report; and that the City award RYAM monetary damages and other such supplemental relief as the Court deems appropriate.

42

## COUNT IV – DECLARATORY JUDGMENT
## (WEISS SEROTA MEMORANDUM)

232.    RYAM re-alleges paragraphs 1 through 190, as if fully set forth herein.

233.    This is an action for declaratory judgment, injunctive relief, and supplementary relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, for the City Planning Director and City Manager summary denial of RYAM's right to have its application considered by the TRC, based on the legal opinion of a private law firm not identified in the Land Development Code as having interpretive authority.

234.    All conditions precedent have been satisfied or waived.

235.    The City Manager issued a "written interpretation" concluding that RYAM's site plan application was inconsistent with the City's Comprehensive Plan and Land Development Code.  Substantively, this is incorrect, as addressed above.  The City Manager's letter specifies that she relied on the Weiss Serota Memo in coming to her conclusion. Previously, the City Attorney publicly indicated that the Weiss Serota Memo was "binding." Certainly, the facts of this case make crystal clear that the City's actions in this case were a foregone conclusion once the Weiss Serota Memo was issued.

236.    The LDC does not identify a process for outsourcing the interpretive power of the City Manager in the manner in which the City has attempted to do here.

237.    Moreover, the LDC specifies that exercise of interpretive power by whomever wields it cannot override the responsibilities of any commission, board, or official. Therefore, while the City Manager can make interpretations and may even be able to consider (but not treat as binding) the legal opinion of a private firm, she is not allowed to use that power to divest another body of its authority. That is exactly what the City Manager has attempted to do here by prematurely issuing a written interpretation letter without request and, in doing so, preventing the

43

TRC from substantively evaluating RYAM's application. The LDC states that site plan applications "shall" be considered by the TRC.

238. The Board of Adjustment has the power to hear appeals regarding sufficiency determinations made pursuant to Section 11.03.01(B), LDC. As stated herein, Section 11.03.01(B), does not authorize the written interpretation letter issued by the City Manager finding inconsistency between RYAM's Project and the Comprehensive Plan (which is what the LDC calls a "sufficiency determination") because subsection (B) is limited to citizen-led plan and code amendment applications.

239. Separately, the Board of Adjustment has the power to review written determinations regarding use and zoning district boundaries, pursuant to Section 11.07.01(B)(10). This category of written determination refers to written determinations regarding uses that can be requested by land owners, pursuant to Section 2.03.01(D), which provides, "[a] property owner may request an interpretation to determine if a use that is not identified is permissible, based on substantial similarity of the requested use to permissible uses within the zoning district in which the property is located." Again, RYAM never requested such a letter, therefore, Section 11.07.01(B)(10), does not grant the Board of Adjustment authority to hear an appeal over the City Manager's letter.

240. The Board of Adjustment has no power to consider legal opinions issued by a private law firm before an application has even been received and which have been identified as "binding" by the City Attorney – such an act is contemplated nowhere in the LDC, either in the first instance or as a matter for quasi-judicial review. Therefore, the City Manager's letter demanding that RYAM submit its appeal to the Board of Adjustment is *ultra vires*. In fact, the

4911-5025-5650, v. 1

City's Code provides no administrative process for the Board of Adjustment to consider the "binding" legal opinion of a private law firm.

241.    Based on the foregoing, RYAM is in doubt regarding its rights under the City's LDC as a site plan amendment applicant and a landowner within the City.  The dispute between the parties is real, actual, present, and adverse.

242.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

243.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application.

244.    Money damages alone will not make RYAM whole for the City's unwarranted refusal to process its application.

245.    The public interest is served by an order requiring the City to refer the application for substantive review by the TRC so that a record can be developed upon which full code compliance can be adequately evaluated.

246.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the Weiss Serota Memorandum is not binding on the City; that the Board of Adjustment process is inapplicable to the  City's decisions that were based on the Weiss Serota Memorandum; that the Court order the City to refer RYAM's application to the TRC for review and a compliance report; and that the City award RYAM monetary damages and other such supplemental relief as the Court deems appropriate.

45

**COUNT V – DECLARATORY JUDGMENT
(BOARD OF ADJUSTMENT – IMPARTIAL DECISIONMAKER AND *EX PARTE*
COMMUNICATIONS)**

247.    RYAM re-alleges paragraphs 1 through 190, as if fully set forth herein.

248.    This is an action for declaratory judgment, injunctive relief, and supplementary

relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, regarding the *ex*

*parte* communication, bias, and prejudgment of Board of Adjustment members Len Kreger, Taina

Christner, and Kim Wolford.

249.    All conditions precedent have been satisfied or waived.

250.    As set forth above, multiple Board of Adjustment members are activists and

committed opponents of both RYAM and the Project. Len Krueger and Taina Christner serve as

members of an anti-RYAM nonprofit and have repeatedly made public and private statements

demonstrating bias and prejudgment against RYAM and the specific application that would form

the basis of RYAM's appeal should it be required to follow the process set forth by the City. While

less public in her opposition than Board Members Krueger and Christner, Board Member Alternate

Kim Wolford has also demonstrated bias against RYAM and its operations. Upon information and

belief, Board Members Krueger and Christner have spoken with each other and others about

RYAM's project and application and how to thwart its approval, representing prejudicial *ex parte*

communications with others opposed to RYAM's project.

251.    In *Jennings v. Dade County*, 589 So. 2d 1337 (Fla. 3d DCA 1991), the Third

District Court of Appeal acknowledged the constitutional violation represented by *ex parte*

communication. The Court further acknowledged that the procedural due process violation posed

by *ex parte* communication is not addressable through a petition for writ of certiorari because it is,

by definition, incapable of inquiry through review of the record. Accordingly, the Court

acknowledged the right to bring a claim in circuit court contesting the *ex parte* communications of quasi-judicial board members as due process violations.

252.    Likewise, federal and state case law has made clear that an impartial decision-maker is a minimum for due process. Decision-makers who have adopted a partisan role in the dispute that they are called upon to determine cannot meet the constitutional requirement for an impartial decision-maker.

253.    Here, Board of Adjustment members, Len Krueger and Taina Christner, through their public conduct have made clear that they have been working in concert with others, including City staff and officials, to quash the RYAM application before it was even filed. Similarly, Kim Wolford has publicly demonstrated bias against RYAM and its application. Thus, all three Board Members are incapable of serving on the Board of Adjustment if it is allowed to hear the decisions that effectively denied RYAM's site plan amendment application. It seems pretty clear that the activism of these three individuals may have been a driving factor in why they were placed on the Board of Adjustment in the first place, given their appointment in the same month as the RYAM application by a City Commission, members of which had publicly expressed an intention to stop RYAM's application process.

254.    The City has no published process allowing for the recusal of its Board of Adjustment members. Even if a recusal process existed, the Board of Adjustment could not legitimately hear RYAM's appeal, since appeals require five votes and there are only five full members and two alternates on the Board of Adjustment.

255.    Thus, RYAM is in doubt as to its procedural rights that any hearing in front of the Board of Adjustment on appeals related to RYAM's site plan amendment application be free of

47

the taint of bias, prejudgment, and prejudicial *ex parte* communication.  The dispute between the parties on this point is real, actual, present, and adverse.

256.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

257.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application. Money damages alone will not make RYAM whole for the City's unwarranted refusal to process its application.

258.    The public interest is served by an order acknowledging that the Board of Adjustment as convened by the City and under its procedures for voting, as set forth in the LDC, is not capable of holding a fair and impartial hearing on RYAM's appeal from the City Planning Director and City Manager's written determinations.

259.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the Len Krueger, Taina Christner, and Kim Wolford are not able to serve as impartial decision-makers on RYAM's site plan amendment application, due to their obvious prejudgment, bias, and upon information and belief prejudicial *ex parte* communications, declare that as a result the Board of Adjustment cannot convene consistent with the City's LDC and hold a fair and impartial hearing on RYAM's appeal of the City Manager and City Planning Director's letters, making such an appeal futile,  and awarding other such supplemental relief as the Court deems appropriate.

Respectfully submitted this 28th day of February 2025.

48

*/s/ Amy Taylor Petrick*

AMY TAYLOR PETRICK, ESQ
Florida Bar No. 315590
LEWIS, LONGMAN & WALKER, P.A.
360 South Rosemary Avenue, Suite 1100
West Palm Beach, FL 33401
Telephone: (561) 640-0820
Primary Email: apetrick@llw-law.com
Secondary Email: bpennington@llw-law.com
Secondary Email: mlozada@llw-law.com

BRENNA M. DURDEN, ESQ
Florida Bar No. 518786
LEWIS, LONGMAN & WALKER, P.A.
245 Riverside Avenue, Suite 510
Jacksonville, FL 32202
Telephone: (904) 353-6410
Primary Email: bdurden@llw-law.com
Secondary Email: dreichard@llw-law.com

NICOLE J. POOT, ESQ
Florida Bar No. 118858
LEWIS, LONGMAN & WALKER, P.A.
100 Second Ave South, Suite 501-S
St. Petersburg, FL 33701
Telephone:  (727) 245-0820
Primary Email: npoot@llw-law.com
Secondary Email:  jgabriel@llw-law.com

WHITNEY K. MCGUIRE, ESQ
Florida Bar No. 0034984
Rayonier Performance Fibers, LLC
1301 Riverplace Blvd.
Jacksonville FL, 32207
Telephone: 904-549-7395
Email: whitney.mcguire@ryam.com
*Counsel for Plaintiff, Rayonier*
*Performance Fibers, LLC*

UNOFFICIAL DOCUMENT

49



**CITY OF FERNANDINA BEACH**                                    Technical Review Committee

Completeness Review

February 4, 2025

Mark Homans
Rayonier Performance Fibers, LLC
10 Gum Street
Fernandina Beach, FL 32034
mark.j.homans@ryam.com

Sent Via Email to Project Team

Applicant Name: Mark Homans
Project Description: RYAM Fernandina 2G Bioethanol Plant
Location: 10 Gum Street
PIN(s): 00-00-31-1840-0000-0000
TRC Case Number: TRC 2024-0009

Mr. Homans,

The City of Fernandina Beach (the "City") received your request for site plan TRC review on Tuesday, January 28, 2025. A Completeness Determination of the application has found the application to be incomplete. The application fails to provide, identify or reference a future land use category (established by the Comprehensive Plan) or zoning district (established by the LDC) which permits the proposed use (2G Bioethanol Plant), as required by LDC Section 11.03.01(A)(2), and is therefore deficient.

The application for the proposed use (2G Bioethanol Plant) is located within the City's Comprehensive Plan Industrial (IN) future land use category and the Heavy Industrial (I-2) Zoning district. Separately, the City Manager has analyzed the proposed use and whether it complies with the IN future land category and the I-2 zoning district. See attached written interpretation letter dated 2.4.2025. She concluded the proposed use does not. More specifically, she notes that interpretations of these documents are required to give effect to the specific provisions over the general, and to liberally interpret the laws to achieve the purposes of the City. See Section 1.05.01(a) and (c), LDC. While Industrial use is allowed in this future land use designation and zoning category generally, the more specific language of the Comprehensive Plan and the LDC directs that the proposed use (2G Bioethanol Plant) constitutes chemical manufacturing or refining, which is strictly prohibited.



**CITY OF FERNANDINA BEACH**                    Technical Review Committee

Completeness Review

Both the Comprehensive Plan, in its Industrial (IN) future land use category, and the LDC, in the definitions applicable to the Heavy Industrial (I-2) zoning, clearly and expressly prohibit the development and operation of the proposed 2G Bioethanol Plant. Comprehensive Plan Policy 1.07.12(g) clearly provides that "... chemical or petroleum manufacturing or refining...... shall be prohibited." Under this mandatory prohibition, the production of chemicals, including the Ethanol manufacturing or refining proposed to occur in the 2G Bioethanol Plant, are prohibited uses in the Industrial (IN) future land use category.

Please note, the application will not be forwarded to the TRC for review until deficiencies are corrected and the application is determined complete. In accordance with LDC Section 11.03.01(A)(4), deficiencies must be corrected within thirty (30) days from the date of this letter for the application to remain active.

Alternatively, this Completeness Determination may be appealed to the Board of Adjustment (the ("BOA") as set forth in LDC Section 11.07.00. Pursuant to LDC Section 11.07.02, an administrative appeal application of this Completeness Determination shall be filled with the City Manager no later than thirty (30) days from the date of this letter.

Sincerely,

Kelly N. Gibson, AICP
TRC Coordinator

CC: Sarah Campbell, City Manager



**City of Fernandina Beach**                    **Ms. Sarah Campbell**

City Manager                                    scampbell@fbfl.org

February 4, 2025

Mark Homans
Rayonier Performance Fibers, LLC
10 Gum Street
Fernandina Beach, FL 32034
mark.j.homans@ryam.com

Sent Via Email to Project Team

**Applicant Name:** Mark Homans
**Project Description:** RYAM Fernandina 2G Bioethanol Plant
**Location:** 10 Gum Street
**PIN(s):** 00-00-31-1840-0000-0000
**TRC Case Number:** TRC 2024-0009

RE:    City Manager – Written Interpretation Concerning Proposed Use

Mr. Homans:

Section 1.05.02(A) assigns the responsibility for interpretation of the application of the City's Land Development Code (the "LDC") to the City Manager or designee, and requires that the interpretation "seek guidance from the comprehensive plan." This letter is being provided as the City's interpretation of the LDC, and the City's 2030 Comprehensive Plan (the "Comprehensive Plan") that it implements, as they apply to the Rayonier Performance Fibers, LLC ("RYAM") application for a site plan to construct a new second-generation bioethanol production plant (the "2G Bioethanol Plant") at its existing facility located at 10 Gum Street in the City  (TRC Case Number: TRC 2024-0009).

The Community Planning Act, codified in Chapter 163, Part II, Florida Statutes (the "Act"), establishes the statutory framework for comprehensive planning in Florida.  Under the Act, local governments are required to adopt and maintain a comprehensive plan necessary to guide their future development and growth. *See* §§ 163.3167(1)(b) and 163.3167(2), Fla. Stat. No "private development shall be permitted except in conformity with comprehensive plans, or elements or portions thereof…", *See* §163.3161(6), Fla. Stat., and "all development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element shall be consistent with such plan or element as adopted." *See* § 163.3194(1)(a), Fla. Stat.

Moreover, the Courts have strictly enforced this statutory mandate. *See* § 163.3194(1)(a), Fla. Stat. See *Pinecrest Lakes, Inc. v. Shidel*, 795 So. 2d 191, 197 (Fla. 4th DCA 2001), *review denied*, 821 So. 2d 300 (Fla. 2002) (holding the Act strictly prohibits the approval of a development order that



**City of Fernandina Beach**

City Manager

**Ms. Sarah Campbell**

scampbell@fbfl.org

is inconsistent with an adopted plan); *Machado v. Musgrove*, 519 So. 2d 629, 631–32 (Fla. 3d DCA 1987) (holding that a comprehensive plan is a statutorily mandated plan to control and direct the use and development of property—like a constitution governing all future development decisions); *Dixon v. City of Jacksonville*, 774 So. 2d 763, 764 (Fla. 1st DCA 2000) ("It is well established that a development order shall be consistent with the governmental body's objectives, policies, land uses, etc., as provided in its comprehensive plan."). The City's LDC was adopted for the purpose of implementing the Comprehensive Plan, in compliance with state law. *See Section 1.00.01 and 1.00.02, LDC.*

The site plan application for the proposed use (2G Bioethanol Plant) is located within the City's Comprehensive Plan Industrial (IN) future land use category and the Heavy Industrial (I-2) Zoning district. Interpretations of these documents are required to give effect to the specific provisions over the general, and to liberally interpret the laws to achieve the purposes of the City. *See Section 1.05.01(a) and (c), LDC.* While Industrial use is allowed in this future land use designation and zoning category generally, the more specific language of the Comprehensive Plan and the LDC directs that the proposed use (2G Bioethanol Plant) constitutes chemical manufacturing or refining, which is strictly prohibited.

Both the Comprehensive Plan, in its Industrial (IN) future land use category, and the LDC, in the definitions applicable to the Heavy Industrial (I-2) zoning, clearly and expressly prohibit the development and operation of the proposed 2G Bioethanol Plant. Comprehensive Plan Policy 1.07.12(g) clearly provides that "… chemical or petroleum manufacturing or refining…… shall be prohibited." Under this mandatory prohibition, the production of chemicals, including the Ethanol manufacturing or refining proposed to occur in the 2G Bioethanol Plant, are prohibited uses in the Industrial (IN) future land use category.

Accordingly, given the applicable requirements of the Comprehensive Plan and the LDC and the statutory requirements to enforce them, state law requires the City to reject the site plan application (TRC 2024-0009) related to the development and operation of the proposed 2G Bioethanol Plant and enforce its Comprehensive Plan and LDC. As such, the City will take no further action on the site plan application (TRC 2024-0009) concerning the proposed 2G Bioethanol Plant.

This interpretation was based upon the whole of the City's entire file, including, but not limited to, the site plan application (TRC 2024-0009) and supplemental documents submitted by RYAM, and supported by the outside legal opinion (dated 5.23.2024) for the City from Weiss Serota.

Nothing in this interpretation shall be construed as reviewing or determining the completeness or compliance of any other aspect of the site plan application (TRC 2024-0009) with any applicable requirement of law. The City has not finalized its analysis of the completeness of the remaining aspects of the site plan application or analyzed the substantive details of the proposed 2G Bioethanol Plant project, because the use is not allowable by either the land use established by the Comprehensive Plan or the zoning permitted by the LDC.



**City of Fernandina Beach**                                    **Ms. Sarah Campbell**

City Manager                                                    scampbell@fbfl.org

Section 11.07.01(B)(10), LDC, provides that when the City Manager or designee makes a written interpretation regarding use, that interpretation is subject to administrative appeal to the Board of Adjustment (the "BOA") in accordance with Section 11.07.04, LDC. Pursuant to Section 11.07.02, LDC, an administrative appeal application of this interpretation shall be filled with the City Manager no later than thirty (30) days from the date of this written interpretation concerning the proposed use.

Sincerely,

Sarah Campbell
City Manager

CC:   Harrison Poole, City Attorney Pro Tem
      Kelly N. Gibson, AICP, Director of Planning and Conservation/TRC Coordinator
      Susan Trevarthen, Weiss Serota
      James White, Weiss Serota

## IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
## IN AND FOR NASSAU COUNTY, FLORIDA

RAYONIER PERFORMANCE FIBERS,
LLC.                                           )
                                               )
      Plaintiff,                           )
                                               )       CASE NO. 2025-CA-000060
v.                                             )
                                               )
CITY OF FERNANDINA BEACH,                      )
FLORIDA                                        )
                                               )
      Defendant.                           )
_____ )

### AMENDED COMPLAINT

COMES NOW, Plaintiff RAYONIER PERFORMANCE FIBERS, LLC ("RYAM"), files

this Complaint seeking declaratory judgment against the CITY OF FERNANDINA BEACH (the

"City"), by and through its Board of City Commissioners, and states as follows:

### PARTIES

1.      RYAM, is a Delaware limited liability company, whose principal place of business

is Jacksonville, Florida, with operations at 10 Gum Street, Fernandina Beach, Florida.

2.      The City, is a municipal corporation located within the geographic boundaries of

Nassau County, Florida. The City has comprehensive planning and land use authority within its

geographic boundaries, pursuant to Chapters 163 and 166, Florida Statutes.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction over this case pursuant to Section 26.012, Florida

Statutes, and Section 86.011, Florida Statutes.

4.      Venue in Nassau County is appropriate because the City is located in Nassau County, RYAM operates its business in Nassau County, and the actions that form the basis of this dispute occurred in Nassau County.

## GENERAL ALLEGATIONS

### The RYAM Facility

5.      RYAM owns and operates an acid sulfite-based pulp mill in Fernandina Beach, Florida that produces dissolving pulp (the "RYAM Facility").

6.      The RYAM Facility was created in the 1930s because of economic demand and scientific breakthroughs in the cellulose market.

7.      The impact of the Great Depression prompted local City officials to turn to heavy industry, particularly the forest industry, to bolster the local economy.

8.      An agreement between local leaders and RYAM's former parent company Rayonier was reached to construct a pulp mill, which was built in 1937, and became operational in 1939 when the first pulp sheet came off the machine.

9.      By 1940, the RYAM Facility employed 500 people, who accounted for 20% of the City's total population in 1940.

10.      During World War II, the RYAM Facility produced nitrating pulp used in munitions and its machine shop and built propellers for the Navy to support the United States' war effort.

11.      Following the war, the City's population grew by approximately 60% with 33% of the population being employed by the RYAM Facility and the other mill currently owned by Smurfit WestRock.

2

12.     As of 2024, the RYAM Facility continues to be one of the top employers in Nassau County, employing approximately 314 people.

13.     In addition to the economic benefits the RYAM Facility has brought to the City in more than eight decades of operation, it has also invested in sustainable manufacturing practices.

14.     In 1976, RYAM constructed an $80 million waste treatment system.  In the early 2000's, it added a $30 million power generation system that implemented a new boiler designed to burn biomass instead of fossil fuels thereby reducing air emissions.  In 2010, RYAM took action to reduce sulfur dioxide emissions, improving its vent gas scrubber system.  This investment in air quality technology allowed Nassau County to be the first county in the United States to be re-designated as having attained ambient air quality standards after having initially been designated under the category of "non-attainment" for sulfur dioxide.

15.     The project that forms the basis of the instant dispute between the City and one of its oldest corporate partners is the next chapter in RYAM's investment in technological solutions to increase economic opportunity and reduce environmental impacts within the City.

### The Project

16.     One of the byproducts of RYAM's pulping process is spent sulfite liquor ("SSL"). SSL contains unused biomass components from the wood chips RYAM uses to make its specialty cellulose products.

17.     Currently, RYAM either burns the SSL in its Sulfite Recovery Boiler for energy or sells it to LignoTech Florida, LLC ("LignoTech").

18.     Consistent with its long history of sustainable operations, RYAM proposes to construct a project within the existing footprint of the RYAM Facility to convert the existing SSL by-product through the biological process of fermentation into second-generation bioethanol, a

3

renewable energy source (the "Project").

**The City's Site Plan Amendment Process**

19.     The City's Land Development Code ("LDC") requires RYAM to submit a site plan amendment application in order to receive approval for the Project.

20.      Sections 11.01.03 and 11.01.04, LDC set forth the application requirements for site plan amendment approval.

21.     Table 11.01.01 identifies the City Manager as the person responsible for final review and decision making on a site plan amendment.  The City Commission has no authority to review, conduct hearings on, or approve or deny site plan amendment applications under the LDC.

22.     Section 11.03.00, LDC identifies review and decision-making procedures for various applications, including site plan amendment applications. The applicable review criteria and procedures depend on the type of approval sought.

23.     Section 11.03.31(A) provides that **all** applications are subject to a determination of completeness. In the context of a site plan, this review includes a determination by the City that all applicable information required in Sections 11.01.03 and 11.01.04, LDC have been submitted.

24.     Once a site plan application is deemed complete, it is required to be submitted to the Technical Review Committee ("TRC") within three days pursuant to Section 11.03.02(A), LDC. Section 11.03.02 states that all applications for site plans **shall** be reviewed by the TRC. (*emphasis added*). Section 11.03.02(A-M) provides for the specific review procedures of the TRC.

25.      Under Sections 9.0503(A) and 11.0302, the TRC must prepare a preliminary compliance report and hold a public meeting to consider the preliminary compliance report and any proposed revisions to the application.  If the application fails to comply with the standards and criteria set forth in the LDC, the compliance report must specifically identify the manner in which

4

the application is deficient, including a citation of applicable sections of the LDC.

26.    The TRC consists of representatives from various City Departments, including Planning and Zoning, Utility, Building, Facilities Maintenance, and Fire pursuant to Section 9.05.02, LDC.

27.    As explained below, the City has failed to follow the process set forth above in its review of RYAM's site plan amendment application.

### The City's Comprehensive Plan and Land Development Code

28.    The City has adopted a Comprehensive Plan, pursuant to Chapter 163, Florida Statutes. The City's LDC was adopted to implement the Comprehensive Plan.

29.    State law requires that development orders issued by a local government, like the denial of the site plan application which RYAM submitted to the City, must be consistent with the City's Comprehensive Plan and LDC.

30.    RYAM's site plan application is consistent with and furthers the goals, objectives and policies of the City's Comprehensive Plan and LDC provisions.

31.    The RYAM Facility has an Industrial (IN) Future Land Use Map ("FLUM") designation under the Comprehensive Plan.

32.    The Comprehensive Plan Policy 1.07.12. describes permissible uses in the "IN" future land use category as follows:

**Policy 1.07.12. Industrial (IN)**

a.    The industrial land use category is intended to recognize existing industrial development, appropriate open air recreation activities and animal shelter, and to ensure the availability of land for industrial and airport purposes.

b.    The intensity of industrial development shall not exceed a FAR of 0.75.

c.    Industrial sites should have transportation access by air, rail, or highway.

5

d.    *Industrial uses include*: airport dependent uses, *manufacturing, assembling and distribution activities*; warehousing and *storage activities*; *green technologies*, general commercial activities; integral airport related support services such as rental car facilities, parking facilities; *and other similar land uses.*

\*\*\*

g.    *Heavy metal fabrication, batch plants, salvage yards, **chemical** or petroleum **manufacturing or refining**, rubber or plastics manufacturing, or other uses generating potentially harmful environmental or nuisance impacts shall be prohibited.*

\*\*\*

CITY OF FERNANDINA BEACH, FLA., 2030 COMPREHENSIVE PLAN, Goal 1, Objective 1.06., Pol'y 1.07.12. (emphasis added).

33.    The Project is a permissible use under Policy 1.07.12.

34.    Policy 1.07.12 makes clear the City's intent to recognize existing industrial development and to ensure the availability of land for industrial purposes. It also expressly includes manufacturing, assembly and distribution activities, storage activities, green technologies, and other similar land uses.

35.    The Project falls within this list of permissible authorized industrial uses. In addition, the site plan amendment application demonstrates that the Project meets the FAR (floor area ratio) limitation of 0.75 and shows that the RYAM Facility site has transportation access, as required by this Policy 1.07.12.

36.    The application also meets the LDC provisions that implement the IN future land use designation.

37.    The RYAM facility is presently zoned Heavy Industrial I-2 under the LDC. Permissible uses in the Heavy Industrial I-2 zoning district include heavy manufacturing and assembly.

38.    The LDC defines "Manufacturing and/or Assembly-Heavy" (hereafter the "Heavy

6

Manufacturing" definition) as follows:

> *[U]ses involving **intensive manufacturing and industrial operations***, including the ***manufacturing***, assembly, fabrication, ***compounding, processing and/or treatment of extracted or raw materials or other industrial products***; packaging and freight loading/unloading activities; ***utilization, handling and bulk* storage *of materials including raw materials, chemicals and hazardous materials* associated *with manufacturing processes; and all other associated or ancillary activities***.

CITY OF FERNANDINA BEACH, FLA., LAND DEV. CODE § 1.07.00 (2023) (emphasis added).

39.     The Project fits squarely within the description of the types of uses and activities included in this definition. The Project proposes the processing and treatment of SSL, an extracted material, and the utilization, handling and bulk storage of materials, including chemicals and hazardous materials associated with the pulp manufacturing process.

40.     The Heavy Manufacturing definition further specifies that "all other associated or ancillary activities" are also included in the definition and authorized in the Heavy Industrial I-2 zoning district. Here, the Project is an "associated or ancillary activity" to the existing and permitted pulp manufacturing use.

41.     Using the SSL, as proposed by the Project, is closely connected and subordinate to the pulp manufacturing process because without the pulping operations, the sugars in the biomass would not be available for fermentation.

42.     Similar to the description of the IN-Industrial land use category in the Plan, the Heavy Manufacturing definition also includes the following sentence:

> Such use does not include heavy metal fabrication, batch plants, salvage yards, chemical or petroleum manufacturing or refining, rubber or plastics manufacturing, or other uses generating potentially harmful environmental or nuisance impacts.

CITY OF FERNANDINA BEACH, FLA., LAND DEV. CODE § 1.07.00 (2023).

43.     Part II of Chapter 163, Florida Statutes, governs county and municipal planning,

growth management, and land development regulation and includes guidance for judicial review

of a consistency determination.  Subsection 163.3194(3)(a) sets forth the criteria to be utilized by

the Court in analyzing the consistency of the development order with the comprehensive plan:

> 3(a) A development order or land development regulation shall be
> consistent with the comprehensive plan if the land uses, densities or
> intensities, and other aspects of development permitted by such order
> or regulation are compatible with and further the objectives, policies,
> land uses, and densities or intensities in the comprehensive plan and if
> it meets all other criteria enumerated by the local government.

Fla. Stat. § 163.3194(3)(a) (2024).

44.     Sections 163.3194(4)(a) and (b), which address the legal status of comprehensive

plans, provide as follows:

> (4)(a)  A court, in reviewing local governmental action or development
> regulations under this act, may consider, among other things, the
> reasonableness of the comprehensive plan, or element or elements thereof,
> relating to the issue justiciably raised or the appropriateness and completeness
> of the comprehensive plan, or element or elements thereof, in relation to the
> governmental action or development regulation under consideration. The court
> may consider the relationship of the comprehensive plan, or element or
> elements thereof, to the governmental action taken or the development
> regulation involved in litigation, ….
>
> (b)  It is the intent of this act that the comprehensive plan set general
> guidelines and principles concerning its purposes and contents and that this act
> shall be construed broadly to accomplish its stated purposes and objectives.

§ 163.3194 (4)(a) & (b), Fla. Stat. (2024)

45.     These provisions require that a reviewing court examine the applicable provisions

of a comprehensive plan as a whole, the most reasonable and holistic interpretation, based on both

the text and the synthesis of the document. Comprehensive plan policies should be read in pari

materia and harmonized so that each policy is given effect.

8

46.    Section 163.3187(4), Florida Statutes, also requires that comprehensive plans be internally consistent.

47.    Therefore, interpretations that create internal inconsistency within a comprehensive plan must be rejected, along with interpretations that are irrational or render words meaningless.

48.    Additionally, zoning regulations are in derogation of private rights of ownership.

49.    For that reason, words used in a zoning ordinance must be ascribed the meaning that offers the broadest range of uses for the property owner.

50.    Where the exact meaning of a term is not defined in a statute itself, courts have concluded that terms can be defined by industry custom.

51.    Even though the Project clearly fits within the Comprehensive Plan and LDC definitions that describe what is permissible in the Heavy Manufacturing zoning district and IN future land use designation, opponents of the Project, including former and current members of the City Commission and the Board of Adjustment, have taken the erroneous position that the Project represents either chemical manufacturing or chemical refining, which are not permitted. The City Staff's machinations to bow to political pressure from the community, candidates for political offices, and members of the City Commission to adopt this erroneous interpretation is at the heart of this dispute.

**Fermentation is Not Chemical Manufacturing**

52.    The Project's proposed method of creating bioethanol relies on the same fermentation process used in making beer, yogurt, and certain baked goods.

53.    This process is distinct from chemical manufacturing, which is generally understood by the chemical industry to refer to the industrial production of chemicals through chemical reactions involving non-living substantives.

9

54.    The distinction between creating bioethanol through fermentation and chemical manufacturing is recognized by state and federal regulatory agencies that govern the industry.

**Physical Separation is Not Chemical Refining**

55.    Once bioethanol is made through fermentation, it can be isolated depending on the end use.

56.    In the case of the proposed Project, the fermented bioethanol mixture will be distilled and then dried using molecular sieves to physically remove water contained in the alcohol so that the bioethanol can be used as a clean energy fuel source.

57.    Distillation and drying are physical processes, relying on temperature differences and mechanical separation to segregate the bioethanol. By contrast, chemical refining is a process that involves the use of chemical reactions, often through the addition of chemical agents that react with impurities.

58.    The distillation proposed by the Project is identical to the process used to make distilled spirits.

59.    Just as chemical manufacturing does not encompass the production of bioethanol through fermentation, "chemical refining" does not encompass the processes of "drying and distillation."

60.    Nothing in Chapter 163, Florida Statutes, the state law governing adoption and implementation of comprehensive plans and zoning codes, nor the City's Comprehensive Plan and LDC calls for a different interpretation of the phrases "chemical manufacturing" or "chemical refining" in the context of making bioethanol through fermentation more than the interpretation applied by both the industry itself and the environmental regulatory agencies that govern it. In fact, the City's Comprehensive Plan and LDC are silent as to the meaning of these phrases. Importantly,

10

the City employs no one with the expertise to draw meaningful technical distinctions between the various processes and has never sought someone with the requisite expertise to review RYAMs site plan application.

61.    In fact, the City has recognized the distinctions between chemical manufacturing and chemical refining and the production methods proposed by the Project by approving the making of beer, yogurt, and even wastewater treatment through the use of living organisms, and the distillation of ethanol intended for drinking within the City limits.

### The Air Permit

62.    On November 14, 2023, RYAM submitted an application for a Title V air construction permit to the Florida Department of Environmental Protection ("FDEP").

63.    FDEP issued a Notice of Intent to Issue the air permit on March 13, 2024, which RYAM published on March 27, 2024.

64.    However, before FDEP's Notice of Intent was even published, the spouse of a City Commissioner obtained a copy of the draft permit and Public Notice of Intent to Issue through a Public Records Request to FDEP.

65.    On March 26, 2024, several citizens asked FDEP for an extension of time to file a petition for formal administrative hearing.

66.    Ultimately, a single petitioner filed a petition challenging the air construction permit sought by RYAM before voluntarily withdrawing his petition for administrative hearing.

67.    FDEP issued RYAM the air construction permit on October 31, 2024 (the "Air Permit").

68.    The Air Permit issuance and its supporting application documents were based on environmental standards that are distinct from the LDC's criteria for the issuance of a site plan

amendment. Significantly, the air permit application process did not evaluate whether the Project qualified as either chemical manufacturing or chemical refining. Consequently, the Air Permit application and FDEP's evaluation of it have no relevance to RYAM's site plan amendment application. Nevertheless, as discussed below, the City improperly considered and misinterpreted the Air Permit application materials in its efforts to fabricate plausible grounds upon which RYAM's site plan amendment application could be denied.

**Prejudgment by the City based on the Air Permit Application**

69.    Well before RYAM submitted any application to the City, there was public opposition to the Project.

70.    At a City Commission meeting on February 20, 2024, resident Jack Imber raised concerns regarding ethanol production during public comments, referring to a sugar dust explosion at an unrelated facility and made the generic statement that ethanol can explode.

71.    During the same meeting, then-City Commissioner Chip Ross asked the City Attorney, Tammi Bach the following: "There has been talk about a bioethanol plant and one of the questions that I have been asked for …is whether that is an allowable use in the City. And umm. Will you get an opinion on that?"

72.    Ms. Bach responded that it was her plan to get an outside written legal opinion because members of the community expressed beliefs that a bioethanol plant is a chemical manufacturing processing plant, which is not permitted under the City's Comprehensive Plan and Land Development Code ("LDC").

73.    As of the February 20, 2024, meeting, RYAM had not submitted an application to the City for review or approval. Public commentary about permitted land uses is not a mechanism for a site plan application evaluation to be initiated under the LDC.

74.     Nevertheless, based solely on the premature request of a single City Commissioner and generalized community concerns, the City Attorney engaged the law firm of Weiss, Serota, Helman, Cole and Bierman ("Weiss Serota") to provide the opinion she promised Commissioner Ross.

75.     Commissioner Ross's apparent animus towards RYAM extended not only to a premature denial of the proposed Project, but also to having the RYAM Facility deemed a "non-conforming use" – a designation with the potential to limit RYAM's reasonable beneficial use of its property.

76.     In fact, the former City Attorney Tammi Bach notified Weiss Serota in email correspondence dated March 26, 2024 that Commissioner Ross' other question was whether the existing pulp plant is a non-conforming use. Ms. Bach informed Weiss Serota that the RYAM Facility is a conforming use, which Commissioner Ross conceded in a verbal conversation with her.

77.     On March 20, 2024, the City Attorney provided Weiss Serota with copies of her memorandum requesting a legal opinion, which recited Commissioner Ross's legal question and personal comments regarding what he believed to be the facts surrounding the Project, as well as the Air Permit backup documentation obtained from FDEP. These materials served as the basis for Weiss Serota to evaluate consistency of the Project with the City's Comprehensive Plan and LDC.

78.     Additionally, in what appears to be an effort to further confuse matters, the City's Planning Director, Kelly Gibson provided Weiss Serota documents related to an entirely different unrelated project collocated at the RYAM Facility as background for how the City viewed things in 2016, which she likened to a "basket of kittens. 😊".  In the Planning Director's March 27,

13

2024, email to Weiss Serota she stated:

> Good Afternoon,
> I am providing several documents that discuss the history surrounding Lignotech. I will also investigate their air permit application and send that over separately. There is one document "NEFRC_102016" which captures my written statements provided at the regional council meeting from when we went to defend the Comp Plan changes. This may provide some insight on how we were viewing things at that time.
> During this trip down memory lane, I was reminded that amid this difficult topic we were simultaneously processing LDC definitional changes for heavy industry, modifying the City's floodplain management ordinance, and establishing Zoning Map change to create the I-2 zoning district. I bundled in some of those meeting minutes too. The year 2016 was akin to accepting a basket of kittens. 😊 If you find any pearls in here and want me to look for more details, just let me know!
> Thank you again for your expertise on this critical issue.
> Sincerely,

79. Weiss Serota was not provided with technical information from anyone with both the requisite expertise and knowledge of RYAM's proposal and the specific production process being proposed, or how the industry or other regulatory authorities view that production process.

80. When RYAM became aware of the City Attorney's scheme to procure an opinion from a private law firm before an application was even submitted, RYAM advised the City Attorney that it had a right to submit an application to the City and have it reviewed pursuant to the City's requirements, separate and apart from the Air Permit application that was reviewed and approved by FDEP. RYAM emphasized that this right was being violated by the City prematurely requesting an opinion from outside counsel.

81. Additionally, in an effort to supplement the woefully inadequate materials provided to Weiss Serota by the City, David Rogers of RYAM provided the City Attorney with information describing the Project in more detail, explaining how it would be sited within the footprint of the current pulping operations, and defining the fermentation, distillation and drying process. The

City Attorney actually requested that RYAM provide this supplemental material so it could be provided to the City's outside counsel, but upon information and belief, that information was never provided to Weiss Serota.

82.     Commissioner behavior makes clear that the Weiss Serota memorandum was requested merely as a tool to deny RYAM's Project before it was ever requested. On May 9, 2024, Commissioner Ayscue told the Fernandina Observer in an article titled "Bioethanol Activists Get Little Support from Four Commissioners" that his position was simple: "if outside attorneys advise that the bioethanol plant violates city laws, ***the commission*** – not the City Manager – will not allow the proposal to move forward".

83.     Likewise, in an April 15, 2024, email to Suzanne Dixon, Commissioner Ross assured her that, when the Weiss Serota opinion is given, "[a]t that point, I will ask the Interim City Manager [Charlie George] - who has the authority to make the final decision - to determine if the use is allowed." When one understands the request for the Weiss Serota memorandum in this context, it is no wonder that proper technical information was never provided to the Weiss Serota lawyers.

**The RYAM Open House**

84.     Despite facts to the contrary, certain members of the City Commission and community members accused RYAM of being secretive and not forthcoming about the Project. Faced with these unfounded accusations and under pressure from the City, RYAM hosted an Open House at the RYAM Facility on March 6, 2024.

85.     The purpose of the Open House was for RYAM to provide the public access to all available information about the Project ***at that time***. RYAM also provided attendees access to its engineers, technical support personnel, local Fernandina Beach site management, its

15

environmental and safety professionals, and lawyers.

86.     More than 100 people, including television news media and newspaper reporters, attended the Open House, which was conducted in a science fair format with informational tables and RYAM employees available to answer questions.

87.     RYAM also responded to news media requests for interviews at the Open House.

88.     Despite RYAM's best efforts to inform and educate, the public remained dissatisfied, and they continued to demand that the City Commission require RYAM to present the Project to the City Commission.

89.     Critically, at the time of the Open House, RYAM did not have all of the information necessary to make a complete site plan application to the City, which it explained to the City and City Commissioners numerous times.   It was not until December 2024, that RYAM had the requisite design, engineering, safety and other information required to submit a complete site plan application.

90.     More importantly, the City's LDC does not require or even provide a process for presenting a site plan amendment application to the City Commission, to the public at an open house or other public meeting, or to outside lawyers for a hatchet job, particularly before the application has even been submitted. Moreover, upon information and belief, no other site plan amendment applicant has ever been required to submit to the type of public scrutiny and City Commission review as they demanded of RYAM.

**The May 23, 2024, Weiss Serota Memo**

91.     On May 23, 2024, Weiss Serota delivered its Memorandum titled "Request for Legal Opinion – Adding Bioethanol Plant to Existing Industrial Use" (the "Weiss Serota Memo").

92.     The Weiss Serota Memo was based entirely on the misapprehension, apparently

16

derived from a misreading of the air permit application materials, that a separate plant – similar to Lignotech - would be constructed for the bioethanol production.

93.     Amazingly, the Weiss Serota Memo acknowledges that its opinion was solicited "...*prior to receiving an application from the property owner*."  The Weiss Serota Memo also states that, "[t]he City is aware of this plan because RYAM has filed an air construction permit application with the Florida Department of Environmental Protection ("FDEP") requesting authority to add the Bioethanol Plant to be co-located with the RPF Plant."

94.     Nothing in the Weiss Serota Memo suggests that its authors were, consulted with, or relied upon input from those familiar with the bioethanol production industry.

95.     Further, because Weiss Serota did not have the application ultimately submitted by RYAM, it made many errors in its assumptions about the RYAM project.

96.     First, while Weiss Serota acknowledges the existence of different processes for converting sugar into bioethanol, it fails to distinguish between the one that is a natural fermentation process and the one that is a chemical process.  After describing both, without recognizing the difference between the two processes described, Weiss Serota concludes "[c]ellulosic production is *the process* that would *typically* be followed for a plant like the proposed at issue."

97.     The Weiss Serota Memo then takes a sharp turn and decides that the key issue is whether ethanol is a chemical.  The Weiss Serota Memo concludes that bioethanol is a chemical substance and therefore bioethanol production must be a form of "chemical manufacturing."

98.     Without any reservation or caveat that an application by RYAM to the City should be reviewed and analyzed, the Weiss Serota Memo concludes, "[i]n sum, it is our opinion that the proposed Bioethanol Plant is not an allowable use consistent with the City's Comprehensive Plan

17

and LDC."

99.     The Weiss Serota Memo further concludes without reservation that "[i]f the City

wanted to consider allowing the proposed Bioethanol Plant, it would need to amend both the

Comprehensive Plan and the LDC to allow for it…."

100.    Following issuance of the Weiss Serota Memo, on June 6, 2024, RYAM's attorneys

met with the City Attorney to address the prejudice to RYAM created by the Weiss Serota Memo.

101.    While the City Attorney invited RYAM to provide a different interpretation of the

Comprehensive Plan and Land Development Code, the Weiss Serota Memo was never rescinded

or updated in light of RYAM's application, which included extensive technical analysis of the

relationship between RYAM's proposed bioethanol production process and the technical meaning

of the phrases "chemical manufacturing" and "chemical refining."

**The City's Attack on RYAM's Credibility, the Project, and Predetermination of Consistency**

102.    Having received the Weiss Serota Memo he asked for, then-City Commissioner

Chip Ross continued his campaign to predetermine, prior to a formal application being made by

RYAM, that the Project could not be approved.

103.    At a public meeting hosted by NoEthanolFernandina on May 30, 2024, then-

Commissioner Ross told the crowd that he wrote an email to the interim city manager asking him

to make an interpretation of whether a bioethanol plant was an allowable use in the city, even

though no application was pending before the City.

104.    In addition, then-Commissioner Ross apparently worked behind the scenes for a

proposed comprehensive plan policy change to expressly prohibit bioethanol, in acknowledgement

that the existing policy did not, in fact, prohibit the production of ethanol through fermentation.

Then-Commissioner Ross was warned against such a plan by the City Attorney who advised in an

email that such a change to "expressly prohibit 'bioethanol' at this time is a big legal liability for

18

the City under the Bert Harris Act and potentially federal takings law."

105.    Instead, the City Attorney advised then-Commissioner Ross that the best way to accomplish the former Commissioner's biased objectives was to "to stick with [the] current position from what we know about RYAM's proposed bioethanol project, it is 'chemical manufacturing' that has been prohibited by the City's Comprehensive Plan for many, many years."

106.    On August 20, 2024, the City Attorney forwarded her July 17, 2024, correspondence with Mr. Ross to the entire City Commission and copied City Staff members.

107.    In this message, the City Attorney supported her position by telling the Commissioners that the Weiss Serota opinion was ***binding***.

108.    She stated, "Based upon the written legal opinion the City has received from outside counsel, City staff could not today approve a building permit application for construction of a bioethanol plant anywhere in the City."  She continued, "There is no danger of the City issuing a building permit for a bioethanol plant, at this time."

109.    Thus, according to the City Attorney, the City procured, at the direction of a single City Commissioner, the legal opinion of a private law firm without first allowing the landowner the right to submit an application, technical expert information, or even legal argument for consideration by either the City or the private law firm whose opinion was then considered binding on the landowner. This position was communicated to the press and repeated in several different fora, thus foreclosing any chance at a fair hearing on RYAM's application when it was eventually filed.

**September 3, 2024, City Commission Meeting**

110.    In response to continuing public comments that RYAM was secretly attempting to construct the Project, RYAM representative Mark Homans had no choice but to appear and speak

19

at the September 3, 2024, City Commission meeting.

111.    He provided information regarding RYAM's public statements about the proposed Project, the air permit application process with FDEP, the Open House hosted by RYAM and attended by 175 people, one-on-one meetings with members of the community, and RYAM's attendance at several other small community group events where the Project was discussed.

112.    Mr. Homans confirmed that RYAM would follow the City's process for applying to the TRC, including answering questions from City Staff and the public during the TRC public meeting.

113.    Additionally, he clearly stated that RYAM expected the City to fairly evaluate RYAM's application without any preconceptions.

114.    Then-Commissioner Chip Ross asked Mr. Homans, "just one question is manufacturing of bioethanol a chemical manufacturing process?"  Mr. Homans responded, "It is not, and we will be prepared to explain that in the application."

115.    Despite RYAM not having an application pending before the City and there being no provision authorizing review of site plan amendment applications by the City Commission, at this same meeting, Interim City Manager Jeremiah Glisson announced that the City Staff was working on dates for another Town Hall to hear feedback from the community for the Bioethanol plant process by RYAM.  He stated, "…so we are looking at dates later on in the next few months to accomplish that."

116.    Both Mr. Glisson and current-Mayor James Antun had communicated with Mark Homans of RYAM before the City Commission meeting asking him to commit to an unspecified date in the future for RYAM to give a presentation regarding the Project at a City Commission meeting.

117.    In fact, Mayor Antun commented at the September 3 City Commission meeting that he would "Like to edify Mr. Jeremiah's request or statement I should say about having a future workshop for bioethanol and informally request that RYAM is willing to do so …to make sure we can get actually get some answers for the Commission."

118.    Commissioner Ayscue then said he wanted to see at a minimum four Open Houses (two during the day and two during the night) that would be open to everyone over a 6-8 week period for people to come in –because this issue is "that large" and "we have gotten to that point." Of course, as noted above, by the time Commissioner Ayscue made this extraordinary demand of RYAM, he had already publicly taken the position that, based on the Weiss Serota Memo, the City Commission would not allow the Project to go forward.

### The October 24, 2024, Town Hall Meeting

119.    The City published the notice of a Town Hall Meeting for October 24, 2024, at 6 p.m. at the City Commission Chambers (the "Town Hall").  The Agenda described the one substantive item on the agenda as "**BIOETHANOL** – *In response to civic concern regarding Rayonier Advanced Materials (RYAM) proposed bioethanol **manufacturing**, the City of Fernandina Beach is holding this Town Hall to facilitate discussion.*"

120.     The Interim City Manager Jeremiah Glisson opened the meeting stating that the Town Hall was being held due to community concern related to the proposed bioethanol plant.

121.    The City retained a facilitator for the Town Hall, Cindy Jacoby, a Fernandina Beach local with whom the City worked with previously on its annual visioning sessions.

122.    Ms. Jacoby announced the meeting agenda, which included a 30-minute presentation by RYAM and a 30-minute presentation by Tom Budd, the petitioner who challenged the Air Permit, and his non-profit group NoEthanolFernandina.  The remaining time was reserved

for public comments of three minutes each. Ms. Jacoby allowed questions to be asked but indicated no one could be compelled to answer a question.

123.    Mark Homans and David Rogers presented for RYAM, sharing general information about the current pulping operations, RYAM's outreach efforts to educate about the Project, and new information about the Project that had been developed since the Open House. RYAM agreed under pressure to make this presentation, even though it did not yet have sufficient information to submit a site plan application to the City and there was on-going litigation involving the other presenting party regarding the Air Permit.

124.    Comments from the community at the Town Hall Meeting demonstrated that the primary concerns of the community related to safety, which the site plan application process already addresses.  Public comments also expressed significant opposition to the ***existing*** pulping operations, rather than the proposed Project.  The existing pulping operations are vested and cannot be modified as part of the City's evaluation of a site plan amendment application.

125.    While not required by the City's TRC process, RYAM took into consideration public comments made at the Open House and the Town Hall in finalizing its site plan amendment application.

**Technical Review Committee First Step Meeting**

126.    The City provides a "First Step Meeting" with City staff as a "free service" to applicants "for input and guidance" and for "exchanging information on the potential development of a site."

127.    The City's webpage instructs applicants to "USE THIS FORM TO Submit a project for input and guidance from the Technical Review Committee ('TRC')" which it identifies as "the City group responsible for reviewing site plans and commercial projects."

22

128.    The City's webpage also instructs that during this exchange of information the City may provide information to the applicant on permissible uses of the site.

129.    RYAM timely submitted its First Step application for and attended a formal TRC Site Plan Review for the December 12, 2024, meeting.

130.    Multiple City Staff members were in attendance. Kelly Gibson the City's Planning Director, and the person ultimately tasked with determining the completeness of a site plan application, directed the meeting.

131.    The meeting was not recorded and, upon information and belief, no minutes were taken.

132.    Mark Homans, on behalf of RYAM, presented a PowerPoint reviewing key components of the Project and RYAM's application.  He also responded to questions and comments from Staff.

133.    At no time during the First Step Meeting did Ms. Gibson, or any other member of Staff, provide information to RYAM about the permissible uses of the site or advise that the proposed use was inconsistent with the Comprehensive Plan or the LDC.

134.    On December 17, 2024, the City's Planning Department provided RYAM with a Next Steps form containing comments along with a contact sheet for City Staff.

135.    The notes contained on the Next Steps form do not state that the use proposed by the Project is inconsistent with the Comprehensive Plan or Land Development Code or request additional information regarding use consistency.  Rather, the notes identified the need for additional information regarding utilities, permitting, potable water supply and new structures associated with the Project.

**The Application**

23

136.    Prior to the submission of the Application in December, 2024, RYAM retained a professional engineer who spoke to Interim City Manager Jeremiah Glisson regarding the proposed Project. Mr. Glisson informed the engineer that the City had no choice but to deny the application. Mr. Glisson advised that the new City Manager would probably have to deny the application because it had become "political."

137.    Nevertheless, RYAM held out hope that after all of the information it had provided the City and its residents and all the time and money it had invested in engaging with the City at the City's prompting, it would be fairly treated. Hence, on December 19, 2024, RYAM submitted a carefully prepared site plan amendment application to the City that responded to the notes contained on the Next Steps form issued after the First Step meeting (the "Application"). The Application properly identified the property's Future Land Use designation and Zoning District and contained technical information from experts supporting RYAM's position that the production of bioethanol through fermentation and distillation was permissible under the applicable Comprehensive Plan and LDC policies.

138.    RYAM also paid the maximum application fee of $4,400, which according to the City's ordinance, is calculated based on the estimated costs of preparing the site for construction.

**First Completeness Determination**

139.    On December 30, 2024, the City provided RYAM with a request for additional information in the City's First Completeness Determination.

140.    The City claimed the Application was incomplete and identified information and items that needed to be submitted before the Application could be deemed complete and transmitted to the TRC for the development of a Compliance Report/Sufficiency Determination.

141.    As with the Next Steps notes, none of the items identified in the First Completeness

24

Determination requested additional information regarding whether the proposed use was consistent with the City's Comprehensive Plan or LDC.

142.    Pretending that RYAM's application was still being considered, Ms. Gibson's letter requested that RYAM, "[p]lease submit response documents to address each comment in the narrative form and with an amended site plan."

143.    On January 22, 2025, RYAM invited Ms. Gibson, Margaret Ohlendorf, and new City Manager Sarah Campbell to visit the proposed Project site that is the subject of RYAM's Application to assist them with their evaluation of the Application. During the January 22 site visit, Ms. Gibson informed RYAM retained engineer Asa Gillette that the new City Manager would deny the application, even though a response to the First Completeness Determination had yet to be submitted.

144.    Despite this worrisome indication of prejudgment and bias, RYAM continued to proceed in good faith, submitting a letter to Ms. Gibson requesting clarification of certain items contained in the First Completeness Determination.

145.    Taking into account feedback received from the City, RYAM timely submitted its responses and updated the Application to the City on January 28, 2025 (the "updated Application"). At no time prior to RYAM's submittal of the updated Application did Ms. Gibson or her staff indicate that RYAM's application was incomplete because of a lack of information regarding consistency with the Comprehensive Plan or zoning district.

### Final Completeness Determination and Written Interpretation

146.    On February 4, 2025, RYAM received two letters from the City in response to its updated Application.

147.    The first was from Kelly Gibson on behalf of the Technical Review Committee ("TRC") titled "Completeness Review." A copy of the Completeness Review dated February 4, 2025, is attached hereto as Exhibit "A" (hereinafter the "Final Completeness Determination").

148.    RYAM has never been given the opportunity to meet with the full TRC, having only spoken with the individuals present at the First Step Meeting. Upon information and belief, the TRC itself has never reviewed the Application or updated materials.

149.    The Final Completeness Determination signed by Kelly Gibson as the TRC Coordinator states that, "[a] Completeness Determination of the application has found the application to be incomplete."

150.    The sole basis for finding the updated Application incomplete is stated as:

> The application fails to provide, identify or reference a future land use category (established by the Comprehensive Plan) or zoning district (established by the LDC) which permits the proposed use (2G Bioethanol Plant) as required by LDC Section 11.03.01(A)(2), and is therefore deficient.

151.    This finding was never communicated to RYAM during the First Step Meeting, in the correspondence following the First Step Meeting, in the First Completeness Determination dated December 30, 2024, or at the January 22, 2025, on-site meeting to review the site plan with Ms. Gibson and Ms. Campbell.

152.    Further, this sole finding is facially absurd. The Application and its supporting documentation expressly state the Project's future land use category and zoning district and explain in detail how the Project comports with the policies for both the future land use category and the zoning district.

153.    Accordingly, while Kelly Gibson's letter is titled a Completeness Determination, its substance reveals that it is simply an improperly labeled "Written Interpretation." The LDC

26

provisions governing the two types of determinations reveal the difference. Under Section 11.03.01(A), LDC, "Determination of Completeness," the LDC provides in part as follows:

> "2.     A determination of completeness is a determination that all required documents and plans has been submitted in sufficient number, and whether all fees have been paid. A determination of completeness is ***not*** a determination of compliance with substantive standards and criteria."

(Emphasis added). The same section directs the City Manager to identify "the missing documents and/or plans" when an application is not complete.

154.     Section 11.01.04(20), lists the document submittal requirements for all site plans. Contrary to Ms. Gibson's letter, the completeness requirements for site plan applications do not require the provision of a future land use and zoning district that permit the use but instead requires only a "summary block" containing the property's future land use designation and zoning district.

155.     Thus, it is clear that a completeness review is limited to a checklist of documents and plans that must be included in an application and expressly ***does not allow*** a substantive review of criteria like whether the documents provided demonstrate Comprehensive Plan or LDC consistency.

156.     By contrast, "Written Interpretation" is the title the LDC uses for substantive determinations of consistency between an application and the City's Comprehensive Plan or LDC provisions except in the context of a site plan that must be reviewed pursuant to the TRC process. In this case, Ms. Gibson's Final Completeness Determination relied on the City Manager's "Written Interpretation of Proposed Use" also dated February 4, 2025 (the "Written Interpretation") as the sole support for the determination that the dispute regarding permissible uses under the Comprehensive Plan and LDC render the application incomplete.  A copy of the Written Interpretation is attached hereto as Exhibit "B".

157.    The Written Interpretation was allegedly provided as the City's interpretation of the LDC and City's Comprehensive Plan, pursuant to Section 1.05.02(A), LDC. RYAM never requested a written interpretation. Instead, the City Manager issued the written interpretation on her own initiative.

158.    Receipt of the City Manager's February 4 Written Interpretation was the first time RYAM became aware that the City intended to issue an independent written interpretation concerning the proposed use. The City Manager never gave RYAM the opportunity to submit additional information regarding the Written Interpretation before it was written.

159.    The Written Interpretation concluded that the Project is not allowable by either the IN future land use designation established by the Comprehensive Plan or the zoning district assigned by the LDC. While the Written Interpretation summarily states that it is based upon the whole of the City's file, including, but not limited to, the site plan application (TRC 2024-0009) and supplemental documents submitted by RYAM, it expressly relies on the Weiss Serota Memo.

160.    As explained above, the Weiss Serota Memo was not based on the Application, as updated, did not consider any of the materials provided to the City to explain why the proposed Project is consistent with the Comprehensive Plan and Land Development Code, and was not prepared by persons knowledgeable about the technical aspects of the proposed Project.

161.    Furthermore, the City obtained no updated opinion from Weiss Serota after the Application was submitted.

162.    Like the Final Completeness Determination, the Written Interpretation concluded, without identifying any bases or facts to refute the information provided by RYAM in its Application, that the proposed Project constituted either chemical manufacturing or refining, which are prohibited uses in the Industrial (IN) future land use category.  And, like the Final

28

Completeness Determination, the Written Interpretation was issued in a manner that is inconsistent with the requirements of the LDC.

163.    Under Section 1.05.02(A), the power to issue written interpretations is vested in the City Manager with one important exception: the City Manager cannot use the Written Interpretation process to override the responsibilities of any other commission, board, or official.

164.    Section 11.03.02, LDC expressly provides that the TRC is vested with the responsibility for reviewing site plan amendments and developing a compliance report. Section 11.03.02, LDC, states, "All applications for site plans, preliminary subdivision plats, final subdivision plats, minor subdivisions, and amendments to previously issued local development orders, change of use, and nonresidential building expansions **shall be reviewed** by the Technical Review Committee (TRC)."

165.    Therefore, a Written Interpretation that precludes the TRC's consideration of a site plan amendment application and development of a compliance report violates the express provisions of Sections 1.05.02(A) and 11.03.02, LDC.

166.    This distinction is not trivial.  Consideration by the TRC allows an applicant to develop a full administrative record upon which further determinations may be judged, first by administrative decision-makers and ultimately by a reviewing court. Therefore, access to the TRC process is a fundamental part of RYAM's right to a meaningful opportunity to be heard.

167.    Furthermore, the City's scheme to issue both a Written Determination and a Written Determination mislabeled as a Completeness Determination changes the process for administrative review.  Written Determinations that fall outside of a compliance report are reviewable by the Board of Adjustment, pursuant to Section 11.07.01(B)(10), LDC. Completeness determinations are also reviewable as an administrative decision by the Board of Adjustment, pursuant to Section

29

11.03.01(A)(5), LDC. By contrast, compliance reports are **not subject** to appeal to the Board of Adjustment.

168.    As explained below, the current membership of the City's Board of Adjustment is incapable of providing RYAM a fair and impartial hearing on the consistency matters raised by both letters, regardless of their titles.  Furthermore, relief at the Board of Adjustment requires five votes in the applicant's favor, pursuant to Section 11.07.04(G), LDC. There ***are*** only five members on the Board of Adjustment, pursuant to Section 9.04.02, LDC, with two alternates.

169.    Therefore, even if the Board of Adjustment was not constituted by anti-RYAM activists who have engaged in *ex parte* communication and prejudged RYAM's application before it was even filed, which is the case as explained more fully below, an appeal to the Board of Adjustment is intentionally set up by the City to be a virtually impossible task.  It is, therefore, no wonder that the City's Planning Director and City Manager have worked so hard to fit their *ultra vires* acts within the Board of Adjustment's purview.

**Board of Adjustment Prejudgment, Ex Parte Communication and Bias**

170.    The Board of Adjustment has five members, with two alternates. Kelly Gibson, is identified as the Staff liaison to the Board, even though it is her decision regarding completeness that is under review.

171.    Board of Adjustment member, Len Kreger was appointed to the Board by the City Commission on December 3, 2024, a few weeks before RYAM's Application and several months after RYAM was pressured to make the many public presentations set forth above. Board member Kreger is a former Commissioner and Vice-Mayor who has been outspoken against the Project, including publishing editorial articles in local newspapers opposing the Project.

172.    Len Kreger is identified as a Director of "NoEthanolFernandina," a DBA for a Florida non-profit corporation called "Fernandina Wins, Inc." Len Kreger is also identified as a Director for Fernandina Wins, Inc., on the Florida Division of Corporations website.

173.    The website for "NoEthanolFernandina" declares "we are united in our determination to prevent the manufacturing of the chemical ethanol in Fernandina Beach at RYAM's Gum Street plant adjacent to residences, businesses, schools, churches, and our historic downtown."

174.    Len Kreger also served as a guest columnist for the News-Leader writing a column on December 5, 2024, in which he implicitly cast aspersions on the veracity of RYAM's public presentations stating "Truth is the first casualty." Board member Kreger wrote that RYAM's Air Permit application was discovered through the "watchful monitoring of a private citizen," perpetuating the false narrative that RYAM had behaved secretively with respect to the Project. Mr. Kreger then wrote that the Weiss Serota Memo "definitively concluded that 'state law requires the city to reject such a proposal and enforce its Comprehensive Plan and LDC."  Mr. Kreger lamented that RYAM's position that the creation of bioethanol through fermentation is not chemical manufacturing or refining" makes it "legally challenging to oppose the project on those grounds."

175.    Mr. Kreger observed that "RYAM's next step will be to bring their project pre-application to the city Technical Review Committee. According to the Land Development Code (LDC), this project should be rejected because it is not a permissible use on the site. **The new city manager, in consultation with staff, will make this decision.** RYAM can and likely will challenge this decision through one of the legal options available to them."  This incredible statement was made almost two weeks before RYAM had even submitted an application to the

31

City for the Project. This suggests that Mr. Kreger was engaged in behind-the-scenes communications with City staff regarding their intent and shows an intense prejudice against the Project.

176.    Interestingly, while Mr. Kreger claims a concern about truth being a casualty, Mr. Kreger did not share as part of his "guest column" his activist role in the NoEthanolFernandina organization, choosing instead to list only his former military service and his prior roles on the Fernandina Beach Planning Advisory Board, Sustainable Fernandina Committee, and County Code Enforcement Board.   To say that Mr. Kreger is incapable of serving as a fair and impartial decision-maker on any appeal related to the RYAM application would be an understatement of the first water.

177.    Taina Christner is another Board of Adjustment member appointed in December, 2024, by the City Commission, who is a member and either current or former director of Fernandina Wins, Inc.

178.    Taina Christner has a history of inflammatory and factually inaccurate social media posts regarding the Project that are obviously designed to create fear and stimulate opposition in the local community against RYAM and its anticipated application. For example, in March, 2024, Taina Christner issued a social media post alerting viewers that "No Ethanol Plant" yard signs were available for sale for $10 at a local art gallery. On March 19, 2024, Taina Christner issued a social media post sharing a NoEthanolFernandina post stating the following, "Ethanol is highly flammable," "**Prohibited by local Comp Plan**," "Dangerous for Residents," "No evacuation plan for residential areas," "Waste water concerns for river quality," "Contaminants pose a threat to aquatic ecosystems," "Noise, odor, and light pollution issues." The post exhorts viewers to "Join Us to Make Our Voice Heard!"

32

179.    On March 22, 2024, Taina Christner issued a social media post sharing a Youtube video about an explosion at an unrelated laboratory in 2007, pondering "What would an explosion similar to this do to downtown Fernandina Beach? Just imagine. And I believe this plant was smaller than what is proposed here."

180.    Two days later on March, 24, 2024, Taina Christner shared on her social media a story with the caption, "Residents concerned over possible health impact of planned bioethanol plant in Fernandina Beach."

181.    In April, 2024, Taina Christner posted that the US Airforce limited the use of foam fire retardant after realizing the substance "polluted the drinking water for 6 million Americans." Ms. Christner queried, "Will the same happen to Fernandina if this is used right next to our local waterways for the proposed Ethanol Plant?"

182.    Also, in April, 2024, both Taina Christner and Len Kreger were part of a group email chain from other anti-RYAM activists reporting on the position of the interim City Manager on RYAM's Project. When advised that the City Manager was apparently concerned about whether the City Commission would interfere if he attempted to thwart the Project (a position the interim City Manager later denied), Ms. Christner stated, "Politicians are still under the belief that they can blow us off and we'll go away. They don't know us very well."

183.    In May, 2024, Taina Christner posted an event invitation for a "No Ethanol Fernandina Town Hall." On June 5, 2024, Taina Christner posted a plea for donations to the aforementioned "NoEthanolFernandina" to "help with the legal fees associated with saving Fernandina from an ethanol plant being built in the middle of our neighborhood." On June 13, 2024, Taina Christner shared a radio program regarding what she referred to as "the proposed ethanol refinery in downtown Fernandina Beach."

184.     In August, 2024, Taina Christner sent an email to the City Commissioners about the public statements of RYAM's CEO.  Even Commissioner Ayscue, no friend to the Project as explained above, responded that he would not comment on the Project for fear of litigation.  Not to be dissuaded, Taina Christner sent another email in August, 2024, complaining that the City Commissioner had removed from the City Commission's agenda a bioethanol presentation designed to stimulate a comprehensive plan amendment prohibiting its production, after the City Attorney advised that such an action would likely lead to litigation.  Ms. Christner's email attacked the City Attorney as "unelected" and decried the lack of opportunity for public participation on the topic.

185.     Taina Christner was also one of the citizens who initially requested an extension of time to challenge RYAM's Air Permit, calling herself "an affected party" as a result of the proposed Project.  Thus, bias and prejudgment are hardly adequate to describe Ms. Christner's anti-RYAM animus.

186.     Alternate Board of Adjustment member Kim Wolford was also appointed to the Board in December, 2024 and has openly spoken out against RYAM. Ms. Wolford has a history of lodging public complaints about RYAM. As recently as January, 2025, Ms. Wolford complained to the City regarding the "chemical smells" emanating from the RYAM facility. City staff concluded that the smells were probably from a neighboring plant, not RYAM. In addition, Ms. Wolford has issued social media posts about the Project that suggest bias and prejudgment.

187.     Since the City has chosen to require a unanimous vote by the Board of Adjustment to overturn staff decisions, the obvious bias and prejudgment of either Board Members Kreger or Christner would be fatal to RYAM's ability to receive due process. That two Board Members and one alternate are biased against the project to this extent renders the entire Board of Adjustment

34

appellate process an obvious sham. Yet, the LDC provides no mechanism to request recusal. Furthermore, the LDC requires the specific number of 5 votes to gain relief on appeal to the Board of Adjustment. Since two Board Members and one alternate are unfit, there are not five members who could even meaningfully hear an appeal brought on RYAM's behalf.

**The City's Celebration of its Ultra Vires Act**

188.    At the regular City Commission Meeting on February 4, 2025, Ms. Campbell announced that Staff sent a letter to Mark Homans at RYAM and read an excerpt from her letter to RYAM stating that the City must reject the application for the proposed Project and that no further action would be taken.

189.    The City Commissioners celebrated. Commissioner Genece Minshew thanked her for "taking a stand on the bioethanol" and thanked her for "stepping up and doing it." Later, Commissioner Minshew issued a social media post celebrating the City Manager's behavior, stating, "OK, this is not anywhere close to being over. Yes, a good victory for the moment, but the war is not over."

190.    Commissioner Joyce Tuten also thanked Ms. Campbell for sending the letter.

191.    Worse, during the Mayor/Commissioner Comments period, Commissioner Tuten asked that an item be placed on the City Commission's agenda to discuss the criteria to award the City Manager her 6 month $10,000 bonus, even though she had only served for 60 days as of this meeting.

192.    This celebration by the City of the City Manager and Planning Director's misuse of the administrative letter processes in order to deprive RYAM of the chance to have its site plan amendment application considered by the TRC makes clear that the City already decided to deny RYAM's application, as far back as May 23, *2024*, almost six months before RYAM submitted its

35

Step One application and before the City coerced RYAM into spending more than one (1) year, hundreds of hours, and hundreds of thousands of dollars preparing and supplementing its Application.

### Direction to Appeal

193.    Even after the two administrative letters were issued, the City has continued to create procedural roadblocks for RYAM. Contradictory to the instructions given to RYAM for filing an administrative appeal with the Board of Adjustment, the Board of Adjustment webpage instructs that, "… you must meet with a planner before your submit an application for a variance or an administrative appeal."

194.    RYAM was required to obtain a clarification from the interim City Attorney regarding the process described by the two letters versus the process described by the webpage.

195.    Even more confusing to RYAM and further demonstrating the lack of control and consistency the City has over its TRC process, RYAM received an automated message from the City of Fernandina Beach dated February 6, 2025, at 7:05:03 PM stating, "Your plan will expire in the next 15 days.  Please reach out to our Planning and Conservation Department as soon as possible to discuss your plans at (904)310-3480."

196.    Once again, RYAM had to contact the interim City Attorney to obtain clarification on the 15-day message.  The first response from the City Planning Department only stating that "no action is required" was vague and ambiguous in light of the two February 4th letters. After questioning the meaning of that message, RYAM was told that the automated message should not have been sent and should be disregarded in favor of the deadlines for filing an administrative appeal set forth in the letters.

4922-0111-2643, v. 3

197.    Thus, for more than a year the City has engaged in an orchestrated, bad-faith, effort
to deny RYAM a reasonable application process for consideration of its bioethanol Project, which
merely augments a facility that has operated safely and to the mutual benefit of RYAM and the
City for almost a century.  The City's behavior has harmed RYAM and caused it to doubt its rights
and responsibilities under the City's Comprehensive Plan and LDC.

### RYAM's Damages

198.    As of May 2024, RYAM had invested $1,563,000 towards developing the
engineering and site planning for the proposed Project necessary to support its application to the
City, but had not had the opportunity to submit an application for consideration before the City
obtained the Weiss Serota Memo and determined it would rely on it to respond to RYAM's
application.

199.    Between May 2024, and February 2025, when the City's Completeness
Determination and consistency evaluation were issued, RYAM spent another $1,899,000 on
design, engineering, and safety and environmental planning.

200.    Additionally, to develop the expert materials interpreting the City's Comprehensive
Plan and Land Development Code in support of RYAM's Application, RYAM incurred fees and
costs of $448,426.19.

201.    Finally, it paid – and the City accepted as if the application would be properly
evaluated - the maximum application fee of $4,400 to access the TRC process.

202.    Worse, RYAM has been substantially burdened in its ability to use and enjoy its
property, even though its proposed use is consistent with both the Comprehensive Plan and the
LDC.  The Project is important to RYAM's corporate goals to engage in sustainable production

37

practices that benefit the environment through the production of renewable energy and enable RYAM to fully utilize its property.

203.    Accordingly, RYAM has suffered significant financial harm through the City's *ultra vires* acts.

## COUNT I – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (COMPLETENESS DETERMINATION)

204.    RYAM re-alleges paragraphs 1 through 203, as if fully set forth herein.

205.    This is an action for declaratory judgment, injunctive relief, and supplementary relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, for the City's *ultra vires* attempt to reject RYAM's site plan amendment application as incomplete based on its substantive review of consistency with the comprehensive plan, and to subject RYAM to the sham of a Board of Adjustment hearing reviewing the Planning Director's determination where its own Code does not call for such review.

206.    All conditions precedent have been satisfied or waived.

207.    The City has issued what it calls a "completeness determination" refusing to further process or consider RYAM's Application, based on its assertion that RYAM failed to identify a comprehensive plan future land use designation and zoning district applicable to the property that would permit the intended use of a secondary bioethanol production process.

208.    However, as explained above the determination is actually an improper Written Interpretation not contemplated by the City's procedures, as set forth in the LDC.

209.    The City is now directing RYAM to the City's Board of Adjustment.  The Board of Adjustment's jurisdiction is set forth in Section 11.07.01, LDC, which provides the Board of Adjustment the power to hear and resolve appeals of specific administrative actions.

38

210.    Section 11.07.01, LDC, does not authorize an appeal from a written interpretation of the City Planning Director acting as the TRC Coordinator addressing comprehensive plan consistency under the title of a completeness determination.

211.    In fact, the City's Code provides no administrative process to consider the Planning Director's letter, which stands entirely outside of the City's LDC and the Planning Director's own admissions regarding how the completeness determination process actually works.

212.    As a quasi-judicial entity, the Board of Adjustment can only exercise the power that is expressly given under the Code.

213.    Moreover, the Planning Director's letter effectively denies RYAM's site plan amendment application, which RYAM is entitled to have considered and processed by the full TRC under the plain terms of the LDC.

214.    Based on the City's actions, RYAM is in doubt regarding its rights under the City's LDC as a site plan amendment applicant and a landowner within the City.  The dispute between the parties is real, actual, present, and adverse.

215.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

216.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application.

217.    While money damages are warranted in this case as supplemental relief, money damages alone will not make RYAM whole for the City's refusal to process RYAM's application.

218.    The public interest is served by an order declaring the ultra vires nature of the Planning Director's letter and requiring the City to acknowledge the completeness of RYAM's application and refer the application for substantive review by the TRC.

219.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the City's denial of RYAM's site plan application as incomplete based on its conclusion that the Comprehensive Plan and Zoning Districts do not permit the use is contrary to the City's Land Development Code process for completeness determinations; that the Board of Adjustment process is inapplicable to such decisions; that the Court order the City to refer RYAM's application to the TRC for review and the development of a compliance report; and that the City award RYAM monetary damages and other such supplemental relief as the Court deems appropriate.

## COUNT II – CONSISTENCY CHALLENGE (SECTION 163.3215, FLORIDA STATUTES)

220.    RYAM re-alleges paragraphs 1 through 203, as if fully set forth herein.

221.    This is an action for declaratory judgment and injunctive relief, pursuant to Section 163.3215 and Chapter 86, Florida Statutes.

222.    All actions taken by local governments on applications for development orders must be made consistent with the provisions of the local government's comprehensive plan.

223.    Where a local government has denied the application for a development order on the grounds that the application would be inconsistent with the comprehensive plan, that decision is subject to challenge pursuant to Section 163.3215, Florida Statutes. In fact, Section 163.3215, Florida Statutes, is the sole method for challenging such consistency, since the City has not adopted

40

an ordinance providing for an alternative method of review, in accordance with Section 163.3215(4), Florida Statutes.

224.    Any applicable conditions precedent have been satisfied or waived.

225.    As the landowner and applicant for a site plan amendment approval, which is a development order under Chapter 163, Florida Statutes, RYAM has been adversely affected by the City's denial of its site plan application, and thus has standing to enforce the requirement that decisions on development orders be consistent with the City's comprehensive plan, pursuant to Section 163.3215, Florida Statutes.

226.    As explained herein, the City's rejection of RYAM's site plan application as inconsistent with the City's Comprehensive Plan is, itself, inconsistent with the City's comprehensive plan. RYAM's Application and subsequent update comports with all the requirements of the City's Comprehensive Plan, as well as the City's LDC, and was denied based solely on the City's inconsistent interpretation of its Comprehensive Plan policies regarding the IN future land use designation.

227.    The City's denial of RYAM's application for a development order that would materially alter the use and intensity of use on RYAM's property due to the City's position that this change in use or intensity of use is not consistent with the Comprehensive Plan is actionable under Section 163.3215, Florida Statutes.

228.    The City's decision is accorded no deference in a consistency challenge brought pursuant to Section 163.3215, Florida Statutes, and the burden to demonstrate consistency belongs to the City.

229.    RYAM has retained the undersigned law firm to represent it in the instant matter and has agreed to pay a reasonable attorney's fee for the firm's prosecution of the case.

4922-0111-2643, v. 3

230.    Pursuant to Section 163.3215(8), Florida Statutes, prevailing parties in a consistency challenge are entitled to the recovery of attorney's fees.

WHEREFORE, RYAM respectfully requests that the Court issue an order finding the City's denial of its site plan application inconsistent with the City's Comprehensive Plan, enjoining the City from denying its site plan application on the basis of comprehensive plan consistency, and awarding RYAM reasonable attorney's fees, and other such supplemental relief as the Court deems appropriate.

### COUNT III – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (SUFFICIENCY DETERMINATION)

231.    RYAM re-alleges paragraphs 1 through 203, as if fully set forth herein.

232.    This is an action for declaratory judgment, injunctive relief, and supplementary relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, for the City's *ultra vires* attempt to reject RYAM's site plan amendment application based on a written interpretation that usurped the power of the TRC and was therefore not within the City Manager's power to issue, and to subject RYAM to the sham of a Board of Adjustment hearing reviewing the written interpretation.

233.    All conditions precedent have been satisfied or waived.

234.    The City Manager issued a "written interpretation" concluding that RYAM's site plan application was inconsistent with the City's Comprehensive Plan and Land Development Code.  Substantively, this is incorrect, as addressed above.

235.    However, the City Manager's interpretation is also procedurally inappropriate. Section 11.03.01(B), LDC, calls for written determinations of sufficiency for "citizen-led Comprehensive Plan Amendments and Amendments to the land development code. . . ", categories

that do not apply to RYAM's application. Separately, an applicant can request written interpretations.

236.    Section 1.05.02 identifies the City Manager as responsible for interpretations of the zoning code, but specifies that this power does not allow the City Manager to override the responsibilities of any commission, board, or official. Therefore, while the City Manager can make interpretations, she is not allowed to use that power to divest another body of its authority. That is exactly what the City Manager has attempted to do here by prematurely issuing a written interpretation letter that prevents the TRC from substantively evaluating RYAM's application.

237.    The Board of Adjustment has the power to hear appeals regarding sufficiency determinations made pursuant to Section 11.03.01(B), LDC. But, the City Manager's letter does not fall under this provision.

238.    Separately, the Board of Adjustment has the power to review written determinations regarding use and zoning district boundaries, pursuant to Section 11.07.01(B)(10). This category of written determination refers to written determinations regarding uses that can be requested by land owners, pursuant to Section 2.03.01(D), which provides, "[a] property owner may request an interpretation to determine if a use that is not identified is permissible, based on substantial similarity of the requested use to permissible uses within the zoning district in which the property is located."   Again, RYAM never requested such a letter, therefore, Section 11.07.01(B)(10), does not grant the Board of Adjustment authority to hear an appeal over the City Manager's letter.

239.    There is no catch-all authority on the part of the Board of Adjustment to hear consistency determinations not authorized by the LDC, which is what the City Manager's letter represents. Therefore, the City Manager's letter demanding that RYAM submit its appeal to the

43

Board of Adjustment is *ultra vires*. In fact, the City's Code provides no administrative process to consider the City Manager's sufficiency determination outside of the provisions of 11.01.03(B) and Section 2.03.01(D).

240.    Based on the foregoing, RYAM is in doubt regarding its rights under the City's LDC as a site plan amendment applicant and a landowner within the City.  The dispute between the parties is real, actual, present, and adverse.

241.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

242.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application. Money damages alone will not make RYAM whole for the City's unwarranted refusal to process its application.

243.    The public interest is served by an order requiring the City to refer the application for substantive review by the TRC so that a record can be developed upon which full code compliance can be adequately evaluated.

244.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the City Manager's denial of RYAM's site plan application as inconsistent with the City's Comprehensive Plan and Land Development Code is outside of the City Manager's authority to issue *sue sponte*; that the Board of Adjustment process is inapplicable to such decisions; that the Court order the City to refer RYAM's application to the TRC for review and a compliance report;

and that the City award RYAM monetary damages and other such supplemental relief as the Court
deems appropriate.

<strong>COUNT IV – DECLARATORY JUDGMENT<br>(WEISS SEROTA MEMORANDUM)</strong>

245.    RYAM re-alleges paragraphs 1 through 203, as if fully set forth herein.

246.    This is an action for declaratory judgment, injunctive relief, and supplementary
relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, for the City
Planning Director and City Manager summary denial of RYAM's right to have its application
considered by the TRC, based on the legal opinion of a private law firm not identified in the Land
Development Code as having interpretive authority.

247.    All conditions precedent have been satisfied or waived.

248.    The City Manager issued a "written interpretation" concluding that RYAM's site
plan application was inconsistent with the City's Comprehensive Plan and Land Development
Code.  Substantively, this is incorrect, as addressed above.  The City Manager's letter specifies
that she relied on the Weiss Serota Memo in coming to her conclusion. Previously, the City
Attorney publicly indicated that the Weiss Serota Memo was "binding." Certainly, the facts of this
case make crystal clear that the City's actions in this case were a foregone conclusion once the
Weiss Serota Memo was issued.

249.    The LDC does not identify a process for outsourcing the interpretive power of the
City Manager in the manner in which the City has attempted to do here.

250.    Moreover, the LDC specifies that exercise of interpretive power by whomever
wields it cannot override the responsibilities of any commission, board, or official. Therefore,
while the City Manager can make interpretations and may even be able to consider (but not treat
as binding) the legal opinion of a private firm, she is not allowed to use that power to divest another

45

body of its authority. That is exactly what the City Manager has attempted to do here by prematurely issuing a written interpretation letter without request and, in doing so, preventing the TRC from substantively evaluating RYAM's application. The LDC states that site plan applications "shall" be considered by the TRC.

251.    The Board of Adjustment has the power to hear appeals regarding sufficiency determinations made pursuant to Section 11.03.01(B), LDC. As stated herein, Section 11.03.01(B), does not authorize the written interpretation letter issued by the City Manager finding inconsistency between RYAM's Project and the Comprehensive Plan (which is what the LDC calls a "sufficiency determination") because subsection (B) is limited to citizen-led plan and code amendment applications.

252.    Separately, the Board of Adjustment has the power to review written determinations regarding use and zoning district boundaries, pursuant to Section 11.07.01(B)(10). This category of written determination refers to written determinations regarding uses that can be requested by land owners, pursuant to Section 2.03.01(D), which provides, "[a] property owner may request an interpretation to determine if a use that is not identified is permissible, based on substantial similarity of the requested use to permissible uses within the zoning district in which the property is located." Again, RYAM never requested such a letter, therefore, Section 11.07.01(B)(10), does not grant the Board of Adjustment authority to hear an appeal over the City Manager's letter.

253.    The Board of Adjustment has no power to consider legal opinions issued by a private law firm before an application has even been received and which have been identified as "binding" by the City Attorney – such an act is contemplated nowhere in the LDC, either in the first instance or as a matter for quasi-judicial review. Therefore, the City Manager's letter

46

demanding that RYAM submit its appeal to the Board of Adjustment is *ultra vires*. In fact, the City's Code provides no administrative process for the Board of Adjustment to consider the "binding" legal opinion of a private law firm.

254.    Based on the foregoing, RYAM is in doubt regarding its rights under the City's LDC as a site plan amendment applicant and a landowner within the City.  The dispute between the parties is real, actual, present, and adverse.

255.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

256.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application.

257.    Money damages alone will not make RYAM whole for the City's unwarranted refusal to process its application.

258.    The public interest is served by an order requiring the City to refer the application for substantive review by the TRC so that a record can be developed upon which full code compliance can be adequately evaluated.

259.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the Weiss Serota Memorandum is not binding on the City; that the Board of Adjustment process is inapplicable to the  City's decisions that were based on the Weiss Serota Memorandum; that the Court order the City to refer RYAM's application to the TRC for review and a compliance report;

and that the City award RYAM monetary damages and other such supplemental relief as the Court

deems appropriate.

## COUNT V – DECLARATORY JUDGMENT
## (BOARD OF ADJUSTMENT – IMPARTIAL DECISIONMAKER AND *EX PARTE*
## COMMUNICATIONS)

260.    RYAM re-alleges paragraphs 1 through 203, as if fully set forth herein.

261.    This is an action for declaratory judgment, injunctive relief, and supplementary

relief in the form of monetary damages, pursuant to Chapter 86, Florida Statutes, regarding the *ex*

*parte* communication, bias, and prejudgment of Board of Adjustment members Len Kreger, Taina

Christner, and Kim Wolford.

262.    All conditions precedent have been satisfied or waived.

263.    As set forth above, multiple Board of Adjustment members are activists and

committed opponents of both RYAM and the Project. Len Krueger and Taina Christner serve as

members of an anti-RYAM nonprofit and have repeatedly made public and private statements

demonstrating bias and prejudgment against RYAM and the specific application that would form

the basis of RYAM's appeal should it be required to follow the process set forth by the City. While

less public in her opposition than Board Members Krueger and Christner, Board Member Alternate

Kim Wolford has also demonstrated bias against RYAM and its operations. Upon information and

belief, Board Members Krueger and Christner have spoken with each other and others about

RYAM's project and application and how to thwart its approval, representing prejudicial *ex parte*

communications with others opposed to RYAM's project.

264.    In *Jennings v. Dade County*, 589 So. 2d 1337 (Fla. 3d DCA 1991), the Third

District Court of Appeal acknowledged the constitutional violation represented by *ex parte*

communication. The Court further acknowledged that the procedural due process violation posed

48

by *ex parte* communication is not addressable through a petition for writ of certiorari because it is, by definition, incapable of inquiry through review of the record. Accordingly, the Court acknowledged the right to bring a claim in circuit court contesting the *ex parte* communications of quasi-judicial board members as due process violations.

265.    Likewise, federal and state case law has made clear that an impartial decision-maker is a minimum for due process. Decision-makers who have adopted a partisan role in the dispute that they are called upon to determine cannot meet the constitutional requirement for an impartial decision-maker.

266.    Here, Board of Adjustment members, Len Krueger and Taina Christner, through their public conduct have made clear that they have been working in concert with others, including City staff and officials, to quash the RYAM application before it was even filed. Similarly, Kim Wolford has publicly demonstrated bias against RYAM and its application. Thus, all three Board Members are incapable of serving on the Board of Adjustment if it is allowed to hear the decisions that effectively denied RYAM's site plan amendment application. It seems pretty clear that the activism of these three individuals may have been a driving factor in why they were placed on the Board of Adjustment in the first place, given their appointment in the same month as the RYAM application by a City Commission, members of which had publicly expressed an intention to stop RYAM's application process.

267.    The City has no published process allowing for the recusal of its Board of Adjustment members. Even if a recusal process existed, the Board of Adjustment could not legitimately hear RYAM's appeal, since appeals require five votes and there are only five full members and two alternates on the Board of Adjustment.

268.    Thus, RYAM is in doubt as to its procedural rights that any hearing in front of the Board of Adjustment on appeals related to RYAM's site plan amendment application be free of the taint of bias, prejudgment, and prejudicial *ex parte* communication.  The dispute between the parties on this point is real, actual, present, and adverse.

269.    RYAM is not bringing this claim for legal advice or out of curiosity and the harm caused by the City's misbehavior is the kind of harm the Court has the power to address.

270.    RYAM has no adequate remedy at law to address the City's misdeeds in this case and will be irreparably harmed in the quiet enjoyment of its property and its rights as a corporate citizen of the City to fair and equal treatment in the processing of its application. Money damages alone will not make RYAM whole for the City's unwarranted refusal to process its application.

271.    The public interest is served by an order acknowledging that the Board of Adjustment as convened by the City and under its procedures for voting, as set forth in the LDC, is not capable of holding a fair and impartial hearing on RYAM's appeal from the City Planning Director and City Manager's written determinations.

272.    The monetary damages RYAM has suffered as a result of the City's actions is in excess of $50,000.00.

WHEREFORE, RYAM respectfully requests that the Court issue an order declaring that the Len Krueger, Taina Christner, and Kim Wolford are not able to serve as impartial decision-makers on RYAM's site plan amendment application, due to their obvious prejudgment, bias, and upon information and belief prejudicial *ex parte* communications, declare that as a result the Board of Adjustment cannot convene consistent with the City's LDC and hold a fair and impartial hearing on RYAM's appeal of the City Manager and City Planning Director's letters, making such an appeal futile,  and awarding other such supplemental relief as the Court deems appropriate.

50

Respectfully submitted this 15th day of May, 2025.

*/s/ Frederick Aschauer*
FREDERICK L. ASCHAUER, JR., ESQ.
Florida Bar No. 357328
LEWIS, LONGMAN & WALKER, P.A.
106 E. College Ave., Suite 1500
Tallahassee, FL 32301
Telephone: (850) 222-5702
Primary Email: faschauer@llw-law.com
Secondary Email: jmelchior@llw-law.com
Secondary Email: mlozada@llw-law.com

BRENNA M. DURDEN, ESQ.
Florida Bar No. 518786
LEWIS, LONGMAN & WALKER, P.A.
245 Riverside Avenue, Suite 510
Jacksonville, FL 32202
Telephone: (904) 353-6410
Primary Email: bdurden@llw-law.com
Secondary Email: sreichard@llw-law.com

NICOLE J. POOT, ESQ.
Florida Bar No. 118858
LEWIS, LONGMAN & WALKER, P.A.
100 Second Ave South, Suite 501-S
St. Petersburg, FL 33701
Telephone:  (727) 245-0820
Primary Email: npoot@llw-law.com
Secondary Email:  jgabriel@llw-law.com

WHITNEY K. MCGUIRE, ESQ.
Florida Bar No. 0034984
Rayonier Performance Fibers, LLC
1301 Riverplace Blvd.
Jacksonville FL, 32207
Telephone: 904-549-7395
Email: whitney.mcguire@ryam.com
*Counsel for Plaintiff, Rayonier*
*Performance Fibers, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the

Florida Courts E-Filing Portal, which provides notice to the following counsel of record, on this

15th day of May, 2025 to:

MATTHEW H. MANDEL, ESQ.
Weiss Serota Helfman Cole & Bierman P.L.
200 E. Broward Blvd, Suite 1900
Ft. Lauderdale, FL 33301
(954) 763-4242
mmandel@wsh-law.com
lbrewley@wsh-law.com

HARRISON W. POOLE, ESQ.
City Attorney Pro Tem
City of Fernandina Beach
204 Ash Street
Fernandina Beach, Florida 32034
(904) 310-3277
hpoole@fbfl.city
*Counsel for Defendant City of Fernandina Beach, Florida*

/s/ *Frederick Aschauer*

FREDERICK L. ASCHAUER, JR., ESQ.
Florida Bar No. 357328

4922-0111-2643, v. 3